# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JERRELL WHITTEN, derivatively on behalf of FLEETCOR TECHNOLOGIES, INC., <br><br>         Plaintiff, <br><br>    v. <br><br> RONALD F. CLARKE; MICHAEL BUCKMAN; JOSEPH W. FARRELLY; THOMAS M. HAGERTY; MARK A. JOHNSON; RICHARD MACCHIA; JEFFREY S. SLOAN; STEVEN T. STULL; and ERIC R. DEY, <br><br>         Defendants, <br><br>    -and- <br><br> FLEETCOR TECHNOLOGIES, INC., a Delaware Corporation, <br><br>         Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> <u>JURY TRIAL DEMANDED</u> |

By and through his undersigned counsel, Plaintiff Jerrell Whitten ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant FleetCor Technologies, Inc. ("FleetCor" or the "Company") and against certain current and former officers and directors of the Company. Based on Defendants' (defined herein) misconduct from at least February 4, 2016 to the present (the "Relevant Period"), Plaintiff asserts claims on behalf of the Company for issuing a false and misleading proxy statement in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as violations of state law involving breaches of fiduciary duties—including the issuance of false and misleading public statements, and insider selling—as well as unjust enrichment. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by FleetCor and other related parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants; (c) review of news articles, shareholder communications, and postings on FleetCor's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending federal securities fraud class action,

*City of Sunrise General Employees' Retirement Plan v. FleetCor Technologies, Inc.,
et al.*, Case No. 1:17-cv-02207-LMM (N.D. Ga.) (the "Securities Class Action");
and (e) review of other publicly available information concerning FleetCor and the
Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.     This derivative action arises from Defendants' violations of federal and
state law in causing FleetCor to engage in fraudulent billing practices, dissemination
of misleading marketing materials, and predatory sales tactics, as well as by making
false and misleading statements and omissions regarding earnings, growth, and
business prospects and practices, which has cost FleetCor millions of dollars in
market capitalization and customer goodwill, and has subjected it to litigation for
violations of the federal securities laws.  During that same time, Defendants sold
***over $108 million*** of their personal holdings in the Company's stock at artificially
inflated prices.

2.     FleetCor is a global provider of workforce payments products,
headquartered in Norcross, Georgia.  The Company offers its products and services
to small businesses, as well as government and corporate clients, primarily including
fuel card payment product solutions, along with corporate payment products, toll
products, lodging cards, and gift cards.  A fuel card is essentially a credit card used

for the purchase of gasoline and diesel fuel at gas stations, which FleetCor provides ostensibly to allow fleet operators to save money when card users purchase gas. During the Relevant Period, FleetCor partnered with many well-known fleet operators, oil companies, and petroleum marketers, including Chevron/Texaco (the Company's largest U.S. customer during the Relevant Period), to develop and implement branded fuel card programs.  FleetCor generates 56% of its net revenue from such fee income.

3.      During the Relevant Period, Defendants caused the Company to issue false and misleading statements concerning the Company's business, operations, and compliance policies and practices.

4.      Specifically, Defendants made, or caused FleetCor to make, false and/or misleading statements, and/or failed to disclose: (i) that FleetCor lacked effective internal controls over financial reporting; (ii) that FleetCor purportedly clearly disclosed and discloses its fees to customers, and that its business is purportedly focused on helping employers control spending and save money; (iii) that the true sources of and reasons for FleetCor's earnings and growth was from its fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics, and not from investments in the Company's sales infrastructure, the conversion of new customers, and the performance of acquired

companies, among other things; and (iv) that as a result of the foregoing, FleetCor's public statements were materially false and misleading at all relevant times.

5.      Indeed, in reality, the Company's ostensible success was based on its fraudulent overcharging of customers, dissemination of misleading marketing materials, and reliance on predatory sales practices.  In addition, FleetCor's fees were not clearly disclosed in its contracts and, contrary to its representations to investors and customers, FleetCor's illicit business practices did not help fleet operators control spending or save money.

6.      Investors began learning the truth regarding FleetCor's improper practices through a series of corrective disclosures.  The first such disclosure came on December 19, 2016, when FleetCor's largest U.S. partner (Chevron/Texaco) announced it was terminating its 10-year relationship with the Company effective December 31, 2017, and signing a long-term contract with FleetCor's primary competitor, WEX, Inc. ("WEX").  On this news, the price of FleetCor stock declined from $148.04 per share on December 16, 2016, to $142.96 per share on December 19, 2016, or approximately 3%.

7.      Then, between March 1, 2017 and April 27, 2017, several published reports accused FleetCor of fraudulent billing practices, dissemination of misleading marketing materials, and/or predatory sales tactics.  Additionally, on May 1, 2017,

4

Chevron filed suit against FleetCor for breach of contract based, at least in part, on the Company's mistreatment of customers.  As a result of those events, FleetCor's stock plummeted nearly 23% in that two-month span, from $170.00 per share on February 28, 2017, to $131.26 per share on May 3, 2017.

8.     As a result of Defendants' conduct, FleetCor's common stock traded at artificially inflated levels during the Relevant Period.  Following the news that the Company had issued false and misleading financial statements, and that it was operating an unlawful business model, investors sold FleetCor stock in droves. Indeed, the Company's stock price plummet erased millions of dollars in market capitalization.

9.     Of course, not everyone was harmed by the Defendants' actions. Specifically, between May 10, 2016 and March 10, 2017, six Company insiders named as defendants in this action—including five Director Defendants (defined herein)—disposed of 685,720 shares of FleetCor stock at artificially inflated prices, reaping over $108 million in proceeds.

10.     FleetCor's Board of Directors (the "Board") has not, and will not, commence litigation against the Defendants named in this Complaint, let alone vigorously prosecute such claims, because the directors face a substantial likelihood of liability to FleetCor for authorizing and/or failing to correct the false and

misleading statements alleged herein, for their engagement in unlawful insider trading, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate FleetCor's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to FleetCor.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all claims pursuant to: (i) 28 U.S.C. § 1331, in that the Complaint states a federal question; and (ii) 28 U.S.C. § 1332(a), in that Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Georgia so as to render the exercise of jurisdiction by the Georgia courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

14.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.     Plaintiff

15.     Plaintiff Jerrell Whitten is a current shareholder of FleetCor common stock and has continuously held FleetCor common stock since January 2011. Plaintiff is a citizen of Illinois.

### B.     Nominal Defendant

16.     Nominal Defendant FleetCor is incorporated in Delaware, and the Company's principal executive offices are located at 5445 Triangle Parkway, Suite 400, Norcross, Georgia 30092-2575.  The Company's common stock is traded on The NASDAQ Stock Market under the ticker symbol "FLT."  The Company had more than 92 million shares outstanding as of the filing of this Complaint.

## C.    Defendants

17.    Defendant Ronald F. Clarke ("Clarke") has been the Company's President and Chief Executive Officer ("CEO") since August 2000, and Chairman of the Board since March 2003.  During the Relevant Period, Clarke was chairman of the Executive and Acquisitions Committee (the "E&A Committee").  Between May 10, 2016 and March 9, 2017, while in possession of material, adverse, non-public information, Clarke disposed of 633,617 shares of his personally-held FleetCor common stock for proceeds of $100,486,398.07, at artificially inflated prices.  Clarke is a defendant in the Securities Class Action.  FleetCor has conceded that Clarke is not an independent director.  Clarke received $29,378,063 in total compensation from FleetCor in 2016.  Clarke is a citizen of Georgia.

18.    Defendant Michael Buckman ("Buckman") has been a director of the Company since July 2013.  During the Relevant Period, Buckman was a member of the Audit Committee, as well as the Information Technology and Security Committee (the "ITS Committee").    Buckman received $242,877 in total compensation from FleetCor in 2016.  Buckman is a citizen of Arizona.

19.    Defendant Joseph W. Farrelly ("Farrelly") has been a director of the Company since April 2014.  During the Relevant Period, Farrelly was a member of the Compensation, Nominating and Corporate Governance Committee (the "CNCG

8

Committee"), as well as chairman of the ITS Committee.  On September 7, 2016, while in possession of material, adverse, non-public information, Farrelly disposed of 1,200 shares of his personally-held FleetCor common stock for proceeds of $202,476.12, at artificially inflated prices.  Farrelly received $292,877 in total compensation from FleetCor in 2016.  Farrelly is a citizen of Florida.

20.    Defendant Thomas M. Hagerty ("Hagerty") has been a director of the Company since November 2014.   During the Relevant Period, Hagerty was chairman of the CNCG Committee, as well as a member of the E&A Committee. On March 10, 2017, while in possession of material, adverse, non-public information, Hagerty disposed of 3,224 shares of his personally-held FleetCor common stock for proceeds of $518,869.59, at artificially inflated prices.  Hagerty received $242,877 in total compensation from FleetCor in 2016.  Hagerty is a citizen of Montana.

21.    Defendant Mark A. Johnson ("Johnson") has been a director of the Company since March 2003.  During the Relevant Period, Johnson was a member of the Audit Committee, as well as the E&A Committee.  On May 10, 2016, while in possession of material, adverse, non-public information, Johnson disposed of 20,000 shares of his personally-held FleetCor common stock for proceeds of

$3,036,064, at artificially inflated prices.  Johnson received $242,877 in total compensation from FleetCor in 2016.  Johnson is a citizen of Florida.

22.     Defendant Richard Macchia ("Macchia") has been a director of the Company since July 2010.  During the Relevant Period, Macchia was chairman and financial expert of the Audit Committee, as well as a member of the ITS Committee.  Between May 12, 2016 and March 9, 2017, while in possession of material, adverse, non-public information, Macchia disposed of 2,400 shares of his personally-held FleetCor common stock for proceeds of $374,051.64, at artificially inflated prices.  Macchia received $292,877 in total compensation from FleetCor in 2016.  Macchia is a citizen of Georgia.

23.     Defendant Jeffrey S. Sloan ("Sloan") has been a director of the Company since July 2013.  During the Relevant Period, Sloan was a member of the E&A Committee, as well as the ITS Committee.  Sloan received $242,877 in total compensation from FleetCor in 2016.  Sloan is a citizen of Georgia.

24.     Defendant Steven T. Stull ("Stull") has been a director of the Company since October 2000.  During the Relevant Period, Stull was a member of the CNCG Committee.  Stull received $242,877 in total compensation from FleetCor in 2016.  Stull is a citizen of Nevada.

25.    Defendant Eric R. Dey ("Dey") has been the Company's Chief Financial Officer ("CFO") since November 2002.   Between May 26, 2016 and March 8, 2017, while in possession of material, adverse, non-public information, Dey disposed of 25,279 shares of his personally-held FleetCor common stock for proceeds of $4,169,154.92, at artificially inflated prices.  Dey is a defendant in the Securities Class Action.   Dey received $1,525,877 in total compensation from FleetCor in 2016.  Dey is a citizen of Georgia.

**D.    Party Definitions**

26.    Defendants Clarke, Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, Stull, and Dey are sometimes referred to collectively herein as "Defendants."

27.    Defendants Clarke, Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull are sometimes referred to collectively herein as the "Director Defendants."

28.    Defendants Buckman, Johnson, and Macchia are sometimes referred to collectively herein as the "Audit Committee Defendants."

29.    Defendants Clarke, Farrelly, Hagerty, Johnson, Macchia, and Dey are sometimes referred to collectively herein as the "Insider Selling Defendants."

## COMPANY BACKGROUND

30.    FleetCor presents itself as a fuel-card company that services small businesses, as well as government and corporate clients, both nationwide and globally.  A fuel card is essentially a credit card used most commonly for the purchase of gasoline and diesel fuel at gas stations.

31.    FleetCor provides fuel cards to different businesses, ostensibly to allow them to increase savings at gas stations, limit expenses, control spending, and minimize unauthorized transactions and billing through the receipt of real-time transaction information.  In addition to small businesses and government clients, the Company's partners also include many large corporate clients including Chevron/Texaco (the Company's largest partner in the U.S.), MasterCard, Shell, BP, Speedway, and ARCO.

32.    According to investment firm Citron Research, most card issuers earn an average of 10% of their net revenue from fees, but FleetCor generates 56% of its net revenue from fees.  Indeed, FleetCor's primary competitor (WEX) generates just 12% of its net revenue from fees.  Synchrony Financial, which serves a lower credit quality customer than FleetCor and facilitates purchases of discretionary items— thus warranting increased fees—earns roughly 18% of its net revenue from fees. And Visa earns just 3% of its net revenue from fees.

33.     According to a report issued by Credit Suisse, roughly 55% of the fees FleetCor charges are "transaction fees," which include out of network charges, minimum use charges, and credit-based fees tied to credit score.  The Company also provides programs that are initially free, but then begin to incur fees after a promotional period expires.  The Company derives the remaining 45% of its fees from "late/financing fees," which include penalties that equate to a percentage of the outstanding balance assessed every billing cycle (around 10%) and an interest component comparable to credit card rates in the mid-20% range.

## FACTUAL ALLEGATIONS

34.     On February 4, 2016, Defendants caused FleetCor to announce that it generated $430.6 million in revenue for the fourth quarter of fiscal year 2015 ("Q4 2015")—an increase of 14% over the prior year.  For fiscal year 2015, the Company reported $1.7 billion in total revenue, a 42% increase over the prior year. On FleetCor's February 5, 2016 earnings conference call for Q4 and fiscal year 2015, Defendant Clarke caused the Company to state that its results were driven by strong organic growth, including 43% growth in FleetCor's MasterCard business, strength in several other FleetCor business areas, and the conversion of many new customers.

35.     Similarly, on the February 4, 2016 earnings conference call, Defendant Dey caused the Company to announce that its Q4 2015 results were driven by "increases in both transactions and revenue per transaction measured on a constant fuel price basis," organic growth, as well as the "exceptional performance of our MasterCard product, which had estimated revenue growth of approximately 43% over the fourth quarter of 2014 . . . driven by increases in both transactions and revenue per transaction."

36.     When explaining the reasons for the growth in FleetCor's MasterCard business, Defendant Clarke caused the Company to intimate that while "we did put some fees in [] the clients are enjoying a much lower absolute bill from us.  I think we continue to say . . . it's not opportunity limited.  It's really investment and execution limited."

37.     The above statements and omissions were materially false and misleading.  As was later revealed, FleetCor's reported results were actually predicated, in substantial part, on the improper overcharging and misleading of its customers.  FleetCor developed an algorithm that classified customers into a color-based scheme depending on the amount of unwarranted fees that FleetCor could charge each customer.  FleetCor's customers were not enjoying a lower absolute bill from FleetCor, as those bills were inflated with extra fees and the Company's

opportunity for growth was limited in that it was contingent on FleetCor's continued mistreatment of customers.

38.     On February 29, 2016, FleetCor filed its Annual Report for 2015 on Form 10-K with the SEC (the "2015 10-K").  Defendant Clarke signed the Annual Report in his capacity as CEO and Chairman of FleetCor's Board of Directors. Defendant Dey signed the Annual Report in his capacity as the Company's CFO. The 2015 10-K was also signed by each Defendant in his or her capacity as director and/or executive of FleetCor.

39.     In the 2015 10-K, Defendants caused the Company to attribute its "leading industry position" to FleetCor's "size and scale, geographic reach, advanced technology and our expansive suite of products."  Defendants also caused the Company to represent in the Annual Report for 2015 that FleetCor retains customers by means of the Company's professional and dedicated call centers that "adher[e] to industry standard service levels" as well as "regular customer surveys to ensure customers are satisfied with our products and services."

40.     The above statements and omissions were materially false and misleading.  As was later revealed, the Company's ostensible success was based on its fraudulent billing practices, dissemination of misleading marketing materials, and reliance on predatory sales tactics.  The Company did not adhere to industry

standards with regard to customer service, and the Company's practices severely undermined customer satisfaction.

41.   On April 26, 2016, Defendants caused FleetCor to file a Proxy Statement pursuant to Section 14(a) of the Exchange Act (the "2016 Proxy").  The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election.  However, the 2016 Proxy misrepresented and/or failed to disclose: (i) that FleetCor lacked effective internal controls over financial reporting; (ii) that FleetCor purportedly clearly disclosed and discloses its fees to customers, and that its business is purportedly focused on helping employers control spending and save money; (iii) that the true sources of and reasons for FleetCor's earnings and growth was from its fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics, and not from investments in the Company's sales infrastructure, the conversion of new customers, and the performance of acquired companies, among other things; and (iv) that as a result of the foregoing, FleetCor's public statements were materially false and misleading at all relevant times.

42.   The 2016 Proxy also stated that based on the Company's "performance," the Company awarded its named executive officers more than $17.2 million in stock awards in 2015, including $9,261,021 in stock awards just to

Defendants Clarke and Dey.  The 2016 Proxy omitted material information concerning the Company's true performance, and did not disclose the Company's inadequate internal controls that led to the Board approving compensation awards based on inflated levels of performance during a time in which Defendants were in breach of the fiduciary duties owed to the Company and its shareholders.

43.     On August 4, 2016, the Company held its earnings conference call for the second quarter of fiscal year 2016 ("Q2 2016").  For the quarter, the Company generated revenue of $418 million, an increase of 3% compared to the $405 million that FleetCor generated over the prior year.  On the conference call, Defendant Clarke stated that the Company's results were driven by an improving macroeconomic environment, strong new bookings—growing 18% over the prior year—as well as new business development efforts and organic growth.

44.     According to Defendant Dey, FleetCor's performance for Q2 2016 was driven by strong organic growth in the Company's North American segment and 27% revenue growth in FleetCor's MasterCard business.   Defendant Clarke attributed the growth in FleetCor's MasterCard business, and the Company's business generally, to "sales investment."  With regard to the success of FleetCor's MasterCard product, Defendant Clarke stated, "there's a product for everybody, little accounts with five cars like it because it is convenient.  Giant accounts because

it works everywhere, and it's controlled. . . .  [Y]ou can sell it in every geography, to every segment, and so I guess we like the prospects of double-digit, for as long as we can see, assuming we can keep investing enough in sales, as the base keeps getting bigger."

45.     The above statements and omissions were materially false and misleading.  As was later revealed, FleetCor's results and growth were actually driven by the assessment of improper fees to numerous customers, and misleading customers with regard to the level of fees they would be charged, as opposed to sales investment.  Upon learning of FleetCor's illicit billing and marketing practices, many of its customers complained and terminated their relationships with the Company.  This includes Chevron/Texaco, one of FleetCor's most important partners, as discussed below.

46.     On November 1, 2016, FleetCor held its earnings conference call for the third quarter of fiscal year 2016 ("Q3 2016").  For the quarter, the Company announced that it generated revenue of $484 million, an increase of 7% compared to the $451 million that FleetCor earned over the prior year.  On the conference call, Defendant Clarke stated that the Company's results were driven by three factors— "[o]rganic revenue growth, [an] acquisition, and tax favorability."  According to Defendant Clarke, the Company experienced "some really good sales performance .

18

. . a number of our businesses grew new sales in excess of 50% in the quarter." Defendant Clarke also told investors that the Company's MasterCard division performed exceptionally well, growing 28% over the prior year.

47.    Defendant Dey similarly stated that for the Company's North American segment, "most of our lines of business performed well resulting in approximately 9% organic growth . . . .  Many of the positive drivers in North America during the quarter were similar to the last several quarters including our MasterCard product which had revenue growth of approximately 28% over the third quarter of 2015."

48.    The above statements and omissions were materially false and misleading.  As was later revealed, the Company's performance was actually driven by FleetCor's imposition of excessive fees on customers that were either unaware of the charges or paid the charges rather than dispute them with the Company.  The dissemination of misleading marketing materials that understated the level of fees customers would be charged also drove FleetCor's performance.

49.    In addition, the Company stated on its website throughout the Relevant Period that its business is focused on "help[ing] employers control spending and save money," and that FleetCor clients "[p]ay no fees–no set-up fees, transaction fees, card fees or annual fees."

19

50.   The above statements and omissions were materially false and misleading.  In truth, FleetCor's business model was not focused on helping its clients control spending or save money, but rather, was directed to assess the maximum amount of unauthorized fees without customers noticing.  The Company's customers paid substantial fees to FleetCor and the "no-fee" statements in the Company's marketing materials were not based in fact.

## REASONS STATEMENTS WERE IMPROPER

51.   The true facts, which were known or recklessly disregarded by Defendants, but were concealed from the investing public, were as follows:

(a)    that FleetCor lacked effective internal financial controls over financial reporting;

(b)    that FleetCor did not clearly disclose its fees to customers, nor did it disclose that its business is not focused on helping employers control spending or save money;

(c)    that the true sources of, and reasons for, FleetCor's earnings and growth were its fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics—rather than the success factors attributed to the Company such as investments in the

Company's sales infrastructure, the conversion of new customers, and the performance of acquired companies, among other things; and

(d)    that as a result of the foregoing, FleetCor's public statements were materially false and misleading at all relevant times.

52.    As a result of Defendants' false and misleading statements and omissions, FleetCor shares traded at artificially inflated prices during the Relevant Period.  Once the true facts were revealed regarding the Company's inadequate internal controls over financial reporting, its fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics, as well as its true growth and business prospects, investors sold FleetCor stock in droves, causing the Company's stock price to plummet nearly 23%, from approximately $170.00 on February 28, 2017, to $131.26 per share on May 3, 2017, erasing millions of dollars in market capitalization.

**THE TRUTH BEGINS TO EMERGE**

53.    On December 19, 2016, Chevron/Texaco—FleetCor's largest U.S. customer—announced that it was terminating its relationship with the Company and signing a long-term contract with FleetCor's main competitor, WEX.  On this news, the price of FleetCor stock declined from $148.04 per share on December 16, 2016, to $142.96 per share on December 19, 2016, or approximately 3%.

54.     On February 8, 2017, FleetCor held its earnings conference call for the fourth quarter of fiscal year 2016 ("Q4 2016").  On the call, the Company reported revenue of $515 million, an increase of 20% over the prior year.  According to Defendant Clarke, FleetCor benefitted in Q4 2016 from healthy sales growth across the Company's entire portfolio, as well as increased new sales bookings as compared to the prior quarter.  Defendant Clarke also represented that the Company "advanced a number of things that should accelerate our performance going forward," including adding more management and technological depth, testing a number of new product ideas, and simplifying FleetCor's technological footprint.

55.     Similarly, Defendant Dey told investors that the Company's strong performance in North America was driven by factors "similar to the last several quarters, including our MasterCard product, which had revenue growth of approximately 16% over the fourth-quarter of 2015," and that FleetCor's organic growth rate will continue to increase.

56.     With regard to the Chevron contract, Defendant Clarke simply stated that the Company was "disappointed with Chevron that they've decided to move on after 10 years with us.  But we will help them transition to their new supplier." Defendant Clarke also stated that "we continue to believe there's still lots of opportunity in front of us.  And we believe we can double FleetCor again."

57.    The above statements and omissions were materially false and misleading.  In truth, the Company's success was based in significant part on its fraudulent overcharging of customers, dissemination of misleading marketing materials, and reliance on abusive sales practices.  FleetCor also concealed that Chevron terminated its relationship with the Company, at least in part, because of similar conduct.

58.    On March 1, 2017, FleetCor filed its Annual Report for 2016 on Form 10-K with the SEC (the "2016 10-K").  Defendant Clarke signed the Annual Report in his capacity as CEO and Chairman of FleetCor's Board of Directors. Defendant Dey signed the Annual Report in his capacity as the Company's CFO. The 2016 10-K was also signed by each Defendant in his or her capacity as director and/or executive of FleetCor.

59.    In the 2016 10-K, Defendants once again caused the Company to attribute its "leading industry position" to FleetCor's "size and scale, geographic reach, advanced technology and our expansive suite of products."  Defendants also caused the Company to represent in the 2016 10-K that FleetCor retains customers by means of the Company's professional and dedicated call centers that "adher[e] to industry standard service levels" as well as "regular customer surveys to ensure customers are satisfied with our products and services."

60.    The above statements and omissions were materially false and misleading.  As was later revealed, the Company's ostensible success was based on its fraudulent billing practices, dissemination of misleading marketing materials, and reliance on predatory sales tactics.  The Company did not adhere to industry standards with regard to customer service, and the Company's practices severely undermined customer satisfaction.

61.    Also on March 1, 2017, Capitol Forum—an investigative news and legal analysis company—published an article titled "FleetCor: Sales and Billing Practices Raise Questions Regarding the Legitimacy of FleetCor's Fee-Based Income."  Based on interviews with "seven former FleetCor employees as well as nine current and former FleetCor customers" and the review of "complaints filed with state and federal regulators, online complaints, and filings from various litigation proceedings," Capitol Forum described how FleetCor routinely imposes a "myriad of unwarranted fees on customers and that such fees are generally only removed in instances where customers are both persistent and vocal in raising objections."

62.    Indeed, according to Capitol Forum's March 1, 2017 report, FleetCor's business model "relies in large part on customers being unaware that they are being overcharged . . . [and] achieve[s] this objective by: (1) understating or

24

misrepresenting the fees associated with its products at the point of sale; (2) waiving fees during the first three months of card use when customers are most likely to carefully scrutinize their bills; and (3) burying fees at the end of lengthy transaction reports utilizing a host of vague descriptors."   In fact, the Company's sales representatives were trained to describe FleetCor's cards as a "free service" and to use the "absence of fees [] as a selling point to differentiate FleetCor from its competitors."

63.    According to Capitol Forum's March 1, 2017 article, FleetCor further supplements its fee revenue with late fees through the use of a bill payment system that makes it "extremely difficult, if not impossible, for customers to make timely payments."  And even if "customers pay on time, they are still assessed late fees."

64.    According to one former employee interviewed by Capitol Forum, "[o]ne customer paid by sending a check overnight by FedEx to make sure it got there way before the due date. . . .  [A]ccounting always cashed the check the day after it was due."

65.    In response to Capitol Forum's article, FleetCor attempted to assure investors on March 1, 2017, that "[a]ll fees are disclosed clearly in our contracts" and that "General Contract Terms and Conditions are provided with the customer welcome package before the customer is able to fuel."   Notwithstanding the

Company's assurances, the price of Company's stock declined from $170.00 per share on February 28, 2017, to $164.75 per share on March 1, 2017, or approximately 3%.

66.     On April 4, 2017, an investment firm, Citron Research, published a report that similarly accused FleetCor of being a "predatory company by design, whose core strategy is to methodically rip off its customers, using business practices and fees that are designed to deceive."  Like Capitol Forum's article, Citron's publication relied on extensive research from "numerous customer, competitor and former employee interviews . . . gathering of customer invoices . . . FOIA requests, and financial modeling," among other things.

67.     Significantly, Citron's April 4, 2017 report specifically attributed Chevron's shift from FleetCor to WEX to the Company's "aggressive and egregious" business practices, and that "Chevron could not afford to associate its corporate name with such a pernicious institutional 'rip off' of their long-time customers."  Citron's report also summarized a number of recent customer complaints, including one that stated that "[t]his company is not a fuel charge card, but rather a FEES charge card.  They will eat you ALIVE in fees.  My experience has been that it is impossible to pay the bill to them (on time) without getting a $75.00 late fee.  After doing some research I have found many, many, many, many

people with the exact same complaint(s) . . . .  This is border-line criminal."  In response to the Citron report, the price of the Company's stock declined from $150.15 per share on April 3, 2017, to $141.60 per share on April 4, 2017, or approximately 6%.

68.    On April 27, 2017, Citron issued a follow-up report on FleetCor that described, among other things, how FleetCor "developed a deep learning algorithm to intentionally cheat its customers with 'junk' fees."  Specifically, Citron explained how FleetCor fits its customers "into a profile / classification based on how many fees can be extracted without complaints.  FleetCor classifies 'Red,' 'Yellow' and 'Green' customers based on its internal algorithmic analysis of how vulnerable the customers are to this type of gouging without detecting it or complaining."

69.    Citron also described in its April 27, 2017 report how the Company is in full "cover-up mode" after Capitol Forum's and Citron's publications, having removed the "no-fee" language from FleetCor's website that markets to government agencies.  According to Citron, the marketing change "could be the sign of either: Impending Government Probe of their Fees[;] Attorney General Investigations[; or] FTC Inquiry/Investigation into deceptive marketing."  As Citron stated, "[t]he question to ask yourself is: If FleetCor is willing to deceive its ***own government***

*agency customers*,[1] imagine what they are willing to do to mom and pop business customers . . . . [F]ederal and state attorneys general will be laser-focused on the computer system operating at FleetCor, which pro-actively discriminates against their own customers."

70.    Expanding on Citron's research in an interview with *Benzinga*, an online financial media outlet, Citron's founder, Andrew Left, stated on April 27, 2017 that "[i]n my opinion, through the interviews, through the analysis that this is something completely contrived by management.  This isn't by chance, this isn't just a few rogue employees jimmyjacking the system.  This is a company that said we found ways to do this to circumvent the system with fine print and in their mind still be legal and compliant.  They keep pushing the envelope to the point where it's not compliant anymore, and that's what I believe."  In the wake of Citron's and Capitol Forum's reporting, FleetCor hired a law firm to review the Company's fee practices.  The disclosure of Citron's follow-up report caused the price of the Company's stock to decline from $151.38 per share on April 26, 2017, to $145.65 per share on April 27, 2017, or approximately 4%.

71.    On May 1, 2017, Chevron sued FleetCor in Texas State court for breach of contract.  According to Chevron's complaint, FleetCor is wrongfully denying

---

[1] Emphasis in original.  Except as otherwise noted, all emphasis herein is added.

Chevron access to Chevron's fuel card portfolio, including "basic revenue and expense data," which is necessary to transition the business to WEX.  The filing of Chevron's complaint, which was not widely reported, caused the price of the Company's stock to decline from $148.18 per share on May 1, 2017, to $138.00 per share on May 2, 2017, or approximately 7%.

72.     Then, on May 3, 2017, Citron and *Benzinga* reported on the filing of Chevron's lawsuit.  According to Citron, Chevron's suit indicates that Chevron terminated its contract with FleetCor due the Company's mistreatment of customers. On this news, the price of the Company's stock dropped from $138.00 per share on May 2, 2017, to $131.26 per share on May 3, 2017, approximately 5%.

## CERTAIN INSIDERS SELL PERSONAL HOLDINGS OF COMPANY STOCK AT INFLATED PRICES

73.     Certain Defendants personally profited from the Company's artificially-inflated stock price by selling their holdings of FleetCor stock at bloated prices based on inside information, in violation of their fiduciary duties. Specifically, between May 10, 2016 and March 31, 2015, a majority of the Director Defendants (Clarke, Farrelly, Hagerty, Johnson, and Macchia), along with Defendant Dey, liquidated significant holdings of FleetCor stock.  In the aggregate, these Defendants sold 685,720 shares ***for proceeds of over $108 million***.

74.    During that same time period, the Director Defendants caused the Company to repurchase 1,670,311 of its own shares for a staggering cost of approximately $240,100,000.   In other words, *over 45 percent of all shares repurchased by the Company were essentially acquired from the Insider Selling Defendants*.

75.    Throughout the period of insider selling, the Insider Selling Defendants (a group which includes *a majority* of the Director Defendants) specifically *timed* their sales of Company stock to *coincide* with the beginning of the Company's repurchase program initiated by Defendants on February 4, 2016.  Indeed, a strong majority of the Board (67%) did not sell *any* personal holdings of FleetCor stock in the year preceding the repurchase program.  Only three directors (Macchia, Johnson, and Stull) sold any of their personal holdings in FleetCor stock in the 13 months prior to the Repurchase Program, selling only 36,335 combined shares for $5,601,318.18 in proceeds.  Yet, in the same span of time following the authorization of the Repurchase Program, from February 4, 2016 through March 10, 2017, five directors (Clarke, Farrelly, Hagerty, Johnson, and Macchia), i.e., a majority of the Board, combined to unload 660,441 personally-held shares of FleetCor stock for a

staggering **_$104,617,859.43_** in proceeds.[2]   Thus, the amount of personal stock holdings sold by directors prior to the Repurchase Program pales in comparison to the amount sold since Defendants artificially inflated the Company's stock price by issuing false and misleading statements, and authorizing and executing the Repurchase Program.   The sales made by each of the Insider Selling Defendants are illustrated in the following chart:

| Sales by Insider Selling Defendants During Relevant Period | | | | | |
|---|---|---|---|---|---|
| **Defendant** | **Date** | **Shares Sold** | **Share Price** | **Proceeds** | **Percentage of Portfolio Sold** |
| Clarke | 05/10/2016 | 290,000 | $150.4200 | $43,621,800.00 | 39.22% |
| | 09/06/2016 | 100,000 | $166.7265 | $16,672,650.00 | 22.26% |
| | 09/07/2016 | 63,617 | $168.1513 | $10,697,281.25 | 18.21% |
| | 09/08/2016 | 80,000 | $167.5479 | $13,403,832.00 | 28.00% |
| | 03/08/2017 | 12,116 | $162.5480 | $1,969,431.57 | 03.81% |
| | 03/09/2017 | 87,884 | $160.6823 | $14,121,403.25 | 22.33% |
| Farrelly | 09/07/2016 | 1,200 | $168.7301 | $202,476.12 | 27.12% |
| Hagerty | 03/10/2017 | 3,224 | $160.9397 | $518,869.59 | 65.92% |
| Johnson | 05/10/2016 | 20,000 | $151.8032 | $3,036,064.00 | 16.69% |
| Macchia | 05/12/2016 | 1,200 | $151.1922 | $181,430.64 | 09.60% |
| | 030/9/2017 | 1,200 | $160.5175 | $192,621.00 | 09.25% |
| Dey | 05/26/2016 | 2,310 | $149.8330 | $346,114.23 | 30.72% |
| | 09/06/2016 | 21,969 | $166.6230 | $3,660,540.69 | 69.69% |
| | 03/08/2017 | 1,000 | $162.5000 | $162,500.00 | 12.35% |
| **TOTAL** | | 685,720 | $158.6464 | $108,787,014.34 | |

---

[2] These figures refer to insider sales made by directors and thus exclude insider sales made by Defendant Dey, who although an Insider Selling Defendant, was an executive (CFO) rather than a director.

76.     Throughout the period of insider selling, the Insider Selling Defendants sold their personal holdings of Company stock as follows:

(a)     During Q2 2016—at a time when Defendants were causing the Company to repurchase 191,291 shares of its stock for a total value of $26 million—the following Insider Selling Defendants sold in excess of a combined $47 million in personal stock holdings at artificially inflated prices:

i.      On May 10, 2016, Defendant Clarke sold 290,000 shares (39.22% of his FleetCor holdings) at $150.4200 per share, for total proceeds of $43,621,800.

ii.     That same day, on May 10, 2016, Defendant Johnson sold 20,000 shares (16.69% of his FleetCor holdings) at $151.8032 per share, for total proceeds of $3,036,064.

iii.    Just two days later, on May 12, 2016, Defendant Macchia sold 1,200 shares (9.60% of his FleetCor holdings) at $151.1922 per share, for total proceeds of $181,430.64.

iv.     Shortly thereafter, on May 26, 2016, Defendant Dey sold 2,310 shares (30.72% of his FleetCor holdings) at $149.8330 per share, for total proceeds of $346,114.23.

(b)     During Q3 2016—at a time when Defendants were causing the Company to repurchase 67,854 shares of its stock for a total value of $9.5 million—the following Insider Selling Defendants sold in excess of a combined $44 million in personal stock holdings at artificially inflated prices:

i.      On September 6, 2016, Defendant Clarke sold 100,000 shares (22.26% of his FleetCor holdings) at $166.7265 per share, for total proceeds of $16,672,650.  The following day, on September 7, 2016, Clarke sold another 63,617 shares (18.21% of his FleetCor holdings) at $168.1513 per share, for total proceeds of $10,697,281.25.  Then, once more, on September 8, 2016, Clarke unloaded 80,000 more shares (28.00% of his FleetCor holdings) at $167.5479 per share, for total proceeds of $13,403,832.

ii.     The same day that Defendant Clarke initiated his Q3 2016 fire sale of FleetCor stock, on September 6, 2016, Defendant Dey followed suit, selling 21,969 shares (69.69% of his FleetCor holdings) at $166.6230 per share, for total proceeds of $3,660,540.69.

iii.    Likewise, on September 7, 2016, Defendant Farrelly sold 1,200 shares (27.12% of his FleetCor holdings) at $168.7301 per share, for total proceeds of $202,476.12.

33

(c)      During Q4 2016, Defendants caused the Company to make its largest repurchase of FleetCor stock of any quarter since the Repurchase Program began, buying back 1,000,000 shares of its stock for a total value of over $152 million.  While that massive repurchase was artificially inflating the Company's stock price, during the first quarter of fiscal year 2017 ("Q1 2017"), the following Insider Selling Defendants sold in excess of a combined $16 million in personal stock holdings at artificially inflated prices:

i.      On March 8, 2017, Defendant Clarke sold 12,116 shares (3.81% of his FleetCor holdings) at $162.5480 per share, for total proceeds of $1,969,431.57.  The following day, on March 9, 2017, Clarke sold another 87,884 shares (22.33% of his FleetCor holdings) at $160.6823 per share, for total proceeds of $14,121,403.25.

ii.      As occurred in Q3 2016, the same day that Defendant Clarke initiated his Q1 2017 fire sale of FleetCor stock, on March 8, 2017 Defendant Dey followed suit, selling 1,000 shares (12.35% of his FleetCor holdings) at $162.5000 per share, for total proceeds of $162,500.

iii.     The following day, on March 9, 2017, Defendant Macchia

likewise sold 1,200 shares (9.25% of his FleetCor holdings) at

$160.5175 per share, for total proceeds of $192,621.

iv.     Finally, on March 10, 2017, Defendant Hagerty made the

most recent illicit insider sale, unloading 3,224 shares (65.92% of his

FleetCor holdings) at $160.9397 per share, for total proceeds of

$518,869.59.

The Insider Selling Defendants' sales during the Relevant Period are broken

down by fiscal quarter in the following chart:

| Insider Selling Defendants' Sales by Quarter | | | | | |
|---|---|---|---|---|---|
| | **1Q16** | **2Q16** | **3Q16** | **4Q16** | **2016** |
| Shares Sold | 0 | 313,510 | 266,786 | 0 | 580,296 |
| Average Price per Share | $0.00 | $150.5069 | $167.3131 | $0 | $158.2334 |
| Total Aggregate Gain to Directors | $0 | $47,185,408.87 | $44,636,780.06 | $0 | $91,822,188.93 |
| | **1Q17** | **2Q17** | **2017** | | **TOTAL** |
| Shares Sold | 105,424 | 0 | 105,424 | | 685,720 |
| Average Price per Share | $160.9199 | $0 | $160.9199 | | $158.6464 |
| Total Aggregate Gain to Directors | $16,964,825.41 | $0 | $16,964,825.41 | | $108,787,014.34 |

77.    In total, the Insider Selling Defendants (including *a majority* of the Director Defendants)—all fully aware of the unlawful basis driving the Company's stock to highly inflated levels—sold 685,720 shares of their personal holdings of FleetCor stock, at an average price of $158.6464 per share, for total proceeds of $108,787,014.34.   These insider sales were executed under highly suspicious circumstances, in that they occurred *both*: (a) while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein; *and* (b) during the precise time periods that these Defendants had caused the Company to itself repurchase $240,100,000 worth of its own stock at an average price of $143.7500 per share, thereby further propping up that Company's stock price allowing these Defendants to receive the highest price possible for their shares.

78.    Moreover, because of their roles as directors and/or officers of FleetCor during the Relevant Period, Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of FleetCor, including, *inter alia*, that FleetCor's pervasive and illicit fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics, as well as false and misleading statements and omissions made regarding the same, caused the price of its stock to trade at artificially inflated prices at the same time these Insider Selling

Defendants were disposing of millions of dollars worth of Company stock. The fact that the Company was repurchasing hundreds of millions of dollars of its own stock during that same time period further buoyed the Company's stock price, to the benefit of the Insider Selling Defendants. These Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning FleetCor's business, finances, and prospects, but they egregiously violated this duty.

## DUTIES OF THE DEFENDANTS

**Fiduciary Duties**

79.    By reason of their positions as officers, directors, and/or fiduciaries of FleetCor, and because of their ability to control the business and corporate affairs of FleetCor, Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FleetCor in a fair, just, honest, and equitable manner. Defendants were, and are, required to act in furtherance of the best interests of FleetCor and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

80.    Each director and officer of the Company owes to FleetCor and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

81.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects and practices so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

82.     In addition to these duties, the members of the Audit Committee owed specific duties to FleetCor under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

83.     Specifically, according to FleetCor's Audit Committee Charter, the purpose of the Audit Committee is:

(a)     to assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's independent auditors, and (v) the qualifications and performance of the Company's internal audit function, including if that service is outsourced; and

(b)   to prepare the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

84.   Further, the Audit Committee is required to evaluate its performance on an annual basis, including an evaluation of the "performance [] of the Committee, which evaluation will compare the performance of the Committee with the requirements of [the Audit Committee] charter."

85.   In more detail, the Audit Committee Charter provides that, *inter alia*, Audit Committee members share the following duties and responsibilities:

(a)   To meet with the independent auditors, the Company's management, the internal auditors, and such other personnel as it deems appropriate and discuss such matters as it considers appropriate, including the matters referred to below. The Committee must meet separately with management, the independent auditors, and the internal auditors periodically.

(b)   To decide whether to appoint, retain, or terminate the Company's independent auditors, including sole authority to approve all audit engagement fees and terms and to pre-approve all audit and permitted non-audit services to be provided by the independent auditors, which shall report directly to the Committee. The Committee will monitor and evaluate the auditors' qualifications, performance, and independence on an ongoing basis, and will oversee the work of the independent auditors (including resolving disagreements between management and the auditor regarding financial reporting). In conducting such evaluations, the Committee will:

(i).   At least annually, obtain and review a report by the independent auditors describing: (a) the auditors' internal

quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the auditors, and any steps taken to deal with any such issues; and (c) (to assess the auditors' independence) all relationships between the independent auditors and the Company (including information the Company determines is required to be disclosed in the Company's proxy statement as to services for audit and non-audit services provided to the Company and those disclosures required by Independence Standards Board Standard No. 1, as it may be modified or supplemented).

(ii). Discuss with the independent auditors any disclosed relationships or services that may impact the objectivity or independence of the independent auditors.

(iii). Review and evaluate the qualifications, performance, and independence of the lead partner of the independent auditors.

(iv). Take into account the opinions of management and the internal auditors.

(v). Discuss with management the timing and process for implementing the rotation of the lead audit partner, the concurring partner, and any other active audit engagement team partner and consider whether there should be a regular rotation of the audit firm itself. The Committee will present its conclusions with respect to the independent auditors to the Board for its information at least annually.

(c) Periodically, normally on an annual basis, discuss with the independent auditors any material written communications between the independent auditors and management, such as any "management" letter or schedule of unadjusted differences.

(d)     Meet to review and discuss with management and the
        independent auditors the Company's annual audited financial
        statements and quarterly financial statements, including
        the Company's disclosures under "Management's Discussion and
        Analysis of Financial Condition and Results of Operations".  The
        Committee will discuss, as applicable: (a) major issues regarding
        accounting principles and financial statement presentations,
        including any significant changes in the Company's selection or
        application of accounting principles; (b) analyses prepared by
        management and/or the independent auditors setting forth
        significant financial reporting issues and judgments made in
        connection with the preparation of the financial statements,
        including analyses of the effects of alternative GAAP methods
        on the financial statements; and (c) the effect of regulatory and
        accounting initiatives, as well as off-balance sheet structures, on
        the financial statements of the Company.  Discuss with the
        Company's General Counsel any significant legal, compliance,
        or regulatory matters that may have a material impact on the
        Company's business, financial statements, or compliance
        policies.

(e)     To obtain assurance from the independent auditors that the audit
        of the Company's financial statements was conducted in a
        manner consistent with Section 10A of the Securities Exchange
        Act of 1934, as amended, which sets forth certain procedures to
        be followed in any audit of financial statements required under
        that Act.

(f)     Meet with management, internal auditors and independent
        auditors to discuss the Company's system of internal controls
        over financial reporting.  This will include a review of
        disclosures made by the CEO, CFO and independent auditors in
        connection with the certification of the Company's quarterly and
        annual reports of (i) all significant deficiencies and material
        weaknesses in the design or operation of internal controls over
        financial reporting which are reasonably likely to adversely
        affect the Company's ability to record, process, summarize and
        report financial data and (ii) any fraud, whether or not material,

41

that involves management or other employees who have a significant role in the Company's internal controls. The Committee will discuss, as applicable, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

(g)     To discuss with the independent auditors on at least an annual basis the matters required to be discussed by Statement of Auditing Standards No. 114, as it may be modified or supplemented, as well as any problems or difficulties the auditors encountered in the course of the audit work, including any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management, and management's response. Among the items the Committee will consider discussing with the independent auditors are: any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); any communications between the audit team and the independent auditor's national office with respect to auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The discussion will also include the responsibilities, budget, staffing, and performance of the Company's internal auditors.

(h)     To discuss with management earnings press releases (including the use of "pro forma" or "adjusted non-GAAP information"), as well as financial information and any earnings guidance provided to analysts and rating agencies. Discussion of earnings releases as well as financial information and any earnings guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

(i)     To discuss with management and, as appropriate, the independent auditors periodically, normally on at least an annual basis:

42

       (i).    The independent auditors' annual audit scope and plan and risk assessment and risk management policies.

       (ii).   The form of independent auditors' report on the annual financial statements and matters related to the conduct of the audit under generally accepted auditing standards.

       (iii).  Any report on the Company's internal control over financial reporting and the independent auditor's attestation relating thereto, prior to such documents being included in any Annual Report on Form 10-K.

       (iv).  All critical accounting policies and practices.

(j)     To discuss with management periodically, and at least on an annual basis, any outsourcing of the internal audit function, including selection of vendor, fees paid, and areas to be audited.

(k)    To discuss with management and the internal auditors, normally on at least an annual basis:

       (i).    The adequacy of the Company's internal controls over financial reporting.

       (ii).   The annual internal audit plan, the Company's major financial risk exposures, steps management has taken to monitor and control such exposures, risk management and risk assessment policies, and significant findings and recommendations and management's responses thereto.

       (iii).  The size and structure of the internal audit function, as well as the experience level of the internal auditors and the performance of the head of the internal audit function.

       (iv).  The internal audit function and responsibilities and any scope restrictions encountered during the execution of internal audit responsibilities.

(l)     To establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting,

internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

(m)     To establish policies governing the hiring by the Company of any current or former employee of the Company's independent auditors.

(n)     To review all proposed business transactions between the Company (or any subsidiary or affiliate thereof) and any director(s) or executive officer(s) (or any subsidiaries, affiliates, or family members thereof) and confirm all proposed business transactions are in compliance with the Related Parties Transaction Policy, as well as any other situations involving a conflict of interest between the Company and any executive officer or director, and to provide direction to management as to whether each such proposed transaction should be consummated and as to how it should be structured.

(o)     To assist the Board of Directors in its general oversight of the Company's Code of Ethics and Business Conduct, including the review and approval of: (a) any change or waiver in the Company's Code of Ethics and Business Conduct granted to any officer or director and (b) any disclosure made on Form 8-K or the Company's website regarding such change or waiver.

(p)     To report regularly to the Board summarizing the Committee's actions and any significant issues considered by the Committee, including any issues as to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the Company's internal audit function.

(q)     Provide the independent auditors and the internal auditors with access to the Board, including access without representatives of the Company's management present.

86.     The Company's Audit Committee Charter was adopted by the Board November 29, 2010, and was in effect at all times during the Relevant Period.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

87.     Additionally, Defendants, as officers and/or directors of FleetCor, are bound by the Company's Code of Business Conduct and Ethics (the "Ethics Code"), which sets forth specific policies to guide directors and employees in the performance of their duties.  According to the Ethics Code, all officers, directors, and employees are required to commit to "conduct [FleetCor's] business in accordance with all applicable laws, rules and regulations and the highest ethical standards."

88.     The Ethics Code further provides:

> The policy of the Company is to comply with all laws governing its operations and to conduct its affairs in keeping with the highest moral, legal and ethical standards.  In particular, Senior Executive and Financial Officers hold an important and elevated role in maintaining a commitment to (i) honest and ethical conduct, (ii) full, fair, accurate, timely and understandable disclosure in the Company's public communications, and (iii) compliance with applicable governmental rules and regulations.

89.     Regarding corporate opportunities, the Ethics Code provides:

> Employees and directors owe a duty to the Company to advance the Company's legitimate business interests when the opportunity to do so arises.  Employees and directors are prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position, using corporate

property, information or position for personal gain or competing with the Company.

90.     Regarding financial reporting and disclosures, the Ethics Code states:

The Company is committed to full, fair, accurate, timely and understandable disclosure in reports and documents that it files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company.  In support of this commitment, the Company has, among other measures, (i) designed and implemented disclosure controls and procedures (within the meaning of applicable SEC rules) and (ii) required the maintenance of accurate and complete records, the prohibition of false, misleading or artificial entries on its books and records, and the full and complete documentation and recording of transactions in the Company's accounting records.  In addition to performing their duties and responsibilities under these requirements, all employees involved in the Company's SEC reporting process, including each of the Senior Executive and Financial Officers, will establish and manage the Company's reporting systems and procedures with due care and diligence to ensure that:

- reports filed with or submitted to the SEC and other public communications contain information that is full, fair, accurate, timely and understandable and do not misrepresent or omit material facts; [and]

- business transactions are properly authorized and completely and accurately recorded in all material respects on the Company's books and records in accordance with generally accepted accounting principles and the Company's established financial policies.

91.     The Ethics Code also incorporates FleetCor's Insider Trading Policy,

providing that "[e]very employee and director of the Company is subject to, and has

a personal responsibility to review and understand, the Company's Insider Trading Policy."

92.     In turn, the Insider Trading Policy, the latest version of which has been effective since April 25, 2013, provides that "[n]o FleetCor employee, officer or director may purchase or sell FleetCor securities while he or she is in possession of material, nonpublic information relating to FleetCor."

93.     The Ethics Code was adopted by the Board November 29, 2010, and was in effect at all times during the Relevant Period.

**Control, Access, and Authority**

94.     Defendants, because of their positions of control and authority as directors and/or officers of FleetCor, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FleetCor.

95.     Because of their advisory, executive, managerial, and directorial positions with FleetCor, each of the Defendants had access to material, adverse, non-public information about the financial condition, operations, and improper representations of FleetCor.

96.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of FleetCor, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

97.     To discharge their duties, the officers and directors of FleetCor were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of FleetCor were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects and practices of the Company at any

given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how FleetCor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that FleetCor was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

98.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to FleetCor and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of FleetCor, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of FleetCor, the absence of good faith on their part, and a reckless disregard for their duties to FleetCor and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to FleetCor.

99.    Defendants each breached his or her duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects and practices were truthful and accurate when made.

100.    In addition, as a result of Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, FleetCor has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

101.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

102.    During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects and practices

were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

103.   The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects and practices.

104.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

105.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted

the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO FLEETCOR

106.   As a result of Defendants' wrongful conduct, FleetCor disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated FleetCor's credibility.   FleetCor has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

107.   As a direct and proximate result of Defendants' actions as alleged above, FleetCor's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

108.   Further, as a direct and proximate result of Defendants' conduct, FleetCor has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred in investigating and defending FleetCor and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)   costs incurred from compensation and benefits paid to Defendants, which was based at least in part on FleetCor's artificially-inflated stock

price, while Defendants were in breach of their fiduciary duties owed to the Company and its shareholders;

(c)     costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling FleetCor common stock at artificially inflated prices; and

(d)     costs incurred from the loss of the Company's customers' confidence in FleetCor's products.

109.   Moreover, these actions have irreparably damaged FleetCor's corporate image and goodwill.  For at least the foreseeable future, FleetCor will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that FleetCor's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

110.   Plaintiff brings this action derivatively in the right and for the benefit of FleetCor to redress injuries suffered, and to be suffered, by FleetCor as a direct result of Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.  FleetCor is named as a nominal defendant solely in a derivative capacity.

111.   Plaintiff will adequately and fairly represent the interests of FleetCor in enforcing and prosecuting its rights.

112.   Plaintiff has been a shareholder of FleetCor since January 2011, and has been continuously so throughout the entirety of the wrongdoing of which Plaintiff complains herein.

113.   Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and useless act.

114.   At the time this action was commenced, the Board of FleetCor consisted of the following nine (9) directors: Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, Stull, and non-party Hala G. Moddelmog ("Moddelmog").[3]   A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.   A majority of these individuals face a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.   Therefore, demand is futile.

**Demand is Futile as to the Directors Based on Insider Sales of FleetCor Stock**

115.   During the Relevant Period, each of the Insider Selling Defendants— who together comprise a majority of the Board—illicitly sold shares of FleetCor

---

[3] Moddelmog joined the Board in April 2017.

stock while in possession of material, adverse, non-public information, during a time in which FleetCor stock was artificially inflated due to Defendants' misconduct. Moreover, in making or causing these sales, the Insider Selling Defendants violated the FleetCor Insider Trading Policy, and in turn the Ethics Code, as described above.

116.   As a result of these illicit insider sales, the Insider Selling Defendants who serve as directors, namely Defendants Clarke, Farrelly, Hagerty, Johnson, and Macchia, comprise a majority of the Board, and each received direct financial benefits not shared with all other FleetCor shareholders.   Each is therefore objectively unable to assess any shareholder demand to bring the claims asserted herein, including, but not limited to: (i) the issuance of false statements; (ii) unlawful insider trading; and/or (iii) failure to maintain adequate internal controls.

117.   In addition, Defendants Clarke, Farrelly, Hagerty, Johnson, and Macchia—who together constitute a majority of the Board—all face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith, and unjust enrichment, based on their challenged insider sales.   As a result of these illicit insider sales, Defendants Clarke, Farrelly, Hagerty, Johnson, and Macchia each received direct financial benefits not shared with FleetCor shareholders, and, therefore, each is directly interested in, and is incapable of disinterestedly

considering, a demand to bring these claims.  For this reason alone, pre-suit demand on the Board to bring these claims is futile.

**Demand is Futile as to a Majority of the Director Defendants Because a Majority of the Director Defendants Face a Substantial Likelihood of Liability**

118.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such, had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects and practices were accurate.

119.   Indeed, FleetCor's quarterly reports on Form 10-Q filed with the SEC for the second and third quarters of 2016 contained signed SOX certifications by Director Defendant Clarke, stating that the information contained therein fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act.  FleetCor's aforementioned filings were false and misleading because, *inter alia*, FleetCor lacked effective internal financial controls over financial reporting and intentionally misrepresented the basis of the Company's growth and its financial prospects and practices.

120.    Additionally, each of the Director Defendants (i.e., eight out of nine members of the current Board) signed the Company's 2015 10-K and 2016 10-K, which were false and misleading or omitted necessary information to make the statements contained therein not false and misleading for the reasons stated herein.

121.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf, and none of them took any steps in a good faith effort to prevent or remedy that situation.

122.    The Director Defendants (or at the very least, a majority of them) cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made—and should be excused from making—a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

123.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to occur, and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or, recklessly and/or with gross negligence, disregarded the wrongs complained of herein, and are therefore not disinterested parties.

124.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

125.   Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members), owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

126.   Because of their participation in the gross dereliction of fiduciary duties and breaches of the duties of due care, good faith, and loyalty, the Director

Defendants face a substantial likelihood of liability, making demand upon them futile.

127.   The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of FleetCor to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

128.   The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing FleetCor's internal controls over financial reporting, and discharging their other duties described herein.  Indeed, the Audit

Committee was required to meet no less frequently than once every quarter for fiscal years 2016 and 2017—and did so on five occasions in 2016, and one occasion so far in 2017—during which time the Audit Committee reviewed annual and interim consolidated financial statements and internal controls over financial reporting. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business and financial prospects and practices were accurate.   Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant Clarke for Additional Reasons**

129.   In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Defendant Clarke because he is named as a defendant in the Securities Class Action.  Thus, if Defendant Clarke were to initiate suit in this action, he would compromise his ability to simultaneously

defend himself in the Securities Class Action and would expose himself to liability in this action. Accordingly, Defendant Clarke cannot disinterestedly consider a demand to bring suit against himself.

**Demand is Futile as to All Director Defendants for Additional Reasons**

130. Each of the Director Defendants receives a lavish annual retainer of nearly $250,000 purely for being a Board member. This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on FleetCor. Demand on each of the Director Defendants is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of FleetCor's Board.

131. If FleetCor's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by

FleetCor against the Director Defendants, known as the "insured versus insured exclusion."

132.   As a result, if the Director Defendants were to sue themselves or certain of the officers of FleetCor, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

133.   Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting FleetCor by prosecuting this action.  Therefore, demand on FleetCor and its Board is futile and is excused.

134.   FleetCor has been, and will continue to be, exposed to significant losses due to the Director Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary

duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

135.   Plaintiff has not made any demand on shareholders of FleetCor to institute this action  since such demand would be a futile and useless act for the following reasons:

(a)   FleetCor is a publicly traded company with thousands of shareholders  of record and at least hundreds of thousands of beneficial owners;

(b)   making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of FleetCor shareholders; and

(c)   making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

**COUNT I**
**Violations of Section 14(a) of The Securities Exchange Act of 1934**
**(All Defendants)**

136.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. § 240.14a-9.

138.   The Company's 2016 Proxy violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose: (i) that FleetCor lacked effective internal controls over financial reporting; (ii) that FleetCor purportedly clearly disclosed and discloses its fees to customers, and that its business is purportedly focused on helping employers control spending and save money; (iii) the true sources of and reasons for FleetCor's earnings and growth—namely, its fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics— instead, falsely attributing the Company's success to factors such as investments in the Company's sales infrastructure, the conversion of new customers, and the performance of acquired companies, among other things; and (iv) that as a result of the foregoing, FleetCor's public statements were materially false and misleading at all relevant times.

139.   In the exercise of reasonable care, Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the 2016 Proxy were materially false and misleading.   The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the proxy statement, including, but not limited to, election of directors and approval of officer compensation.

140.   The Company was damaged as a result of Defendants' material misrepresentations and omissions in the proxy statement.

### COUNT II
### Breach of Fiduciary Duties for Disseminating False and Misleading Information to Shareholders (All Defendants)

141.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.   Defendants owed, and owe, FleetCor fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed, and owe, FleetCor the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

143.   Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

144.   Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions were not, and could not have been, a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, FleetCor has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

146.   Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## COUNT III
### Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Insider Selling Defendants)

147.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.   At the time the Insider Selling Defendants sold their FleetCor stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

149.   The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, revenue growth, and the sufficiency of its Company's internal controls—was a proprietary

asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

150. At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's fraudulent billing practices, dissemination of misleading marketing materials, predatory sales tactics, and lack of internal controls over financial reporting.

151. The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

152. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

153. As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

154. Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## COUNT IV
## Unjust Enrichment (All Defendants)

155.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of, and to the detriment of, FleetCor.

157.   Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to FleetCor.

158.   Further, the Insider Selling Defendants sold (or caused to be sold for their benefit) FleetCor common stock while in possession of material, adverse, non-public information concerning the Company, the concealment of which artificially inflated the price of the Company's stock at the time of their sales.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their misappropriation and exploitation of material, adverse, non-public information that belonged to the Company.

159.   Plaintiff, as a shareholder and representative of FleetCor, seeks restitution from Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, fiduciary breaches, and/or insider sales.

160.   Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, and unjust enrichment;

B.     Against the Director Defendants, on behalf of FleetCor, to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws, and to protect FleetCor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a proposal to ensure the accuracy of the qualifications of FleetCor's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a proposal to permit the shareholders of FleetCor to nominate at least two candidates for election to the Board to replace current directors;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.     Awarding to FleetCor restitution from Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

70

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 10, 2017

**JOHNSON & WEAVER, LLP**

*/s/ Michael I. Fistel, Jr.*

Michael I. Fistel, Jr.
michaelf@johnsonandweaver.com
Georgia Bar No.: 262062
William W. Stone
williams@johnsonandweaver.com
Georgia Bar No.: 273907
David A. Weisz
davidw@johnsonandweaver.com
Georgia Bar No.: 134527
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

**JOHNSON & WEAVER, LLP**
Frank J. Johnson
frankj@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

***Attorneys for Plaintiff***

# <u>VERIFICATION</u>

I, Jerrell Whitten, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  July 5, 2017

DocuSigned by:

_Jerrell Whitten_
D843276F3A8A4F4...

(Signature of Jerrell Whitten)