# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JERRELL WHITTEN, derivatively on behalf of FLEETCOR TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> RONALD F. CLARKE; MICHAEL BUCKMAN; JOSEPH W. FARRELLY; THOMAS M. HAGERTY; MARK A. JOHNSON; RICHARD MACCHIA; JEFFREY S. SLOAN; STEVEN T. STULL; and ERIC R. DEY, <br><br> Defendants, <br><br> -and- <br><br> FLEETCOR TECHNOLOGIES, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: 1:17-cv-02585-LMM <br><br> **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

## **TABLE OF CONTENTS**

**Page**

I.     OVERVIEW OF THE ACTION ................................................................1

II.    JURISDICTION AND VENUE ................................................................13

III.   THE PARTIES ........................................................................................14

    A.   Plaintiff ........................................................................................14

    B.   Nominal Defendant .....................................................................14

    C.   Defendants ...................................................................................14

IV.    DUTIES OF THE DEFENDANTS .........................................................18

    A.   Fiduciary Duties ..........................................................................18

    B.   Audit Committee Duties ..............................................................19

    C.   Control, Access, and Authority ...................................................26

    D.   Reasonable and Prudent Supervision ..........................................26

V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION
........................................................................................28

VI.    COMPANY BACKGROUND ..................................................................29

VII.   FACTUAL ALLEGATIONS ....................................................................33

    A.   Defendants Made Repeated False and Misleading Statements
Regarding the Company's Revenue and Bookings Growth ...............33

    B.   FleetCor's Revenue Growth Was in Fact the Result of Predatory Sales
Practices and Hidden and Fraudulent Fees ..........................................41

        1.   Late Fees ...............................................................................42

            a.   FleetCor's Online Payment System—iConnect ..........................43

            b.   Payment by Mail ................................................44

            c.   Payment by Phone ...............................................45

2. "High-Risk" Fees or "Level 2 Pricing"..............................50

3. Fleetcor Charges Miscellaneous Additional Hidden Fees.................54

    i. Minimum Program Administration Fees .......................56

    ii. Program Fees..................................................................58

    iii. Account Fees ................................................................60

    iv. Convenience Network and Out of Network Fees ..........61

C. FleetCor's Bookings Growth Was In Fact the Result of Flipping Accounts .................................................................................64

D. Defendants Falsely Claimed the Company's Focus Was to Help Its Customers Save Money...........................................................66

E. In Fact, FleetCor's Business Model Was Not to Save Its Customers Money, but Instead, to Generate Revenue Through the Fraudulent Imposition of Hidden Fees and Predatory Sales Practices................70

F. Defendants Were Not Simply Aware of the Company's Predatory Sales Scheme, They Orchestrated It .............................................73

VIII. DEFENDANTS' FRAUDULENT SCHEME IS SLOWLY EXPOSED, CULMINATING IN THE FTC ACTION .........................................81

A. The FTC Action........................................................................84

1. The Company Issues a Press Release Dismissing the FTC Action as Being "Without Merit".....................................................87

B. The Securities Class Action ...............................................88

IX. DEFENDANTS SOLD THEIR FLEETCOR STOCK AT ARTIFICIALLY INFLATED PRICES WHILE SIMULTANEOUSLY CAUSING THE COMPANY TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES .............................................90

X. DAMAGES TO FLEETCOR................................................................100

XI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS.................101

A.    Demand Is Excused as to Clarke .......................................................102

B.    The Rest of the Board Is Dominated and Controlled by Clarke, and Has Demonstrated Such By Issuing the December 20, 2019 Press Release Prejudging the FTC Action Against Him ..........................................104

C.    Johnson, Macchia, Farrelly, and Hagerty Are Interested Based on Their Challenged Insider Sales ................................................................107

D.    There Is Also Reason to Doubt the Independence of Johnson, Macchia, Farrelly, and Hagerty ..........................................................................109

E.    A Majority of the Director Defendants Face a Substantial Likelihood of Liability .............................................................................................110

F.    Demand Would Be Futile as to the Audit Committee Defendants ...114

G.    Demand Would Be Futile as to All Director Defendants for Additional Reasons ..............................................................................................116

COUNT I BREACH OF FIDUCIARY DUTIES FOR DISSEMINATING FALSE AND MISLEADING INFORMATION TO SHAREHOLDERS (ALL DEFENDANTS) ................................................................................119

COUNT II BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF COMPANY INFORMATION (INSIDER SELLING DEFENDANTS) ............................................................120

COUNT III UNJUST ENRICHMENT (ALL DEFENDANTS) ...........................121

COUNT IV CONTRIBUTION (DEFENDANTS CLARKE AND DEY) ...........122

XII.   PRAYER FOR RELIEF ...........................................................................123

XIII.  JURY DEMAND  ...……………………………………………..………..125

## I.   OVERVIEW OF THE ACTION

1.    This is a shareholder derivative action on behalf of Nominal Defendant FleetCor Technologies, Inc. ("FleetCor" or the "Company") against certain of its current and former top officers and directors for breach of fiduciary duty, unjust enrichment, contribution, and violations of the federal securities laws.[1]

2.    Based in Norcross, Georgia, FleetCor is a provider of workforce payments products.  According to its public filings, the Company offers its products and services to small businesses, as well as government and corporate clients, including so-called "fuel cards."  A "fuel card" is a credit card used for the purchase of gasoline and diesel fuel at gas stations.

3.    Between at least February 2016 through May 2017 (the "Relevant Period"), Defendants engaged in an unlawful scheme designed to artificially inflate the trading prices of FleetCor common stock to as high as $170.00 per share on February 28, 2017.  While FleetCor common stock traded at such artificially inflated prices as a result of Defendants' misrepresentations, Defendants collectively sold

---

[1] Defendants include Ronald F. Clarke ("Clarke"), Michael Buckman ("Buckman"), Joseph W. Farrelly ("Farrelly"), Thomas M. Hagerty ("Hagerty"), Mark A. Johnson ("Johnson"), Richard Macchia ("Macchia"), Jeffrey S. Sloan ("Sloan"), Steven T. Stull ("Stull"), and Eric R. Dey ("Dey") (together, "Defendants").  All emphasis is added and citations omitted unless otherwise stated.

685,720 shares of their personal FleetCor shares, based on adverse, material non-public information about FleetCor's deceptive and unfair business practices, for ***$108 million*** in unlawful insider trading proceeds.  Most, if not all, of Defendants' unlawful insider trades occurred while they simultaneously caused FleetCor to repurchase 1,670,311 of its own shares of its common stock, thereby artificially inflating the prices Defendants received for their personal FleetCor shares and unjustly enriching Defendants.

4.     In a detailed complaint for deceptive and unfair business practices filed by the President Donald J. Trump Administration's Federal Trade Commission ("FTC") against FleetCor's Chairman and Chief Executive Officer ("CEO"), Clarke, and the Company, federal law enforcement authorities detailed how Clarke and FleetCor falsely represented to customers that they (i) would save money using FleetCor sponsored fuel cards; (ii) be protected from unauthorized charges; and (iii) have no set-up, transaction, or membership fees.  In fact, none of these things was true.  Instead, to inflate corporate profits, Clarke and FleetCor systematically charged FleetCor customers myriad unauthorized and unexpected fees.  These included:

- ▪ <u>Account Administration Fees</u> – FleetCor often started charging an administration fee after a few billing cycles, without notice to the

consumer.  Tens of thousands of customers paid this fee in one year, yielding the Company $1.68 million.

- Program Fees – the Company treated this fee as a catch-all fee that allowed FleetCor to charge a multitude of fees, *i.e.*, the Program Fee was a whatever FleetCor wanted it to be fee.

- Late Fees and Finance Charges – the Company charged customers late fees and related interest even when the customer paid their balance fully by the due date.  The Company charged late fees without informing customers of the true circumstances that triggered such fees.

- High Risk Fees – the Company charged customers high risk fees, including a High Credit Risk Account fee and Level 2 Pricing, without notice to the consumer.  FleetCor raked in at least $108 million in high risk fees.

- Convenience Network and Out of Network Fees – the Company claimed there were no transaction fees and customers could fuel at over 50,000 locations nationwide.  Yet, the Company charged customers this fee at certain non-preferred and out-of-network fueling stations.

- Minimum Program Administration Fees – the Company charged customers at least $40 million in Minimum Program Administration Fees ("MPAFs").  The Company charged these fees on either a per-gallon or per-transaction basis when fuel prices fell below $3.25 per gallon.

- Re-Imposing Fees and Fee-Swapping – When customers noticed unauthorized fees on their accounts and called FleetCor, the Company stopped charging those specific fees, but only temporarily (from one month to one year) before re-imposing the fees on the customer without notice.

5.     Notably, on Defendant Clarke's instructions, the Company often began charging customers some or all of these fees only after a few billing cycles passed.  Likewise, FleetCor regularly did not provide a billing invoice to customers

3

specifying the fees; instead, the Company listed some, but not all, of the individual fees it has assessed a customer.

6.      Despite Clarke's implementation of myriad deceptive and unfair billing practices at FleetCor during the Relevant Period, Clarke, along with his co-Defendants, publicly attributed the Company's purported success to old-fashioned hard work, investments in customer service, and superior business acumen in reports to shareholders.  They never disclosed the deceptive and excessive fees and unfair billing practices uncovered by the FTC.

7.      Instead, Defendants, in breach of their fiduciary duties of loyalty, care, and good faith, caused FleetCor to make materially false and misleading statements and omissions regarding the Company's publicly reported earnings, growth, and business prospects and practices.  For example, on February 4, 2016, Defendants represented that for fiscal year 2015, the Company generated $1.7 billion in total revenue, a 42% increase over the prior year, and $430.6 million in revenue for the fourth quarter of fiscal year 2015, an increase of 14% over the prior year, driven by, according to Defendants, "increases in both transactions and revenue per transaction measured on a constant fuel price basis," as well as the "exceptional performance of our MasterCard product, which had estimated revenue growth of approximately 43%

over the fourth quarter of 2014 . . . driven by increases in both transactions and revenue per transaction."

8.    On August 4, 2016, Defendants represented that "[i]n terms of sales for the quarter, we had a very strong new bookings quarter, with bookings growing 18% over the prior year.  That's on top of 27% sales growth rate that we had in Q1."

9.    And, throughout the Relevant Period, Defendants caused the Company to publicly state on its website that its business focused on "*help[ing] employers control spending and save money*," and that FleetCor clients "*[p]ay no fees—no set-up fees, transaction fees, card fees or annual fees*."

10.    However, Defendants' positive statements were not true, and in fact, were materially false and misleading when made.  In truth, FleetCor's purported revenue and new bookings were based on the Company's fraudulent overcharging of customers, dissemination of misleading marketing materials, fraudulent new customer bookings, and reliance on predatory sales practices, all of which were orchestrated by Clarke and his minion executives, including FleetCor's Chief Financial Officer ("CFO"), Dey, and directors Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull.  Indeed, contrary to Defendants' public representations, FleetCor's illicit business practices did not help customers control spending or save

money, and in fact, resulted in tens of thousands of customer complaints to the Company, government agencies, and the Better Business Bureau.

11.    Further, Defendants, in breach of their fiduciary duties, misrepresented and/or failed to disclose that: (i) FleetCor lacked effective internal controls over financial reporting; (ii) FleetCor adequately disclosed and discloses its fees to customers, and its business is purportedly focused on helping employers control spending and save money; (iii) the true sources of and reasons for FleetCor's earnings and growth was from its fraudulent billing practices, dissemination of misleading marketing materials, fraudulent new customer bookings, and predatory sales tactics, and not the conversion of new customers or the Company's U.S. MasterCard business, among other things, as Defendants caused the Company to claim; and (iv) as a result of the foregoing, FleetCor's public statements were materially false and misleading at all relevant times.

12.    Driven by Defendants' false statements and deceptive business practices, FleetCor's common stock soared from $123.76 per share in early February 2016, to as high as $170.00 per share in February 2017.  While FleetCor stock traded at artificially inflated prices, Defendants unloaded over $108 million worth of their personal FleetCor shares.  They also paid themselves $32,704,079.00 in cash, fees, and excessive incentive compensation that were neither entirely fair to FleetCor nor

justified by the Company's actual performance while under Defendants' stewardship.

13.     Defendants' unlawful scheme continued unabated until March 2017. Then, beginning on March 1, 2017, Capitol Forum published the first of several investigative reports detailing FleetCor's fraudulent billing practices, dissemination of misleading marketing materials, fraudulent new customer bookings, and/or predatory sales tactics.[2]

14.     On this news, the trading price of FleetCor's stock collapsed, falling from $170.00 per share on February 28, 2017, to $131.26 per share on May 3, 2017, or 23%, and wiped out hundreds of millions in shareholders' equity.  Worse yet, FleetCor has been named as a primary defendant in a class action lawsuit for violations of the federal securities brought by FleetCor shareholders.  *See City of Sunrise General Employees' Retirement Plan v. FleetCor Technologies, Inc., et al.*, Case No. 1:17-cv-02207-LMM (N.D. Ga.) (the "Securities Class Action").  On May

---

[2]   Capitol Forum, a journalism company focusing on consumer protection and antitrust and merger and acquisition activity, published several investigative reports on FleetCor, including on March 1, 2017; March 20, 2017; and April 27, 2017. Likewise, Citron Research ("Citron"), an online stock commentary website in existence for more than 14 years with a goal of "provid[ing] truthful information in an entertaining format to the investing public," also published its own investigative reports on April 4, 2017 and April 27, 2017.

15, 2018, the U.S. District Court for the Northern District of Georgia issued an Order

sustaining, in part, the allegations that Clarke, Dey, and FleetCor violated §§10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The Court

held, in relevant part:

> Defendants first argue that Plaintiff has failed to explain why the Revenue Statements and the alleged fee practices upon which those statements were based were "fraudulent," to include "what statute, regulation, or standards the practices allegedly violated." . . . .  However, Defendants have not cited any authority for the proposition that the alleged fee practices must violate a statute, regulation, or standard in order to be actionable under the [Private Securities Litigation Reform Act of 1995].  Rather, **the question is whether Defendants publicly told investors one thing about their revenue sources and, thereby, their fees – i.e., that the cards were "fee free"—when in fact that statement was a material misrepresentation**. . . . Because Plaintiff has plausibly pled that **Defendants voluntarily misrepresented that FleetCor's cards were "fee free" when they were not (and created a scheme that would cause fraudulent fees to be charged)**, . . . the Court does not find that misrepresentation must separately violate some statutory regulatory scheme to be actionable.
>
> *       *       *
>
> Taking the facts most favorable to Plaintiff as the Court is required to do on a motion to dismiss, the Court finds Plaintiff has plausibly pled that the alleged fee-related fraud was widespread.  Plaintiff has pled that **the fee-related scheme was orchestrated by FleetCor Executives, fees amounted to 76% of FleetCor's revenues, and that the majority of customer complaints related to fees**. . . .  This is sufficient to survive a motion to dismiss.

*See* ECF No. 40 in the Securities Class Action at 16-18.  Thereafter, FleetCor agreed

to pay $50 million to resolve the securities fraud claims.

15.     Additionally, on the heels of the Securities Class Action settlement, the FTC sued Clarke and FleetCor for engaging in deceptive and unfair business practices, *i.e.*, lying to customers about the purported benefits from using FleetCor-sponsored fuel cards and charging customers excessive and unauthorized fees to artificially inflate corporate profits.  *See Federal Trade Commission v. FleetCor Technologies, Inc. and Ronald Clarke*, Case No. 1:19-cv-05727-ELR (N.D. Ga.) (the "FTC Action").  The very same facts that gave rise to the claims for deceptive and unfair business practices in the FTC Action, and securities fraud in the Securities Class Action, give rise to the claims for breach of fiduciary duty in this shareholder derivative case.

16.     Defendants' misconduct has severely injured FleetCor by exposing it to at least hundreds of millions of dollars in damages (and counting).  However, Defendants have not fared nearly so badly.  On the contrary, Defendants pocketed over $32,704,079.00 million in cash, fees, and incentive-based compensation not justified by FleetCor's actual financial performance while under their stewardship.  Moreover, a majority of FleetCor's directors—Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull—along with Clarke and other top FleetCor insiders collectively sold 685,720 shares of FleetCor stock at artificially inflated prices, reaping over $108 million in illicit insider trading proceeds.  These insider

sales breached the fiduciary duty owed by Defendants to FleetCor to refrain from
self-dealing.



17.     Nevertheless, FleetCor's Board of Directors (the "Board"), consisting
of Clarke, Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull, has not
taken any legal action against the directors and officers responsible for this debacle,

let alone vigorously prosecute the derivative claims.   In fact, these defendants already have prejudged the factual allegations leveled against Clarke as being "without merit" in a very public and widely disseminated statement.  On December 20, 2019, immediately following the filing of the FTC Action—in which Clarke is a named defendant—the Board ***affirmatively demonstrated*** that it is incapable of impartially responding to a demand by permitting the issuance of a Company press release entitled "FLEETCOR Reinforces Commitment to Customer Transparency: Strongly Disagrees with FTC Lawsuit" (the "December 20, 2019 Press Release").[3] The December 20, 2019 Press Release contests and denies the FTC's allegations, and states, among other things:

- "FLEETCOR strongly disagrees with the FTC's complaint…and believes the FTC's claims are without merit."

- "We believe the FTC's complaint is based upon fundamental misconceptions of the Company"

- "We strongly disagree with the FTC's assertion that our existing [customer-facing] materials failed to meet market standards, and therefore do not believe redress is warranted."

- "We feel the FTC's broad characterization of our practices and our customers' awareness of disclosures . . . is completely inappropriate."

---

[3] The complete press release is available at https://investor.fleetcor.com/node/13376/pdf.

- "FLEETCOR . . . is confident that it has acted in accordance with all applicable laws."

18.    In issuing this press release, the FleetCor Board undeniably showed that it has prejudged the allegations of wrongdoing and derivative claims asserted in this action against Clarke and otherwise, and that it is not disinterested, independent, or objective.  In such circumstances, there is not merely reason to doubt that the Board could properly respond to a shareholder demand—rather, the Board has ***proved*** it is incapable of doing so.   This Court and the Company's shareholders cannot reasonably repose confidence in this Board to respond disinterestedly, independently, or objectively to a shareholder demand when that very same Board has publicly and prematurely issued a press release exculpating Clarke and, by extension, all other defendants to this derivative action.

19.    But even if the FleetCor Board had not already prejudged the merits, their suspicious insider trading breached their fiduciary duty of loyalty and would still disable them from objectively and fairly considering a pre-suit demand.  The same goes for Defendants' materially false and misleading statements and material omissions about the Company's purported business success and the reasons therefor in FleetCor's shareholder reports.  Accordingly, a pre-suit demand on the FleetCor Board is excused as futile.

## II.   JURISDICTION AND VENUE

20.    This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Georgia so as to render the exercise of jurisdiction by the Georgia courts permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District under 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

23.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.   THE PARTIES

### A.   Plaintiff

24.   Plaintiff Jerrell Whitten is and continuously has been a shareholder of FleetCor common stock since at least January 2016.   Plaintiff will adequately represent FleetCor's interests in the derivative claims asserted herein.   Plaintiff is a citizen of Illinois.

### B.   Nominal Defendant

25.   Nominal Defendant FleetCor is incorporated in Delaware, and the Company's principal executive offices are located at 5445 Triangle Parkway, Suite 400 Norcross, Georgia 30092-2575.   The Company's common stock is traded on The NASDAQ Stock Market under the ticker symbol "FLT."   The Company had more than 86 million shares outstanding as of the filing of this Amended Complaint. FleetCor is a citizen of Delaware and Georgia.

### C.   Defendants

26.   Defendant Clarke has been the Company's President and CEO since August 2000, and Chairman of the Board since March 2003.   During the Relevant Period, Clarke was chairman of the Executive and Acquisitions Committee (the "E&A Committee").   In breach of his fiduciary duties, Clarke sold 633,617 shares of FleetCor common stock, or 67% of his personal holdings, for unlawful insider

trading proceeds of $100,486,398.07, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges.   By exerting control over the FleetCor Board, Clarke also extracted $29,378,063.00 in cash and incentive compensation from the Company not justified by FleeCor's actual performance in 2016.   Clarke is a defendant in the Securities Class Action and the FTC Action.   Clarke is a citizen of Georgia.

27.   Defendant Dey has been the Company's CFO since November 2002. In breach of his fiduciary duties, Dey sold 25,279 shares of FleetCor common stock, or 78% of his personal holdings, for unlawful insider trading proceeds of $4,169,154.92, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges.   Dey also pocketed $1,525,877.00 in cash and incentive compensation not justified by FleetCor's actual performance in 2016.   Dey is a defendant in the Securities Class Action.   Dey is a citizen of Georgia.

28.   Defendant Johnson has been a director of the Company since March 2003.   He also was a member of the Audit Committee, as well as the E&A Committee.   In breach of his fiduciary duties, Johnson sold 20,000 shares of FleetCor

common stock, or approximately 17% of his personal holdings, for unlawful insider trading proceeds of $3,036,064.00, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges. Johnson also paid himself $242,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016. Johnson is a citizen of Florida.

29.     Defendant Hagerty has been a director of the Company since November 2014. He also was chairman of the Compensation, Nominating and Corporate Governance Committee (the "CNCG Committee"), as well as a member of the E&A Committee. In breach of his fiduciary duties, Hagerty sold 3,224 shares of FleetCor common stock, or 100% of his personal holdings, for unlawful insider trading proceeds of $518,869.00, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges. Hagerty also paid himself $242,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016. Hagerty is a citizen of Montana.

30.     Defendant Farrelly has been a director of the Company since April 2014. He also was a member of the CNCG Committee, as well as chairman of the

Information Technology and Security Committee (the "ITS Committee"). In breach of his fiduciary duties, Farrelly sold 1,200 shares of FleetCor common stock, or 27% of his personal holdings, for unlawful insider trading proceeds of $202,476.12, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges. Farrelly also paid himself $292,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016. Farrelly is a citizen of Florida.

31.    Defendant Macchia has been a director of the Company since July 2010. He also was chairman and financial expert of the Audit Committee, as well as a member of the ITS Committee. In breach of his fiduciary duties, Macchia sold 2,400 shares of FleetCor common stock, or 17% of his personal holdings, for unlawful insider trading proceeds of $374,051.64, based on adverse, material non-public information about FleetCor's purported business success and deceptive and unfair sales promises, unfair billing practices, and excessive and unauthorized fees and charges. Macchia also paid himself $292,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016. Macchia is a citizen of Georgia.

32.     Defendant Buckman has been a director of the Company since July 2013.  He also was a member of the Audit Committee, as well as the ITS Committee. Buckman paid himself $242,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016.  Buckman is a citizen of Arizona.

33.     Defendant Sloan has been a director of the Company since July 2013. During the Relevant Period, Sloan was a member of the E&A Committee, as well as the ITS Committee.   Sloan paid himself $242,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016.  Sloan is a citizen of Georgia.

34.     Defendant Stull has been a director of the Company since October 2000.   He also was a member of the CNCG Committee.   Stull paid himself $242,877.00 in fees and incentive compensation not justified by FleetCor's actual performance in 2016.  Stull is a citizen of Nevada.

## IV.     DUTIES OF THE DEFENDANTS

### A.     Fiduciary Duties

35.     By reason of their positions as officers, directors, and/or fiduciaries of FleetCor, and because of their ability to control the business and corporate affairs of FleetCor, Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to

use their utmost ability to control and manage FleetCor in a fair, just, honest, and equitable manner.  Defendants were, and are, required to act in furtherance of the best interests of FleetCor and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

36.     Each director and officer of the Company owed, and owe, to FleetCor and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

37.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects and practices so that the market price of the Company's stock would be based on truthful and accurate information.

### B.     Audit Committee Duties

38.     In addition to these duties, the members of the Audit Committee owed, and owe, specific duties to FleetCor under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

39.     Specifically, according to FleetCor's Audit Committee Charter, the purpose of the Audit Committee is, in relevant part:

(a)     to assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's independent auditors, and (v) the qualifications and performance of the Company's internal audit function, including if that service is outsourced.

40.     Further, the Audit Committee is required to evaluate its performance on an annual basis, including an evaluation of the "performance [] of the Committee, which evaluation will compare the performance of the Committee with the requirements of [the Audit Committee] charter."

41.     In more detail, the Audit Committee Charter provides that, *inter alia*, Audit Committee members share the following duties and responsibilities:

(a)     To meet with the independent auditors, the Company's management, the internal auditors, and such other personnel as it deems appropriate and discuss such matters as it considers appropriate, including the matters referred to below.  The Committee must meet separately with management, the independent auditors, and the internal auditors periodically.

(b)     To decide whether to appoint, retain, or terminate the Company's independent auditors, including sole authority to approve all audit engagement fees and terms and to pre-approve all audit and permitted non-audit services to be provided by the independent auditors, which shall report directly to the Committee.  The Committee will monitor and evaluate the auditors' qualifications, performance, and independence on an ongoing

20

basis, and will oversee the work of the independent auditors (including resolving disagreements between management and the auditor regarding financial reporting).  In conducting such evaluations, the Committee will:

(i).   At least annually, obtain and review a report by the independent auditors describing: (a) the auditors' internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the auditors, and any steps taken to deal with any such issues; and (c) (to assess the auditors' independence) all relationships between the independent auditors and the Company (including information the Company determines is required to be disclosed in the Company's proxy statement as to services for audit and non-audit services provided to the Company and those disclosures required by Independence Standards Board Standard No. 1, as it may be modified or supplemented).

(ii).   Discuss with the independent auditors any disclosed relationships or services that may impact the objectivity or independence of the independent auditors.

(iii).   Review and evaluate the qualifications, performance, and independence of the lead partner of the independent auditors.

(iv).   Take into account the opinions of management and the internal auditors.

(v).   Discuss with management the timing and process for implementing the rotation of the lead audit partner, the concurring partner, and any other active audit engagement team partner and consider whether there should be a regular rotation of the audit firm itself.  The Committee

21

will present its conclusions with respect to the independent
auditors to the Board for its information at least annually.

(c)    Periodically, normally on an annual basis, discuss with the
independent auditors any material written communications
between the independent auditors and management, such as any
"management" letter or schedule of unadjusted differences.

(d)    Meet to review and discuss with management and the
independent auditors the Company's annual audited financial
statements and quarterly financial statements, including the
Company's disclosures under "Management's Discussion and
Analysis of Financial Condition and Results of Operations". The
Committee will discuss, as applicable: (a) major issues regarding
accounting principles and financial statement presentations,
including any significant changes in the Company's selection or
application of accounting principles; (b) analyses prepared by
management and/or the independent auditors setting forth
significant financial reporting issues and judgments made in
connection with the preparation of the financial statements,
including analyses of the effects of alternative GAAP methods
on the financial statements; and (c) the effect of regulatory and
accounting initiatives, as well as off-balance sheet structures, on
the financial statements of the Company. Discuss with the
Company's General Counsel any significant legal, compliance,
or regulatory matters that may have a material impact on the
Company's business, financial statements, or compliance
policies.

(e)    To obtain assurance from the independent auditors that the audit
of the Company's financial statements was conducted in a
manner consistent with Section 10A of the [Exchange Act], as
amended, which sets forth certain procedures to be followed in
any audit of financial statements required under [the Exchange]
Act.

(f)    Meet with management, internal auditors and independent
auditors to discuss the Company's system of internal controls
over financial reporting. This will include a review of

disclosures made by the CEO, CFO and independent auditors in connection with the certification of the Company's quarterly and annual reports of (i) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.    The Committee will discuss, as applicable, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

(g)　　To discuss with the independent auditors on at least an annual basis the matters required to be discussed by Statement of Auditing Standards No. 114, as it may be modified or supplemented, as well as any problems or difficulties the auditors encountered in the course of the audit work, including any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management, and management's response. Among the items the Committee will consider discussing with the independent auditors are: any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); any communications between the audit team and the independent auditor's national office with respect to auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company.  The discussion will also include the responsibilities, budget, staffing, and performance of the Company's internal auditors.

(h)　　To discuss with management earnings press releases (including the use of "pro forma" or "adjusted non-GAAP information"), as well as financial information and any earnings guidance provided to analysts and rating agencies.  Discussion of earnings releases as well as financial information and any earnings guidance may

be done generally (*i.e.*, discussion of the types of information to be disclosed and the type of presentation to be made).

(i)     To discuss with management and, as appropriate, the independent auditors periodically, normally on at least an annual basis:

    (i).   The independent auditors' annual audit scope and plan and risk assessment and risk management policies.

    (ii).   The form of independent auditors' report on the annual financial statements and matters related to the conduct of the audit under generally accepted auditing standards.

    (iii).   Any report on the Company's internal control over financial reporting and the independent auditor's attestation relating thereto, prior to such documents being included in any Annual Report on Form 10-K.

    (iv).   All critical accounting policies and practices.

(j)     To discuss with management periodically, and at least on an annual basis, any outsourcing of the internal audit function, including selection of vendor, fees paid, and areas to be audited.

(k)     To discuss with management and the internal auditors, normally on at least an annual basis:

    (i).   The adequacy of the Company's internal controls over financial reporting.

    (ii).   The annual internal audit plan, the Company's major financial risk exposures, steps management has taken to monitor and control such exposures, risk management and risk assessment policies, and significant findings and recommendations and management's responses thereto.

    (iii).   The size and structure of the internal audit function, as well as the experience level of the internal auditors and the performance of the head of the internal audit function.

(iv). The internal audit function and responsibilities and any scope restrictions encountered during the execution of internal audit responsibilities.

(l) To establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

(m) To establish policies governing the hiring by the Company of any current or former employee of the Company's independent auditors.

(n) To review all proposed business transactions between the Company (or any subsidiary or affiliate thereof) and any director(s) or executive officer(s) (or any subsidiaries, affiliates, or family members thereof) and confirm all proposed business transactions are in compliance with the Related Parties Transaction Policy, as well as any other situations involving a conflict of interest between the Company and any executive officer or director, and to provide direction to management as to whether each such proposed transaction should be consummated and as to how it should be structured.

(o) To assist the Board of Directors in its general oversight of the Company's Code of Ethics and Business Conduct, including the review and approval of: (a) any change or waiver in the Company's Code of Ethics and Business Conduct granted to any officer or director and (b) any disclosure made on Form 8-K or the Company's website regarding such change or waiver.

(p) To report regularly to the Board summarizing the Committee's actions and any significant issues considered by the Committee, including any issues as to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the Company's internal audit function.

(q)    Provide the independent auditors and the internal auditors with access to the Board, including access without representatives of the Company's management present.

42.    The Company's Audit Committee Charter was adopted by the Board on November 29, 2010, and was in effect at all times during the Relevant Period.

### C.    Control, Access, and Authority

43.    Defendants, because of their positions of control and authority as directors and/or officers of FleetCor, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FleetCor.

44.    Because of their advisory, executive, managerial, and directorial positions with FleetCor, each of the Defendants had access to material, adverse, non-public information about the financial condition, operations, and improper representations of FleetCor.

45.    At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of FleetCor, and was at all times acting within the course and scope of such agency.

### D.    Reasonable and Prudent Supervision

46.    To discharge their duties, the officers and directors of FleetCor were required to exercise reasonable and prudent supervision over the management,

policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of FleetCor were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects and practices of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how FleetCor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection

therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that FleetCor was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.     During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects and practices were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

49.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Defendants' violations of law, including breaches of fiduciary duties and unjust

enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects and practices.

50.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.   COMPANY BACKGROUND

52.     FleetCor presents itself as a fuel card company that services small businesses, as well as government and corporate clients, both nationwide and globally.  A fuel card is essentially a credit card used most commonly for the purchase of gasoline and diesel fuel at gas stations.

53.    FleetCor provides fuel cards to different businesses, ostensibly to allow them to increase savings at gas stations, limit expenses, control spending, and minimize unauthorized transactions and billing through the receipt of real-time transaction information.  In addition to small businesses and government clients, the Company's partners include many large corporate clients, such as Chevron/Texaco (the Company's largest customer in the U.S. until December 31, 2017, when it terminated its contract with FleetCor), MasterCard, Shell, BP, Speedway, and ARCO.

54.    FleetCor contracted with businesses with large fleets (over 150 vehicles), medium fleets (11-150 vehicles), small fleets (1-10 vehicles), and government fleets (which include police vehicle fleets and school bus fleets). However, FleetCor focused its business development efforts on small to medium fleets, instead of large fleets.  Clarke and Dey repeatedly emphasized to analysts and investors during conference calls that it was focused on selling its products "down market."  FleetCor targeted "down market" companies—*i.e.*, small, unsophisticated businesses—as the primary source for its revenue growth because, as Dey once put it, "those customers have very little pricing leverage."

55.    FleetCor stated in its SEC filings that it targeted small fleet businesses through telesales.  For larger accounts, FleetCor had sales agents in the

fieldmaking face-to-face pitches. FleetCor primarily housed its telesales group in its corporate headquarters in Norcross, Georgia.

56.    FleetCor represents its transactions in its SEC filings in the following manner:



Under FleetCor's business model, it purports to derive revenue from the difference between the price charged to a customer for a transaction and the price paid to the merchant or network pursuant to wholesale pricing contracts FleetCor had with merchants.   In return, FleetCor claimed to customers that their drivers were discounted approximately $0.10 to $0.15 per gallon of gas by using FleetCor products.

57.    During the Relevant Period, FleetCor also coordinated with major oil company "partners," such as Chevron/Texaco—formerly the Company's largest partner in the United States—to develop and implement branded fuel card programs.

Chevron and other oil companies provide branded commercial cards to consumers, some of which are administered by outside third parties like FleetCor.  In 2007, FleetCor and Chevron agreed that FleetCor would manage Chevron's commercial card program for ten years.

58.    According to Citron, most card issuers earn an average of 10% of their net revenue from fees, but according to its SEC filings, FleetCor generates 76% of its net revenue from fees.  Indeed, FleetCor's primary competitor (WEX) generates a significantly smaller percentage of its revenue from fees—just 12%— ████████

████████████████



█████████████████████████████ Moreover, Synchrony Financial, which serves a lower credit quality customer than FleetCor serves and facilitates purchases of discretionary items—thus warranting increased fees—earns roughly 18% of its net revenue from fees.  And Visa earns just 3% of its net revenue from fees.

59.    According to a report issued by Credit Suisse, roughly 55% of the fees FleetCor charges are "transaction fees," which include out of network charges, minimum use charges, and credit-based fees tied to credit score.  The Company also provides programs that are initially free, but then begin to incur fees after a promotional period expires.  The Company derives the remaining 45% of its fees from "late/financing fees," which include penalties that equate to a percentage of the outstanding balance assessed every billing cycle (around 10%) and an interest component comparable to credit card rates in the mid-20% range.

## VII.   FACTUAL ALLEGATIONS

### A.    Defendants Made Repeated False and Misleading Statements Regarding the Company's Revenue and Bookings Growth

60.    On February 4, 2016, Defendants caused FleetCor to announce that it generated $430.6 million in revenue for the fourth quarter of fiscal year 2015 ("Q4 2015")—an increase of 14% over that generated during the same period the prior year.  Clarke stated that the Company's "adjusted revenue growth was approximately 10% for the quarter."  For fiscal year 2015, the Company reported

$1.7 billion in total revenue, a 42% increase over the prior year.  Clarke caused the Company to state that its results were driven by 43% growth in FleetCor's MasterCard business, strength in several other FleetCor business areas, and the conversion of many new customers.

61.    Similarly, on the February 4, 2016 earnings conference call, Dey caused the Company to announce that its Q4 2015 results were driven by "increases in both transactions and revenue per transaction measured on a constant fuel price basis," as well as the "exceptional performance of our MasterCard product, which had estimated revenue growth of approximately 43% over the fourth quarter of 2014 . . . driven by increases in both transactions and revenue per transaction."

62.    When explaining the reasons for the growth in FleetCor's MasterCard business, Clarke caused the Company to intimate that "the clients are enjoying a much lower absolute bill from us.  I think we continue to say . . . it's not opportunity limited.  It's really investment and execution limited."

63.    The above statements in ¶¶ 60-62 were materially false and misleading and/or omitted material information.  As was later revealed, FleetCor's reported revenue results were actually predicated, in substantial part, on the improper overcharging and misleading of its customers.  FleetCor developed an algorithm that classified customers into a color-based scheme depending on the amount of

unwarranted fees that FleetCor could charge each customer.  In fact, FleetCor's customers were not enjoying a lower absolute bill from FleetCor, as those bills were inflated with extra fees and the Company's opportunity for growth was limited in that it was contingent on FleetCor's continued mistreatment of customers.

64.    On May 4, 2016, FleetCor announced its first quarter 2016 earnings in a press release and held an earnings conference call.  Clarke announced that "[o]n a macro neutral basis, that is adjusted for fuel price, fuel spreads, and FX, revenues actually grew 10%."  Clarke attributed this growth to five different "primary drivers": 1) the MasterCard business; 2) the Comdata business; 3) the Uber business; 4) the Pacific Price business; and 5) lower interest expense caused by FleetCor de-levering and a lower tax rate than 2015.

65.    On the same call, Clarke told analysts that "new sales booking dollars, the way we look at new business, was up 27% versus the prior-year."  JP Morgan analyst Tien-tsin later asked Clarke: "The sales, the booking dollars I think, Ron, you said up 27%. Where are you seeing some of that good sales performance? Is it more international, domestic?  Is it in the same areas or maybe some new areas? Just trying to understand that better."  Clarke responded:

> Yes, Tien-tsin, it's literally across-the-board. I've got the page here in front of me. The US numbers were up big, particularly because they didn't have as good a quarter a year ago. The Comdata bookings are way, way up because we made investments both in the trucking line of

business and in the corporate payments business The people have stabilized. The sales are way up.

66.     On August 4, 2016, the Company held its earnings conference call for the second quarter of fiscal year 2016 ("Q2 2016").  For the quarter, the Company reported revenue of $418 million, an increase of 3% compared to the $405 million that FleetCor generated over the same period the prior year.  On the conference call, Clarke also announced that "in terms of sales for the quarter, we had a very strong new bookings quarter, with bookings growing 18% over the prior year.  That's on top of the 27% sales growth rate that we had in Q1."  Further, Clarke stated that "revenue growth was 9%."  Notably, Clarke claimed that FleetCor's "bookings" numbers were "the single best indicator of health" for investors to pay attention to.

67.     According to Dey, FleetCor's performance for Q2 2016 was driven by 27% revenue growth in FleetCor's MasterCard business.  Clarke attributed the growth in FleetCor's MasterCard business, and the Company's business generally, to "sales investment."  With regard to the success of FleetCor's MasterCard product, Clarke stated, "there's a product for everybody, little accounts with five cars like it because it is convenient.  Giant accounts because it works everywhere, and it's controlled. . . .  [Y]ou can sell it in every geography, to every segment, and so I guess we like the prospects of double-digit, for as long as we can see, assuming we can keep investing enough in sales, as the base keeps getting bigger."

36

68.     Also on that same conference call, a JP Morgan analyst asked Clarke "how does the 18[%] and 27[%] in the first quarter in terms of bookings?  How can we use that figure to translate that into revenue next year?  Is there a rule of thumb?  Obviously it is a good number but just trying to contextualize that for?" After explaining the logic of modeling revenue with bookings growth figures, Clarke stated:

> What I think what we're trying to do with the sales thing that we are disclosing here, is to give you a sense of sales investment that we are making.  Moreover, we told them $20 million to $25 million . . . [i]ncremental this year. So we are growing sales almost as fast if you take the first and second quarter, I think we are at 20% or something at the first half up.
>
> So we're, the first headline is we're selling more, right? Than we were the prior year.
>
> The second one, which I think it's good for investors, is it's the single best indicator of health.  If you can sell the card program in July of 2016 then your offers are relevant.
>
> We call out sales to let people know people still, that are making decisions like the product line, that we have in the market today. We are not living off of the past. Those are the couple of reasons for the disclosure.

69.     The above statements in ¶¶ 64-68 were materially false and misleading and/or omitted material information.  As was later revealed, FleetCor's revenue and bookings growth were actually driven by the assessment of improper fees to numerous customers, fraudulently booking new customers, and misleading

customers with regard to the level of fees they would be charged.  Upon learning of FleetCor's illicit billing and marketing practices, many of its customers complained and terminated their relationships with the Company.   This includes Chevron/Texaco, one of FleetCor's most important partners.

70.    On November 1, 2016, FleetCor held its earnings conference call for the third quarter of fiscal year 2016 ("Q3 2016").  For the quarter, the Company reported revenue of $484 million, an increase of 7% compared to the $451 million that FleetCor generated over the same period the prior year.  On the conference call, according to Clarke, "[i]n terms of new sales for the quarter, bookings grew 7% versus the prior year, but we did have some really good sales performance . . . a number of our businesses grew new sales in excess of 50% in the quarter."  Clarke also told investors that the Company's MasterCard division performed exceptionally well, growing 28% over the prior year.

71.    Dey similarly stated that for the Company's North American segment, "most of our lines of business performed well resulting in approximately 9% organic growth. . . .  Many of the positive drivers in North America during the quarter were similar to the last several quarters including our MasterCard product which had revenue growth of approximately 28% over the third quarter of 2015."

72.     The above statements in ¶¶ 70-71 were materially false and misleading and/or omitted material information.  As was later revealed, the Company's revenue growth was actually driven by FleetCor's imposition of excessive fees on customers that were either unaware of the charges or paid the charges rather than dispute them with the Company.  The fraudulent booking of new customers and dissemination of misleading marketing materials that understated the level of fees customers would be charged also drove FleetCor's performance in these areas.

73.     On February 8, 2017, FleetCor held its earnings conference call for the fourth quarter of fiscal year 2016 ("Q4 2016").  On the call, the Company reported revenue of $515 million, an increase of 20% compared to the revenue generated over the same period the prior year.  According to Clarke, FleetCor benefitted in Q4 2016 from healthy sales growth across the Company's entire portfolio, as well as increased new sales bookings as compared to the prior quarter.  Clarke stated that "new sales bookings recovered quite nicely from Q3."  Clarke reported that "on a constant macro or like-for-like basis Q4 revenue growth would have been 24% . . . ."  Clarke also represented that the Company "advanced a number of things that should accelerate our performance going forward," including adding more management and technological depth, testing a number of new product ideas, and simplifying FleetCor's technological footprint.

74.     Similarly, Dey told investors that the Company's strong performance in North America was driven by factors "similar to the last several quarters, including our MasterCard product, which had revenue growth of approximately 16% over the fourth-quarter of 2015."

75.     The above statements in ¶¶ 73-74 were materially false and misleading and/or omitted material information.  In truth, the Company's revenue growth was based in significant part on the Company's fraudulent overcharging of customers, dissemination of misleading marketing materials, fraudulent booking of new customers, and reliance on abusive sales practices.

76.     Defendants' false and misleading statements concerning bookings growth impressed investment analysts, who noted them while recommending that investors purchase FleetCor stock.  For example:

   a.  JP Morgan announced in an August 5, 2016 report that it was maintaining its rating of Overweight and noted that "[n]ew sales (or bookings) increased 18%, which paired with 27% growth in 1Q bodes well for future growth."

   b.  An August 5, 2016 JP Morgan report observed that "New sales (or bookings) increased 18%, which paired with 27% growth in 1Q bodes well for future growth."

   c.  A November 1, 2016 Oppenheimer & Co. report highlighted as a "key point" in raising its revenue guidance for 2016 FleetCor's claim that "[b]ookings growth was up 7% Y/Y, highlighted by 50% Y/Y growth in Comdata new business sales."

40

**B.    FleetCor's Revenue Growth Was in Fact the Result of Predatory Sales Practices and Hidden and Fraudulent Fees**

77.    While Defendants were misrepresenting the sources of the Company's revenue growth, third-party investigative reports and FleetCor's own marketing materials and Terms and Conditions ("T&Cs") told a very different story—the Company's revenue in fact derived from stuffing customer invoices with exorbitant fees.

78.    Indeed, despite stating that its business is focused on "*help[ing] employers control spending and save money*" and marketing "*[n]o fees for set-up, transactions or annual membership*" and "*[n]o set-up, transaction or annual fees*," and in order to artificially inflate FleetCor's stock price, Defendants caused the Company to adopt and apply a myriad of bogus charges, fees, and penalties to customer accounts to boost corporate revenues and earnings.  During the Relevant Period, the vast majority of the Company's revenues constituted some type of predatory fee that Defendants caused FleetCor to assess its unsuspecting customers.

79.    This was the Company's true business model.  Indeed, on March 1, 2017, Capitol Forum reported that the Company "*routinely imposes a myriad of unwarranted fees on customers* and that such fees are generally only removed in instances where customers are both persistent and vocal in raising objections."

80.     During the Relevant Period, FleetCor's revenues derived from its myriad of hidden fees soared, with net consolidated revenues climbing from $414 million for the first quarter of fiscal year 2016 to $520 million for the first quarter of fiscal year 2017.  The Company reported that 76% of its consolidated revenues were derived from a "variety of fees and charges associated with transactions, cards, reports, optional services and late payments."

81.     These fees included, among other things, late fees, high risk fees (including Level 2 Pricing), Minimum Program Administration Fees, Program Fees, Account Fees, and Convenience Network and Out of Network Fees, discussed below.

### 1.     Late Fees

82.     During the Relevant Period, revenues attributed to the Company's bogus late fees soared, climbing from $24.8 million in the first quarter of fiscal year 2016 to $31.2 million in the first quarter of fiscal year 2017.  As the Company would later disclose, late fees accounted for a sizable portion of FleetCor's consolidated revenue (approximately 6%), and constituted a core element of FleetCor's business and finances.

83.     Defendants carried out their late fees scheme by causing FleetCor to manipulate each method to pay bills available to its customers to prevent customers

from paying their bills on time, thereby triggering the imposition of late fees on the customer, as detailed below.

### a.   FleetCor's Online Payment System—iConnect

84.     As Capitol Forum corroborated in its March 1, 2017 report, FleetCor's online payment system, iConnect, was deliberately constructed to impose late fees on customers.  According to Capitol Forum, "FleetCor [] supplements its fee revenue with *late fees through the use of a bill payment system that makes it extremely difficult, if not impossible, for customers to make timely payments*."  Indeed, the online system did not allow for early payments, and payments made on the due date were "posted" days later.  In its May 11, 2017 report, Capitol Forum quoted a current employee as stating that payments are not posted immediately and that "oftentimes they hold the payment or if they apply the payment it will not credit the account right away."  Thus, if the due date for a given client's payment was on a Wednesday, and the client posted a payment on that Wednesday, the payment would still be late.  The March 1, 2017 Capitol Forum report also concluded, based on reviews of customer complaints and discussions with FleetCor customers, that there were suspiciously

frequent problems with the FleetCor payment website that made it difficult for customers to pay their bills online.

85.     Further, the online billing system would also crash when customers would try to pay their bills online, which customers viewed as deliberate by the Company. ████████████████████████████████████

████████████████████████████████

### b.     Payment by Mail

86.     FleetCor also made it nearly impossible for customers to pay their bills by mail.  Specifically, FleetCor bills provided two addresses to clients to pay by mail.  One address was purportedly monitored by a third party, and according to Capitol Forum, the location for overnight payments was FleetCor itself.  But customers of FleetCor could not mail in their payments for timely processing by the Company, even if the customer itself paid timely. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

87.     A Capitol Forum report dated March 1, 2017 quoted a small business owner, Wes Hamilton, owner of Plumb Pro, Inc., recounting that:

They didn't post my check payment I sent from Alabama in early January to North Carolina until January 24. . . They have plenty of time to post it and all this time they kept calling and calling telling me I'm late. I explained that they are holding two checks and charging late fees and his only advice was to provide my banking info so I pay online and if there was overage I'd get a credit refunded but I wasn't comfortable with that.

88.



### c. Payment by Phone

89.    FleetCor also dissuaded customers from paying their bills by phone.

90.    Customers were able to make payments directly and immediately to FleetCor over the phone, but to do so, they incurred a fee.

45

91.     These late fees could constitute an incredibly high percentage of customers' fees.  Indeed, a September 19, 2016 complaint to the FTC (obtained by Capitol Forum) states that a customer received ***$121,000 in late fees*** between the period of February 2013 and March 2016.

       **d.**  ███████████████████████████████
████████████████

92.   █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

93. ███████████████████████████████████████

94. ███████████████████████████████████████

95. ███████████████████████████████████████

 In

other places, however, such as the Company's website, FleetCor provides later

payment cut-offs, such as 2:00 p.m. Eastern Time.  As a result, customers who have

paid in the morning on the due date, believing their payments timely, have

sometimes been charged late fees.  Customers who have paid before the due date

have also been charged late fees.  Further, customers who have paid the amount

quoted on their billing invoice by the due date have been assessed late fees because

FleetCor has listed on the invoice a total amount due that the Company later deemed

incorrect, and has subsequently assessed late fees to those customers because they

paid the amount they were invoiced.

96.     Moreover, as the FTC found following its own lengthy and independent

investigation, FleetCor assessed its customers millions of dollars in unjustified late

fees:

> In numerous instances, FleetCor has charged customers [l]ate [f]ees and
> related [i]nterest and [f]inance [c]harges even when the customers have

> paid their balance in full by the due date. . . . FleetCor has charged customers [l]ate [f]ees without informing them of the true circumstances that trigger such fees. To the extent a customer could find any information about this fee in the Ts&Cs, these documents claim that FleetCor will credit payments made by a particular time on the same day, but it makes inconsistent statements about what that time is.

FTC Action, ECF No. 1, at ¶¶ 42, 44.

97.     While FleetCor's customers often did not notice that late charges were being secretly embedded in their bills, those that did often vigorously complained. For example, one Chevron customer (who later became a Citgo customer), the Southern Appalachian Labor School (SALS) in West Virginia, a small non-profit that runs a food pantry and repairs homes for low income families, sued FleetCor in 2014 in West Virginia State Court after numerous requests that FleetCor take off unauthorized late fees of $1,000 on bills that typically ran from $4,000 to $7,000.

98.     The Better Business Bureau website also contains numerous customer complaints about FleetCor regarding exorbitant late fees similar to the following:

> • "I opened the account in June of 2016 and literally 11 months out of the 13 months we had the account trying to get my account corrected from Program fees of $30, administration fees of $300, high risk fees of $120, and late fees, of over $1000. However I was never late and paid the account in full every single month. I also called 11 out

of the 13 months we had the account because I was not receiving the statements. They had my correct email and correct address. I would get it 2 days before it was due and had to call and make the payment over the phone. Which was a $25 phone fee."

- "If you try to pay on [their] website it won't let you process the payment until the following day. Then they charge 15% late fee. Around $500 on a little over $3,000."

- "We were charged [a] $1,982.83 late fee and $285.62 'default int charge' on an invoice when the check was sent 6 days before the due date. . . .The check was mailed on Monday Dec. 8th. It was due on Sunday (Dec 14th) and not cashed until Tuesday Dec 16th. This is the second time they have done this but it was credited the last time when I complained.  When I called I was told they charge up to $5,000 in late fee[s]."

- "Ever heard of a $1,000 late fee? Mind you, our payments were not late. . . . After 6 months of MULTIPLE submissions of EFT forms, phone calls, faxes, etc. [we were advised by FleetCor that] '[w]e don't do autopay.'"

- "I opened the [FleetCor] account in June of 2016 and literally 11 months out of the 13 months we had the account, [we needed to get the account corrected because there were] program fees of $30, administration fees of $300, high risk fees of $120 and late fees [] of over $1000."

### 2. "High-Risk" Fees or "Level 2 Pricing"

99.     In addition to unmerited and exorbitant late fees, FleetCor also charged a High Risk Credit Account fee and "high risk" fee to certain of its customers.  FleetCor would sometimes call this fee "Level 2 Pricing."

100.     These fees were often substantial.  During the Relevant Period,

revenues attributed to high risk fees and Level 2 Pricing soared, climbing from $6.2 million in the first quarter of fiscal year 2016 to $7.8 million in the first quarter of fiscal year 2017.  These fees constituted roughly 1.5% of FleetCor's total revenues in 2016 and 2017 and were a core element of FleetCor's business and finances. █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

101.     According to FleetCor documents attached to an April 11, 2017 Capitol Forum Report, FleetCor may impose Level 2 Pricing from the outset when customers have commercial credit scores below 520 and individual credit scores below 660 or as a result of two late payments.  After making such a determination, FleetCor imposed these fees on customers without notice or an opportunity to dispute FleetCor's decision before the fees were imposed.

102.     Capitol Forum corroborated in its April 11, 2017 report that because the Level 2 Pricing does not appear as its own separate fee on customer bills, customers are likely to remain unaware of the change in pricing.  In other words, there were no itemized fees for Tier 2 pricing, not even buried at the end of an invoice like the other fees charged by FleetCor.  Capitol Forum reported that the Level 2

Pricing was increased from 10 cents per gallon to 20 cents per gallon at some point after July 2016 without any notice to customers.   In response to Capitol Forum's inquiries, FleetCor disclosed that risk-based pricing fees "represent roughly 1.5% of FLT's revenue." ███████████████████████████████████████

███████████████████████████████

103.   To make matters worse, FleetCor is often incorrect in its determination of which customers are high risk (and thus charged Level 2 pricing).   Indeed, as part of its April 11, 2017 investigative report, Capitol Forum interviewed Nancy Lawrence, the bookkeeper for Oval Tennis, a provider of tennis court construction and maintenance.   She noticed that on November 1, 2016, her company was charged an additional 5% on each transaction even though the business had an excellent credit history.   This, however, was the second time that FleetCor put Oval Tennis on Level 2 Pricing.   Lawrence explained that "[b]usiness owners don't have time to cross check all those gas receipts against the invoices each month."

104.   ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████



105.   Moreover, as the FTC found after its investigation, the Company

assessed its customers millions in high risk fees and Level 2 Pricing:

> In numerous instances, FleetCor has charged customers High Credit
> Risk Account Fees ("HCRAFs"), including a High Risk Fee ("HRF")
> and Level 2 Pricing Fee ....   FleetCor has charged these fees without
> notice.   FleetCor has charged customers at least $108 million in
> HCRAFs. . . .   FleetCor has imposed HCRAFs on customers who have
> "missed" a payment.   However, numerous customers deemed to have
> "missed" a payment in fact paid their balance in full by the due date and
> were charged HCRAFs (in addition to a Late Fee and Finance Charges)
> because FleetCor did not post the payment to their account in a timely
> fashion or because FleetCor at times has stated that it has quoted the
> balance incorrectly on the invoice . . . . When FleetCor has imposed
> HCRAFs, it has sometimes added a fee for *each transaction* made using
> its fuel cards.   Given the high transaction volume for a typical FleetCor
> customer, this fee has been particularly costly[.]

FTC Action, ECF No. 1, at ¶¶ 46, 50-51 (emphasis in original).

### 3.   FleetCor Charges Miscellaneous Additional Hidden Fees

106.   During the Relevant Period, the Company's revenues soared, with total

revenues climbing from $1.8 billion in 2016 to $2.2 billion in 2017.   "Miscellaneous

fees," according to the Company's SEC filings, constituted 6% of FleetCor's total

revenues, or approximately $108 million in 2016 to $132 million in 2017, and

constituted a core element of FleetCor's business and finances.

107.   As confirmed by a March 1, 2017 Capitol Forum report, through

interviews with FleetCor customers, as well as in Company documents, after the first

three months—and after seeing that their bills contain no fees—customers were

likely to stop reviewing their bills, which is when FleetCor would begin charging customers excessive hidden fees. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

108.   When FleetCor did add in the fees, they were buried in invoices with only a summary charge on the first page, but miscellaneous charges were detailed on the final page of the bill.  Thus, customers would need to dig through their bills to understand what fees had been tacked onto their bills.  These fees included:

- account administration fees;
- member fees;
- minimum usage fees;
- transaction fees;
- high risk transaction fees;
- minimum program administration fees
- credit risk assessment fees;
- high risk credit fees;
- convenience network surcharges;
- advantage program fees;
- payment processing fees;
- electronic transfer fees;
- telephone payment fees; and
- inactive card fees.

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

109.     Thus, in addition to late fees and high risk fees (Level 2 Pricing), the Company also routinely imposed a myriad of other fees on its unsuspecting customers, including, *inter alia*, Minimum Program Administration Fees, Program Fees, Account Fees, and Convenience Network and Out of Network Fees, discussed below.

### i.     Minimum Program Administration Fees

110.     One of FleetCor's more egregious and significant fees was its MPAFs, which would be imposed on FleetCor's customers several months after they joined a card program.

111.     FleetCor reserved the right to impose MPAFs on its customers when fuel prices dropped below $3.25.  According to the U.S. Energy Information Administration, however, gas prices have generally remained below $3.25 since 2014 (an average of $2.429 in the U.S. for 2015 and $2.143 in the U.S. for 2016).  Thus, contrary to FleetCor's marketing, customers were potentially always paying more for their fuel than the sticker price, rather than saving money.  Due solely to the MPAFs (much less all of the other fees FleetCor could charge), customers could end

up paying as much as 10 cents per gallon ***above*** the retail gas price.

112.     Indeed, a March 20, 2017 Capitol Forum investigative report discussed FleetCor's MPAFs and noted one example where a FleetCor customer incurred $1,004 in MPAFs in connection with retail fuel charges of $3,241—or approximately 30% of the total bill.  The Capitol Forum investigative report also quoted one former employee as stating that "what we were always told to disclose is that [customers] will never pay more than the pump price . . . but with gas prices as low as they are, one of the things that they did was start these administrative fees and people were paying higher than pump price."

113.



These fees, as is the case with all other hidden fees charged by FleetCor, are imposed

on the Company's customers despite FleetCor's promise of "No fees for set-up, transactions or annual membership" in its marketing materials.

114.   Moreover, as the FTC found after its investigation, FleetCor customers were charged millions in MPAFs:

> In numerous instances, FleetCor has charged customers a Minimum Program Administration Fee ("MAPF") [*sic*].  FleetCor has charged customers at least $40 million in MAPFs.

FTC Action, ECF No. 1, at ¶ 60.

### ii.   Program Fees

115.   In addition, FleetCor charged customers so-called Program Fees.

116.   ████████████████████████████████████████████
████████████████████████████



117.   Following its investigation, the FTC found FleetCor customers were

fraudulently charged tens of millions of dollars in unexpected Program Fees:

> FleetCor has charged customers unexpected Program Fees.  At least
> tens of thousands of customers have incurred Program Fees.  FleetCor
> has charged at least tens of millions of dollars in such fees. . . .  Internal
> emails indicate that FleetCor treated this fee as a catch-all provision that

allowed the company to charge a multitude of fees.  Specifically, one FleetCor representative asked whether FleetCor's "changes to the program fee section seem broad enough for us to charge whatever program fees we want?" In response, another employee stated, "We would have to come up with some benefit or tie it to a new add/on product. Unlike [our] Fuelman [card] we can't just add arbitrary fees and run off all the accounts."

ECF No. 1 in the FTC Action at ¶¶ 39, 41.

### iii.    Account Fees

118.    The Company also charged its customers so-called Account Fees.

119.    ██████████████████████████████████████████████



### iv.    Convenience Network and Out of Network Fees

120.    Despite representing in ads that there are no transaction fees and customers can "fuel at over 50,000 locations nationwide," and that customers can "[a]void wasting time searching for fuel" by "us[ing] the card at any fuel location

that accepts MasterCard," FleetCor has imposed this charge for transactions at certain "non-preferred" and "out-of-network" fueling stations.

121. ███████████████████████████████████████

███

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

122.     Moreover, as the FTC found following its investigation, "FleetCor has charged customers at least tens of millions of dollars in unexpected 'Convenience Network Surcharge' and 'Out of Network' fees," despite claiming in ads that "there are no transaction fees and customers can 'fuel at over 50,000 locations nationwide,' or that customers can '[a]void wasting time searching for fuel' by 'us[ing] the card at any fuel location that accepts MasterCard." FTC Action, ECF No. 1, at ¶ 57.

123.     The fact that FleetCor charged exorbitant fees was also corroborated by the Verified Original Petition And Application For Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in the Chevron Action (the "Chevron Petition"), filed on May 1, 2017, which alleged that FleetCor was seeking

to "maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels.   These actions are harming Chevron's customer goodwill and will continue to inflict damages to goodwill until the [Chevron accounts are] transferred to WEX."   In other words, Chevron had identified that FleetCor's enormous fees and poor customer service were harming its customer relationships.

124.    Additionally, in a July 17, 2017 report, Capitol Forum reported that BP, which is another major partner of FleetCor, was pressing FleetCor to address customer complaints relating to deceptive marketing, delayed posting of payments resulting in late fees, hidden fees and charges, delayed application of credits, missing rebates, withheld deposits, website portal problems, and lack of action despite numerous customer calls.

125.    As detailed herein, FleetCor trained its salespeople to market FleetCor's cards as "no fee," when in reality FleetCor knew that enormous fees would eventually be imposed on the customer.   In fact, FleetCor deliberately withheld information about its fees from its salespeople so they were unable to provide accurate information even if they wanted to and had not been prohibited from doing so. █████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

### C.   FleetCor's Bookings Growth Was In Fact the Result of Flipping Accounts

126.   While Defendants repeatedly represented the Company's new business (or bookings) as growing markedly, as much as 27% during the Relevant Period, the truth was that much of this purported growth was illusory.  Indeed, a substantial portion of new bookings was attributable to FleetCor's routine practice of shifting customer accounts from one fuel card to another and then counting this shift as "new business," a process called "flipping" accounts.   FleetCor's supposed "new business" was thus not representative of a new client base, but merely the process of providing an existing client with one FleetCor card in place of another.  FleetCor's account flipping practices accounted for a significant number of "new" accounts that Defendants reported to investors.  ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

127.   Defendants were able to perpetrate this fraud because FleetCor purchased so many companies and managed so many fuel cards for oil companies (such as Chevron, Shell, and BP) that customers often did not realize that FleetCor was the company actually managing the fuel card program.   ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████   ██████████████████████████████████

███████████████████████████████████████████

██████████

128.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



129.   Defendants' statements regarding the Company's purported bookings growth identified in ¶¶ 65-68, 70, and 73 were objectively false and misleading because the Company's bookings growth was in fact the result of an unsustainable practice of "flipping" accounts to meet the Company's account growth goals.

130.   Indeed, a review by a former employee on the website Indeed states:

> Get an exorcism and a lobotomy and pray to God to give you a soul and a conscience! Stop using Fleetcor as a $40 million per year ATM while your employees are starving and haven't had raises in over 10 years. Stop ripping off all of your customers with tremendous fees. Put a stop to all of the stealing of accounts by Inside/Outbound Sales. ***Stop letting them flip existing accounts and take them as new sales.*** Support field sales and stop stealing them blind.

### D.   Defendants Falsely Claimed the Company's Focus Was to Help Its Customers Save Money

94.   In addition, the Company stated on its website throughout the Relevant Period that its business is focused on "***help[ing] employers control spending and save money***," and that FleetCor clients "***[p]ay no fees—no set-up fees, transaction fees, card fees or annual fees***."

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

95.     FleetCor's electronic and print advisements likewise represented that consumers would achieve specific per-gallon savings by using its fuel cards, despite Clarke and other high-level employees being aware that many customers, including small- and medium-sized business customers, do not achieve the claimed savings. For example:

**Fuelman**   FUELMAN DIESEL PLATINUM FLEETCARD

# Save 10¢ per gallon on diesel fuel
## with a customized fleet management solution.*

Fuel your business with everyday diesel savings. Throughout the Fuelman Network, the Fuelman Diesel Platinum FleetCard offers a 10¢ per gallon rebate on diesel fuel.*

With Fuelman Diesel Platinum, savings at the pump are just the beginning. In addition, our purchase controls and detailed reporting can save your business in overall fuel management costs through fuel spend monitoring and the prevention of driver theft and fraud.

Here's how the Fuelman Diesel Platinum FleetCard helps your business:


## Savings

- Save 10¢ per gallon on diesel fuel throughout the Fuelman Network*
- Save money with customized limits that prevent purchases outside of the parameters you select


## Controls

- Ensure drivers can only make business purchases by restricting cards to fuel or fuel and maintenance only
- Get real-time transaction monitoring and account management capabilities with the iFleet online platform
- Customize card limits by gallon amount, fuel type, time or day of week
- Receive real-time email or text alerts on unusual transactions


## Convenience

- Accepted at 50,000 commercial fuel and 20,000 maintenance locations nationwide
- Find locations via **www.fuelman.com** or the Fuelman Mobile Site Locator
- Manage your fleet on-the-go with the free Fuelman Mobile application. Download today in the iTunes or Google Play Stores by searching "Fuelman Mobile".

# Take advantage of better fuel management.

For more information or to apply today:
**1-800-FUELMAN (1-800-383-5626) or www.fuelman.com**



**Fuelman** FUELMAN DISCOUNT ADVANTAGE FLEETCARD

# Earn 5¢ cash back per gallon
## from the very first gallon pumped.*

The Fuelman Discount Advantage FleetCard is the choice for businesses with smaller fleets that want to maximize discounts on retail fuel prices. In addition, our purchase controls and detailed reporting can save your business up to 15% in overall fuel management costs through fuel spend monitoring and the prevention of driver theft and fraud.¹

Here's how the Fuelman Discount Advantage FleetCard helps your business:

### Savings

- Earn 5¢ cash back per gallon at 25,000 locations*
- No volume requirements—ever!
- Start saving with the first gallon
- No set-up, transaction or annual fees

### Controls

- Ensure drivers can only make business purchases by restricting cards to fuel or fuel and maintenance only
- Monitor transactions and manage your account online in real time
- Customize card limits by gallon amount, fuel type, time or day of week
- Receive real-time email or text alerts on unusual transactions

### Convenience

- Fuel up at 40,000 commercial fueling locations nationwide
- Use the card for maintenance purchases at 25,000 locations
- Find convenient locations via www.fuelman.com or the Fuelman Mobile Site Locator

# Take advantage of better fuel management.

## For more information or to apply today:
## 1-800-FUELMAN (1-800-383-5626) or www.fuelman.com

*Rebate credited to account statement as a true, and limited to 2,500 gallons per use for. Rebate is in subject to total applicable payment balance during the party. Amount does not apply to gallons pumped at the Convenience Network of Clientos, Testco, Lows, Pilot, Sinclair and ARCO. Convenience Network is subject to change without notice.
¹A Government survey shows that, on average, fuels that change from enfleet management program to a managed fuel program realize savings of up to 15% or their reported fuel management costs.
Fuelman® is a registered trademark of FLEETCOR Technologies Operating Company, LLC.

E.     **In Fact, FleetCor's Business Model Was Not to Save Its Customers Money, but Instead, to Generate Revenue Through the Fraudulent Imposition of Hidden Fees and Predatory Sales Practices**

131.   The Company's statements and omissions regarding its purported business model as functioning to save customers money and that customers paid "no fees" were materially false and misleading.

132.   In truth, FleetCor's business model was not focused on helping its clients control spending or save money, but rather was directed to assess the maximum amount of unauthorized fees without customers noticing.   Indeed, customers generally do not experience any savings due to the significant and unexpected fees FleetCor charges, as described herein, that exceed any savings customers might experience using FleetCor's cards.   These unexpected fees often amount to between at least hundreds of dollars to tens of thousands of dollars in charges per year per customer.   Further, even setting aside fees, customers typically do not achieve the promised per-gallon savings, in part because the savings come as rebates and discounts that are not available for fuel purchases at a number of large retailers frequently used by FleetCor's customers' drivers.   As set forth in fine-print disclaimers at the bottom of the advertisements shown above, these retailers have included Pilot, Texaco, Chevron, and Loves.

133.   In fact, FleetCor's sales personnel were trained by the Company to

falsely inform customers that there were no fees.  In its March 1, 2017 report, Capitol Forum reported that sales representatives were "told by their supervisors that there were no fees associated with FleetCor's cards."

134.   Capitol Forum reached out to FleetCor to obtain a copy of the Terms and Conditions from the Company.  The Company told Capitol Forum that it was "unable" to provide a copy.  Capitol Forum did, however, obtain a Welcome Kit sent to Fuelman cardholders, which was sent to new cardholders in an email with several attachments.  The attachments discuss how to access and use certain features, but do not mention fees.  Apparently, the terms and conditions, if sent, were sent later, after the customer had already received the "no fees" sales pitch and a Welcome Kit without mention of fees.  Moreover, to the extent terms and conditions were sent, Capitol Forum reported that **Clarke specifically directed** that the terms and conditions for FleetCor's fuel cards be reduced from 6-point to 4-point font, and from black to grey, and that a former employee recalled Clarke saying, "Don't make it easy on folks to read." ██████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

135.   The March 1, 2017 Capitol Forum report corroborated that customer representatives were not given any information about FleetCor's fees.  In that report,

Capitol Forum reported that "the sales representatives unwittingly provide little transparency regarding fees at the point of sale.  The sales representatives we spoke with indicated that they were told by their supervisors that there were no fees associated with FleetCor's cards—a message that they then conveyed to prospective customers."  The same Capitol Forum report quoted a former FleetCor sales person as stating that "[w]e claim [to the customer that] we didn't charge card fees, that was our advantage over [WEX]."

136.    Moreover, FleetCor's sales personnel were not incentivized to be honest with prospective customers, but to be entirely dishonest. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

137.    And even though the Defendants were fully aware of this fraudulent scheme to impose hidden fees on FleetCor's customers—indeed, Clarke and Dey were its architects, as discussed below—they would not refund customers the value of fees imposed unless the customers vigorously disputed the fees (assuming customers were aware of them in the first place).

138.     Capitol Forum confirmed as much in an April 27, 2017 report. The report quoted a former sales employee as stating, "[w]hy are we refunding fees just because they caught it?" When customers did not pay the fees, they were charged the fee the next month plus additional late fees.

## F.    Defendants Were Not Simply Aware of the Company's Predatory Sales Scheme, They Orchestrated It

139.     According to the April 27, 2017 Capitol Forum report, "[f]ormer employees say that Mr. Clarke—not line level customer service and sales employees—is the driving force behind the various business practices [such as adding undisclosed fees and preventing customers from paying bills on time]." According to a former management-level employee, "Ron [Clarke] is the mastermind—He's pulling all the levers." The former employee further told Capitol Forum that Clarke "specifically directed that the font on the terms and conditions be reduced from 6 to 4 point and switched from black to gray font," and recalled Clarke saying, "Don't make it easy on folks to read." According to Capitol Forum, another former sales employee told them that he heard Mr. Clarke state, "[i]f you are not losing 10% of your customers, you are not charging enough." Another former employee recalled that the FleetCor headquarters had a white board stating "[i]t's all about the money."

140.     A May 17, 2017 Capitol Forum report provided further information

and documents confirming that the Company carefully monitored and controlled its billings practices to extract the greatest amount of fees from their customers. According to that report, the Company used a Journal Entry Spreadsheet, which is a "document that various lower level FleetCor employees use to request approval from upper level managers to provide FleetCor customers with a percentage credit back for various fees those customers incur." The report provided a copy of the spreadsheet, which provides "REASON CODE[S]" for the employee to select when providing a credit to a customer. The spreadsheet states that these "reason codes" are "just what it says, this is the reason you are issuing the credit/debit." One of the Reason Codes was labeled "TESTING." According to the Spreadsheet, "Testing" credits were "[t]o be used by management only for specific test transactions, payments, fees, etc." As clarified by a former employee, this code denotes tests run by the Company "to see what will be acceptable to clients for fees, if they get pushback for fees, they will stop, but that's only a management call." In other words, FleetCor management would "test" how far it could push its customers with fees and credit amounts when those customers pushed back.

██████████████████████

141.    The spreadsheet also contains language concerning "% OF FEE CREDITS," which states: "This is the percentage of the fee you are crediting and if that credit is in conjunction with a rebate.  This shows how well we are negotiating." In other words, FleetCor carefully tracked its staffers' negotiation of credits to pacify dissatisfied customers—and encouraged staff *not* to reimburse the fees that were imposed.  Notably, one of the only six categories of permissible "billing error" credits was "customer provided proof that payment was received prior to the due date"—indicating that this was a frequent enough "error" that FleetCor recognized it merited its own category.

142.    Other evidence shows that FleetCor was deliberately testing vulnerabilities in its customer base to establish how far FleetCor could push their fees.  Capitol Forum reported on April 27, 2017 that fees that are taken off of a customer bill are often tacked right back on within several billing cycles.  The report quoted a former sales employee as stating that FleetCor "push[es] the envelope until they get their hand caught in the cookie jar and then say whoops we'll fix that.  If they take it off, that fee will mysteriously pop back up within the next two billing cycles and then you will have to go through it all over again to get it taken off."

143.    Citron confirmed that FleetCor used an algorithm to adjust customer

fees in an April 27, 2017 report entitled "Citron Exposes the Dirty Illegal Secrets of FleetCor. Also, Proof the Company is Already in Cover-Up Mode." This new report explained how FleetCor developed a "deep learning algorithm" to "intentionally cheat its customers." Citron interviewed 25 former employees and determined that FleetCor customers are "fitted into a profile/classification based on how many fees can be extracted without complaints." Citron reported that customers are classified as "Red," "Yellow" or "Green," based on "internal algorithmic analysis of how vulnerable the customers are to this type of gouging without detecting it or complaining." ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

144.     FleetCor also carefully tracked its customer retention rate, including accounts lost and the reason for the customer attrition.

145.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



146.

147.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

148.   ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

149.    █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

150.    █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

151.   ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

152.   Despite this knowledge, and indeed, heavy involvement and orchestration by Defendants, Defendants consciously chose to withhold adverse, material and non-public information from FleetCor shareholders.  ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

153.  As a result of Defendants' false and misleading statements and omissions, FleetCor shares traded at artificially inflated prices during the Relevant Period.  Once the true facts were revealed regarding the Company's inadequate internal controls over financial reporting, its fraudulent billing practices,

dissemination of misleading marketing materials, fraudulent booking of new customers, and predatory sales tactics, as well as its true growth and business prospects, investors sold FleetCor stock in droves, causing the Company's stock price to plummet nearly 23%, from approximately $170.00 on February 28, 2017, to $131.26 per share on May 3, 2017, erasing millions of dollars in market capitalization.

## VIII.  DEFENDANTS' FRAUDULENT SCHEME IS SLOWLY EXPOSED, CULMINATING IN THE FTC ACTION

154.  Defendants' fraudulent scheme continued until March 2017, when Capitol Forum published the first in a series of investigative reports on the Company's fraudulent billing practices and predatory sales tactics, culminating in the FTC Action.

155.  Capitol Forum's premier investigative report entitled "FleetCor: Sales and Billing Practices Raise Questions Regarding the Legitimacy of FleetCor's Fee-Based Income" detailed FleetCor's business model as "rel[ying] on customers being unaware that they are being overcharged" through fraudulent fees and billing systems practices.

156.  Capitol Forum published a follow-up report on March 20, 2017 "reaffirm[ing] [Capitol Forum's] initial findings that fuel cards are marketed as having no fees" and further found that "the nature of FleetCor's sales & marketing

practices, onboarding process, and initial grace period on fees work in concert to obscure certain important fees."

157.   On April 4, 2017, Citron published a report that similarly accused FleetCor of being a "predatory company by design, whose core strategy is to methodically rip off its customers, using business practices and fees that are designed to deceive."

158.   On April 27, 2017, Capitol Forum published another investigative report, entitled "FleetCor: Bill Payment System Imposes Numerous Obstacles that Limit Customers' Ability to Identify and Resolve Billing Issues and Make Timely Payments," which found that the complexity of the billing system was part of the business and increased the odds that the customer would pay late or that an undisclosed fee would go undetected.

159.   Also on April 27, 2017, Citron issued a follow-up report on FleetCor entitled "Citron Exposes the Dirty Illegal Secrets of FleetCor. Also, Proof the Company is Already in Cover-Up Mode."  The new report described, among other things, how FleetCor "developed a deep learning algorithm to intentionally cheat its customers with 'junk' fees."  Citron also described in its April 27, 2017 report how the Company is in full "cover-up mode" after Capitol Forum's and Citron's

publications, having removed the "no-fee" language from FleetCor's website that markets to government agencies.

160.   The disclosure of Citron's and Capitol Forum's follow-up reports caused the price of the Company's stock to decline from $151.38 per share on April 26, 2017, to $145.65 per share on April 27, 2017, or approximately 4%.

161.   Then on May 1, 2017 (after the close of the market), Chevron filed the Chevron Petition against FleetCor in Texas state court for a temporary restraining order, temporary injunction, and permanent injunction, and alleging "FleetCor's increasingly poor service threatens to harm Chevron's customer relationships and to decrease the value of the portfolio.  FleetCor's damaging actions include, but are not limited to: allowing the number of sales personnel to fall below contractual requirements; increasing customer card shipping-and-handling fees without approval; and attempting to cut call-center hours without approval.  FleetCor seeks to maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels."

162.   After news of Chevron's filing of the Chevron Petition penetrated the market on May 2, 2017, the price of the Company's stock price continued to decline through May 3, 2017, due to a Citron tweet calling attention to the lawsuit and connecting the lawsuit to FleetCor's fee practices.

163.   In the end, the Company's stock price decreased from the Chevron news from May 1, 2017 to May 3, 2017 dropping from $148.18 per share on May 1, 2017 to $131.26 per share on May 3, 2017.

A.   **The FTC Action**

164.   On December 20, 2019, the FTC, following an independent investigation, also brought suit against the Company, seeking temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, disgorgement, and other equitable relief for alleged violations of the Federal Trade Commission Act, 15 U.S.C. § 53(b).  The FTC Action alleges, *inter alia*, that FleetCor made misrepresentations and/or deceptive claims that FleetCor's customers save money using the Company's various fuel programs, that "FleetCor charges no fees for set-up, transactions, or membership," and that customers have not provided express consent to be charged the fees, interest, and finance charges imposed on them by FleetCor.  *See* FTC Action, ECF No. 1, at ¶ 96.

165.   In particular, the FTC Action alleges FleetCor engaged in numerous deceptive and unfair billings and sales practices to collect hundreds of millions of unwarranted fees from its customers.  *Id.*, ¶ 10.  First, while the Company's advertising materials represent that customers will enjoy specific per-gallon savings by using FleetCor's fuel card, Clarke and other high-level employees knew that

customers would not achieve the advertised savings because: (i) customers were charged "significant unexpected fees," which amounted to at least hundreds to tens of thousands of dollars in charges per year per customer; and (ii) the "savings" came via rebates and discounts that were not available for fuel purchases at a number of large retailers frequently used by FleetCor's customers' drivers. *Id.*, ¶¶ 12-14. Furthermore, Clarke received an email with a "discount analysis" showing that customers only saved a fraction of a cent per gallon, yet Clarke still allowed the fraud to continue. *Id.*, ¶ 16.

166. Second, during sales pitches and in advertising materials, FleetCor falsely represented the protections afforded to customers to prevent unauthorized purchases on its fuel cards, claiming customers can "[e]liminate [u]nauthorized [p]urchases," "[p]revent unwanted non-fuel spending with a fuel-only card," and "[c]ontrol fraud." *Id.*, ¶ 17. Moreover, the Company also represented that customers could authorize only certain purchases and restrict the card for purchases of "fuel only" or "fuel and maintenance only," and thus, customers could "[s]top worrying about unauthorized purchases." *Id.* However, in fact, FleetCor's fuel cards permitted purchases of any type of good or service available at a fueling site, regardless of whether a customer selected "fuel only" card access. *Id.*, ¶ 19. Then, once a customer sought to be reimbursed for this fraud via the unauthorized

purchase, FleetCor would refuse to reimburse the customer for the fraudulent charges. *Id.*, ¶ 23.

167.   Third, FleetCor claimed that there were "[n]o set-up, transaction or annual fees," and "[n]o fees for set-up, transactions or annual membership," but this too was false. *Id.*, ¶ 25.  Despite the foregoing representation, customers could not fuel vehicles at tens of thousands of locations nationwide without incurring a transaction fee, which came in the form of a "convenience" transaction fee of $2.00 or more per transaction. *Id.*, ¶ 27.  While claiming that customers could enjoy the "[c]onvenience" of fueling at tens of thousands of locations nationwide, customers could avoid the "convenience" fee by jumping through several hoops and only using restricted fuel retailers in FleetCor's "Convenience Network." *Id.*, ¶¶ 26-28.

168.   Fourth, FleetCor charged its customers significant unexpected hidden fees, including Account Administration Fees, Program Fees, Late Fees and Interest and Finance Charges, high risk fees, Convenience Network and Out of Network Fees, and Minimum Program Administration Fees. *Id.*, ¶ 29.  To avoid detection, FleetCor would charge the Company's customers all or some of these fees after a few billing cycles have passed. *Id.*  In the event a customer did detect these unwarranted fees and called a customer service representative to waive the fees,

FleetCor often subsequently replaced the complained-about fees with different fees. *Id.*, ¶ 30.

169.   Furthermore, after the Company migrated to a new payment and billing platform, customers could not access their bills, and in other instances, FleetCor would issue invoices that had listed total amounts due that FleetCor later deemed inaccurate, causing the customer to pay less than the amount FleetCor determined they should pay.  *Id.*, ¶ 31.  Nevertheless, FleetCor assessed fees to customers based on inaccurate or untimely payments.  *Id.*

170.   Remarkably, Clarke took an active role in efforts to create fees, knew how and when the Company would charge them, and knew that the Company re-enrolled customers in certain fees after those customers asked FleetCor to remove the fees from their statements.  *Id.*, ¶ 32.  To the detriment of FleetCor's customers, Clarke's efforts have been wildly successful.   According to the FTC Action, FleetCor has charged customers "***at least two hundred million dollars in unexpected fees***," all under the direction of Clarke.  *Id.*, ¶¶ 32-36.

## 1.   The Company Issues a Press Release Dismissing the FTC Action as Being "Without Merit"

171.   Despite the detailed allegations in the FTC Action complaint, Defendants are only continuing their fraudulent scheme.  Specifically, on December

20, 2019—the same day the FTC Action was filed—Defendants caused the Company to issue the December 20, 2019 Press Release.[4]

172.   In the December 20, 2019 Press Release, incredibly, Defendants caused the Company to publicly state that the FTC's claims are "***without merit***" and that "FLEETCOR strongly disagrees with the FTC's complaint."  Further, Defendants caused the Company to also state that "***the FTC's complaint is based upon fundamental misconceptions*** of the Company, its customers and its products" in several areas, including, among others, that "FLEETCOR's customer disclosures are clear and communicated repeatedly," "FLEETCOR's fees are in line with industry standards and are understood by our customers," and "FLEETCOR's savings offers are clearly articulated."

**B.    The Securities Class Action**

173.   Following the revelation of Defendants' fraudulent scheme, on June 14, 2017, the Securities Class Action was filed on June 14, 2017 and alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* Securities Class Action, ECF No. 1.

---

[4] In addition to the December 20, 2019 Press Release, on February 18, 2020, Defendants caused FleetCor to file its Answer to the FTC's Complaint, in which FleetCor denies most of the FTC's allegations and avers, among other things, that "FleetCor provides the promotional savings it advertises and discloses all fees to its customers."  FTC Action, ECF No. 8, at 2.

174.   In denying in part defendants' motion to dismiss in the Securities Class

Action on May 15, 2018, the Court held, in relevant part:

> Defendants first argue that Plaintiff has failed to explain why the Revenue Statements and the alleged fee practices upon which those statements were based were "fraudulent," to include "what statute, regulation, or standards the practices allegedly violated." . . . .   However, Defendants have not cited any authority for the proposition that the alleged fee practices must violate a statute, regulation, or standard in order to be actionable under the [Private Securities Litigation Reform Act of 1995].   Rather, ***the question is whether Defendants publicly told investors one thing about their revenue sources and, thereby, their fees – i.e., that the cards were "fee free" – when in fact that statement was a material misrepresentation***. . . .   Because Plaintiff has plausibly pled that ***Defendants voluntarily misrepresented that FleetCor's cards were "fee free" when they were not (and created a scheme that would cause fraudulent fees to be charged)***, . . . the Court does not find that misrepresentation must separately violate some statutory regulatory scheme to be actionable.
>
> *          *          *
>
> Taking the facts most favorable to Plaintiff as the Court is required to do on a motion to dismiss, the Court finds Plaintiff has plausibly pled that the alleged fee-related fraud was widespread.   Plaintiff has pled that ***the fee-related scheme was orchestrated by FleetCor Executives, fees amounted to 76% of FleetCor's revenues, and that the majority of customer complaints related to fees***. . . .   This is sufficient to survive a motion to dismiss.

*See* Securities Class Action, ECF No. 40 at 16-18.

## IX.   DEFENDANTS SOLD THEIR FLEETCOR STOCK AT ARTIFICIALLY INFLATED PRICES WHILE SIMULTANEOUSLY CAUSING THE COMPANY TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES

175.   Certain Defendants personally profited from the Company's artificially-inflated stock price by selling their holdings of FleetCor stock at bloated prices based on inside information, in violation of their fiduciary duties. Specifically, between May 10, 2016 and March 31, 2017, a majority of the Director Defendants (Clarke, Farrelly, Hagerty, Johnson, and Macchia), along with Dey, liquidated significant holdings of FleetCor stock.  In the aggregate, these Defendants sold 685,720 shares *for proceeds of over $108 million*.

176.   Notably, many of these insider sales, including certain of Clarke's and Dey's insider sales, occurred *in the midst of Capitol Forum's investigation into the Company*.

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

177.   While engaging in these stock sales, the Insider Selling Defendants[5] unquestionably had adverse, material non-public information about FleetCor's unlawful business practices. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[5] Defendants Clarke, Farrelly, Hagerty, Johnson, Macchia, and Dey are sometimes referred to collectively herein as the "Insider Selling Defendants."

178.   During that same time period, the Director Defendants caused the Company to repurchase 1,670,311 of its own shares for a staggering cost of approximately $240,100,000.00.   In other words, ***over 45% of all shares***

***repurchased by the Company were essentially acquired from the Insider Selling Defendants***.

179.   Throughout the period of insider selling, the Insider Selling Defendants (a group which includes ***a majority*** of the Director Defendants) specifically ***timed*** their sales of Company stock to ***coincide*** with the beginning of the Company's repurchase program initiated by Defendants on February 4, 2016.  Indeed, a strong majority of the Board (67%) did not sell ***any*** personal holdings of FleetCor stock in the year preceding the repurchase program.  Only three directors (Macchia, Johnson, and Stull) sold any of their personal holdings in FleetCor stock in the 13 months prior to the Repurchase Program, selling only 36,335 combined shares for $5,601,318.18 in proceeds.  Yet, in the same span of time following the authorization of the Repurchase Program, from February 4, 2016 through March 10, 2017, five directors (Clarke, Farrelly, Hagerty, Johnson, and Macchia), *i.e.*, a majority of the Board, combined to unload 660,441 personally-held shares of FleetCor stock for a staggering ***$104,617,859.43*** in proceeds.[6]  Thus, the amount of personal stock holdings sold by directors prior to the Repurchase Program pales in comparison to the amount sold since Defendants artificially inflated the Company's stock price by

---

[6] These figures refer to insider sales made by directors and thus exclude insider sales made by Dey, who although an Insider Selling Defendant, was an executive (CFO), rather than a director.

issuing false and misleading statements, and authorizing and executing the Repurchase Program.  The sales made by each of the Insider Selling Defendants are illustrated in the following chart:

| Sales by Insider Selling Defendants During Relevant Period | | | | | |
|---|---|---|---|---|---|
| Defendant | Date | Shares Sold | Share Price | Proceeds | Percentage of Portfolio Sold |
| Clarke | 05/10/2016 | 290,000 | $150.4200 | $43,621,800.00 | 39.22% |
|  | 09/06/2016 | 100,000 | $166.7265 | $16,672,650.00 | 22.26% |
|  | 09/07/2016 | 63,617 | $168.1513 | $10,697,281.25 | 18.21% |
|  | 09/08/2016 | 80,000 | $167.5479 | $13,403,832.00 | 28.00% |
|  | 03/08/2017 | 12,116 | $162.5480 | $1,969,431.57 | 03.81% |
|  | 03/09/2017 | 87,884 | $160.6823 | $14,121,403.25 | 22.33% |
| Farrelly | 09/07/2016 | 1,200 | $168.7301 | $202,476.12 | 27.12% |
| Hagerty | 03/10/2017 | 3,224 | $160.9397 | $518,869.59 | 65.92% |
| Johnson | 05/10/2016 | 20,000 | $151.8032 | $3,036,064.00 | 16.69% |
| Macchia | 05/12/2016 | 1,200 | $151.1922 | $181,430.64 | 09.60% |
|  | 03/09/2017 | 1,200 | $160.5175 | $192,621.00 | 09.25% |
| Dey | 05/26/2016 | 2,310 | $149.8330 | $346,114.23 | 30.72% |
|  | 09/06/2016 | 21,969 | $166.6230 | $3,660,540.69 | 69.69% |
|  | 03/08/2017 | 1,000 | $162.5000 | $162,500.00 | 12.35% |
| TOTAL |  | 685,720 | $158.6464 | $108,787,014.34 |  |

180.   Throughout the period of insider selling, the Insider Selling Defendants sold their personal holdings of Company stock as follows:

(a)     During Q2 2016—at a time when Defendants were causing the Company to repurchase 191,291 shares of its stock for a total value of $26 million—the following Insider Selling Defendants sold in excess of a combined $47 million in personal stock holdings at artificially inflated prices:

      i.     On May 10, 2016, Clarke sold 290,000 shares (39.22% of his FleetCor holdings) at $150.4200 per share, for total proceeds of $43,621,800.

      ii.     That same day, on May 10, 2016, defendant Johnson sold 20,000 shares (16.69% of his FleetCor holdings) at $151.8032 per share, for total proceeds of $3,036,064.

      iii.     Just two days later, on May 12, 2016, defendant Macchia sold 1,200 shares (9.60% of his FleetCor holdings) at $151.1922 per share, for total proceeds of $181,430.64.

      iv.     Shortly thereafter, on May 26, 2016, Dey sold 2,310 shares (30.72% of his FleetCor holdings) at $149.8330 per share, for total proceeds of $346,114.23.

(b)     During Q3 2016—at a time when Defendants were causing the Company to repurchase 67,854 shares of its stock for a total value of

$9.5 million—the following Insider Selling Defendants sold in excess of a combined $44 million in personal stock holdings at artificially inflated prices:

      i.      On September 6, 2016, Clarke sold 100,000 shares (22.26% of his FleetCor holdings) at $166.7265 per share, for total proceeds of $16,672,650. The following day, on September 7, 2016, Clarke sold another 63,617 shares (18.21% of his FleetCor holdings) at $168.1513 per share, for total proceeds of $10,697,281.25. Then, once more, on September 8, 2016, Clarke unloaded 80,000 more shares (28.00% of his FleetCor holdings) at $167.5479 per share, for total proceeds of $13,403,832.

      ii.      The same day that Clarke initiated his Q3 2016 fire sale of FleetCor stock, on September 6, 2016, Dey followed suit, selling 21,969 shares (69.69% of his FleetCor holdings) at $166.6230 per share, for total proceeds of $3,660,540.69.

      iii.      Likewise, on September 7, 2016, defendant Farrelly sold 1,200 shares (27.12% of his FleetCor holdings) at $168.7301 per share, for total proceeds of $202,476.12.

(c)      During Q4 2016, Defendants caused the Company to make its largest repurchase of FleetCor stock of any quarter since the Repurchase

Program began, buying back 1,000,000 shares of its stock for a total value of over $152 million.  While that massive repurchase was artificially inflating the Company's stock price, during the first quarter of fiscal year 2017 ("Q1 2017"), the following Insider Selling Defendants sold in excess of a combined $16 million in personal stock holdings at artificially inflated prices:

     i.     On March 8, 2017, Clarke sold 12,116 shares (3.81% of his FleetCor holdings) at $162.5480 per share, for total proceeds of $1,969,431.57.  The following day, on March 9, 2017, Clarke sold another 87,884 shares (22.33% of his FleetCor holdings) at $160.6823 per share, for total proceeds of $14,121,403.25.

     ii.     As occurred in Q3 2016, the same day that Clarke initiated his Q1 2017 fire sale of FleetCor stock, on March 8, 2017 Dey followed suit, selling 1,000 shares (12.35% of his FleetCor holdings) at $162.5000 per share, for total proceeds of $162,500.

     iii.     The following day, on March 9, 2017, defendant Macchia likewise sold 1,200 shares (9.25% of his FleetCor holdings) at $160.5175 per share, for total proceeds of $192,621.

     iv.     Finally, on March 10, 2017, defendant Hagerty made the most recent illicit insider sale, unloading 3,224 shares (65.92% of his

FleetCor holdings) at $160.9397 per share, for total proceeds of $518,869.59.

The Insider Selling Defendants' sales during the Relevant Period are broken down by fiscal quarter in the following chart:

| Insider Selling Defendants' Sales by Quarter | | | | | |
|---|---|---|---|---|---|
| | **1Q16** | **2Q16** | **3Q16** | **4Q16** | **2016** |
| Shares Sold | 0 | 313,510 | 266,786 | 0 | 580,296 |
| Average Price per Share | $0.00 | $150.5069 | $167.3131 | $0 | $158.2334 |
| Total Aggregate Gain to Directors | $0 | $47,185,408.87 | $44,636,780.06 | $0 | $91,822,188.93 |
| | **1Q17** | **2Q17** | **2017** | | **TOTAL** |
| Shares Sold | 105,424 | 0 | 105,424 | | 685,720 |
| Average Price per Share | $160.9199 | $0 | $160.9199 | | $158.6464 |
| Total Aggregate Gain to Directors | $16,964,825.41 | $0 | $16,964,825.41 | | $108,787,014.34 |

181. In total, the Insider Selling Defendants (including *a majority* of the Director Defendants)—all fully aware of the unlawful basis driving the Company's stock to highly inflated levels—sold 685,720 shares of their personal holdings of

FleetCor stock, at an average price of $158.6464 per share, for total proceeds of $108,787,014.34.  These insider sales were executed under highly suspicious circumstances, in that they occurred *both*: (a) while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein; *and* (b) during the precise time periods that these Defendants had caused the Company to itself repurchase $240,100,000 worth of its own stock at an average price of $143.75 per share, thereby further propping up that Company's stock price allowing these Defendants to receive the highest price possible for their shares.

182.   Moreover, because of their roles as directors and/or officers of FleetCor during the Relevant Period, Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, and non-public information about the business of FleetCor, including, *inter alia*, that FleetCor's pervasive and illicit fraudulent billing practices, dissemination of misleading marketing materials, and predatory sales tactics, as well as false and misleading statements and omissions made regarding the same, caused the price of its stock to trade at artificially inflated prices at the same time these Insider Selling Defendants were disposing of millions of dollars' worth of Company stock.  The fact that the Company was repurchasing hundreds of millions of dollars of its own stock during that same time period further buoyed the Company's stock price, to the

benefit of the Insider Selling Defendants.  These Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning FleetCor's business, finances, and prospects, but they egregiously violated this duty.

## X.   DAMAGES TO FLEETCOR

183.  As a result of Defendants' wrongful conduct, FleetCor disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated FleetCor's credibility.  FleetCor has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

184.  As a direct and proximate result of Defendants' actions as alleged above, FleetCor's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

185.  Further, as a direct and proximate result of Defendants' conduct, FleetCor has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending FleetCor and certain officers in the pending Securities Class Action and FTC Action, plus potentially millions of dollars in fines or to satisfy an adverse judgment;

(b)     costs incurred from compensation and benefits paid to Defendants, which was based at least in part on FleetCor's artificially-inflated stock price, while Defendants were in breach of their fiduciary duties owed to the Company and its shareholders;

(c)     costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling FleetCor common stock at artificially inflated prices while forcing the Company to buy back its shares at artificially inflated prices; and

(d)     costs incurred from the loss of the Company's customers' confidence in FleetCor's products.

186.    Moreover, these actions have irreparably damaged FleetCor's corporate image and goodwill.  For at least the foreseeable future, FleetCor will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that FleetCor's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

187.    Plaintiff incorporates ¶¶ 1-186.

188.   Plaintiff brings this action derivatively in the right and for the benefit of FleetCor to redress injuries suffered, and to be suffered, by FleetCor as a direct result of Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.  FleetCor is named as a nominal defendant solely in a derivative capacity.

189.   At the time this action was commenced, the Board of FleetCor consisted of the following nine (9) directors: defendants Clarke, Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull, and non-party Hala G. Moddelmog ("Moddelmog").[7]  There is reason to doubt that a majority of these individuals could have disinterestedly and/or independently responded to a pre-suit demand. Therefore, demand on the FleetCor Board is excused as a futile and useless act.

### A.   Demand Is Excused as to Clarke

190.   Clarke was and is a named individual defendant in the Securities Class Action, where fraud claims under the federal securities laws were asserted against him for issuing a series of materially false and misleading statements, and where it was alleged that Clarke executed insider stock sales between May 2016 and March 2017 "in order to take advantage of FleetCor's 'soaring stock' that was artificially inflated due to [d]efendants' misrepresentations."  As discussed herein, on May 15,

---

[7]  Moddelmog joined the Board in April 2017.

2018 the amended complaint in the Securities Class Action (in substantial part) survived a motion to dismiss notwithstanding the rigorous standards for pleading securities fraud.  In light of that ruling in the Securities Class Action, it is black-letter Delaware law that demand is excused as to Clarke, as it would be impossible for Clarke to consider a demand impartially.  Had the Company pressed forward with its rights of action against Clarke in derivative litigation, then the Company's efforts could have undercut or compromised the defense of the Securities Class Action.

191.   In addition, as alleged both in the Securities Class Action and in this derivative action, on the following dates Clarke illicitly sold FleetCor stock while in possession of material, adverse, non-public information, during a time in which FleetCor stock was artificially inflated due to Defendants' misconduct: May 10, 2016, September 6, 2016, September 7, 2016, September 8, 2016, March 8, 2017, and March 9, 2017.  As a result of Clarke's illicit insider sales, pursuant to which he reaped proceeds totaling over $100 million, Clarke received direct financial benefits not shared with FleetCor shareholders, and, therefore, he is directly interested in, and is incapable of disinterestedly considering, a pre-suit demand.  Clarke also is interested because he faces a substantial likelihood of liability for his breaches of

fiduciary duties of loyalty and good faith, and unjust enrichment, based on his challenged insider sales.

192.   Further, there is reason to doubt that Clarke could independently respond to a demand because when this derivative action was initiated and continuing to the present time, Clarke's principal professional occupation has been his executive role as the Company's President and CEO.  The Board concedes in FleetCor's own public filings, as it must, that Clarke is not an independent director, and accordingly, there is reason to doubt that Clarke could respond to a demand independently.

### B.   The Rest of the Board Is Dominated and Controlled by Clarke, and Has Demonstrated Such By Issuing the December 20, 2019 Press Release Prejudging the FTC Action Against Him

193.   Clarke has served as President and CEO of FleetCor since 2000, and as Chairman of the Board since 2003.  Clarke is undeniably the most influential, significant, and wealthy individual at FleetCor,[8] and he ranks among the most influential and significant business leaders in the entire U.S., if not the world. Indeed, Clarke has been listed by *Forbes* as one of the top 50 "creative and

---

[8]  On February 23, 2019, *MarketWatch* published an article containing a study of CEO pay which ranked Clarke as the most overpaid CEO in the S&P 500, based on the over $52.6 million compensation package Clarke received in 2018: https://www.marketwatch.com/story/heres-one-ranking-of-the-25-most-overpaid-ceos-in-the-sp-500-2019-02-22.

successful business minds of today," alongside the likes of Jeff Bezos, Elon Musk, Mark Zuckerberg, Reed Hastings, Tim Cook, and Robert Iger, among others.[9]

194.   The Board has inexplicably and shockingly failed to take any action with respect to Clarke despite the serious allegations of fraud and insider trading leveled against him in the Securities Class Action.  The Securities Class Action was sustained (in large part) in May 2018—stated another way, a federal Court determined that it was more likely than not that Clarke had committed federal securities fraud against FleetCor investors, and that Clarke's challenged insider trades were probative of scienter.

195.   In such circumstances, it is clear that the other eight members of the Board—Buckman, Farrelly, Hagerty, Johnson, Macchia, Sloan, and Stull, and non-party Moddelmog—are dominated and controlled by Clarke, who is a "larger than life" figure at FleetCor, and specifically on the Board.  If the Board would not act under these circumstances, then under no circumstances would the members of the Board take the necessary and proper action against Clarke on behalf of the Company, and accordingly, demand is excused.  ███████████████████████

███████████████████████████████████████████████████

---

[9]  https://www.forbes.com/lists/innovative-leaders/#6af10ee926aa

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

196.    Indeed, the December 20, 2019 Press Release issued by the Board within mere hours of the initiation of the FTC Action against Clarke demonstrates that it is incapable of impartially, disinterestedly, and objectively responding to a demand.  Among other things, the December 20, 2019 Press Release states that the Board "strongly disagrees with the FTC's complaint" against Clarke, that the FTC Action is "based upon fundamental misconceptions of the Company," and that the FTC's allegations are "completely inappropriate."

197.    In circumstances such as these, where the Board has publicly and prematurely issued statements exculpating Clarke, whose conduct would of course be at the epicenter of any purportedly independent investigation by the Board in response to a stockholder demand, it is impossible for this Court or stockholders to repose confidence in the Board.  If the Board concluded that Clarke committed no wrongdoing in response to a demand (as this Board undoubtedly would), there would always be a reasonable doubt that its investigation was designed to "paper a decision" that had already been made.  The December 20, 2019 Press Release shows

that the Board has prejudged the merits of the allegations and claims against Clarke and that the Board is not independent. Accordingly, a pre-suit demand on the FleetCor Board is excused.

### C. Johnson, Macchia, Farrelly, and Hagerty Are Interested Based on Their Challenged Insider Sales

198. Like Clarke, Johnson, Macchia, Farrelly, and Hagerty are each directly interested directors based on their challenged, illicit insider sales, pursuant to which they received direct financial benefits not shared with all other FleetCor shareholders, and they each are likewise interested based on a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith, and unjust enrichment as a result of their challenged stock sales.

199. Indeed, the challenged insider trades by Johnson, Macchia, Farrelly, and Hagerty are all suspicious for multiple reasons, but especially with respect to their *timing* when compared with sales by Clarke and Dey, *which were already found by the Court to have been probative of scienter* under the heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995. *See* Securities Class Action, ECF No. 40 at 23-28.

200. Significantly, each of these directors' stock sales was executed either on the same date that one of Clarke's and/or Dey's sales were executed, or almost immediately thereafter:

- Johnson's challenged insider sale netting over $3 million in proceeds and representing nearly 17% of Johnson's holdings, was executed on May 10, 2016—the *same date* as one of Clarke's challenged stock sales.

- Macchia's challenged insider sales, which together netted over $374,000 in proceeds and represented nearly 17% of Macchia's holdings, were executed (1) on May 12, 2016, *two days after* Clarke's May 10, 2016 stock sale, and (2) on March 9, 2017, the *same date* as one of Clarke's stock sales and *the day after* the March 8, 2017 stock sales by Clarke and Dey.

- Farrelly's September 7, 2016 stock sale, netting over $202,000 in proceeds and representing over 27% of Farrelly's holdings, was executed on the *same date* as one of Clarke's challenged stock sales, and *the day after* Dey's September 6, 2016 stock sale.

- Hagerty's March 10, 2017 stock sale, netting nearly $519,000 in proceeds and representing almost 66% of Hagerty's holdings, was executed *the day after* Clarke's March 9, 2017 stock sale, and *two days after* Dey's March 8, 2017 stock sale.

201.   In sustaining the Securities Class Action, the Court concluded that the challenged insider sales by Clarke and Dey were probative of scienter, and accordingly, the similarly timed sales by Johnson, Macchia, Farrelly, and Hagerty are suspicious.   The suspicious nature of these trades is only that much more heightened given that: (a) like Clarke and Dey, Johnson, Macchia, Farrelly, and Hagerty *did not* sell their shares pursuant to a Rule 10b5-1 plan, and (b) Board meeting minutes showing contemporaneous knowledge of adverse information which was shared with the Board in July 2016 and in October 2016.   ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

202.   These insider stock sales are only that much more suspicious in that they were executed by defendants Johnson, Macchia, Farrelly, and Hagerty during the precise time periods that the Board had caused FleetCor to expend vast sums of the Company's (*i.e.*, shareholders') funds to repurchase $240.1 million worth of its own stock, thereby further propping up the stock price.

203.   Based on their suspicious insider sales, pursuant to which they each received direct financial benefits not shared with all other FleetCor shareholders, Johnson, Macchia, Farrelly, and Hagerty are not disinterested directors and demand was not required on any of them.   Together with Clarke, these directors comprise a majority of the Board, and accordingly, pre-suit demand would be futile.

### D.   There Is Also Reason to Doubt the Independence of Johnson, Macchia, Farrelly, and Hagerty

204.   As described above, each of the challenged insider stock sales in 2016 and 2017 by Johnson, Macchia, Farrelly, and Hagerty was executed either on the same date as, or very shortly after, one of the challenged insider sales executed by Clarke and Dey, which have already been found to have been probative of scienter.

205.   Accordingly, in these unique circumstances, even putting aside that they are not disinterested directors based on their own challenged insider trades, there is reason to doubt that in response to a stockholder demand, Johnson, Macchia, Farrelly, and Hagerty could independently investigate, or make any impartial decision regarding, Clarke's insider trades with only the best interests of FleetCor in mind.

206.   Any inquiry or decision regarding Clarke's and Dey's (mis)conduct undertaken by Johnson, Macchia, Farrelly, and Hagerty in response to a stockholder demand would necessarily require each one of those directors to independently investigate insider trades by Clarke and Dey which were executed at the same time or very shortly before their own insider trades.  In such circumstances, there is reason to doubt their ability to do so impartially and exclusively with the interests of the Company in mind.

207.   Accordingly, because together with Clarke, these directors comprise a majority of the Board, pre-suit demand would be futile.

### E.    A Majority of the Director Defendants Face a Substantial Likelihood of Liability

208.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such, had a fiduciary duty to ensure that the Company's SEC

filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects and practices were accurate.

209.   Indeed, FleetCor's quarterly reports on Form 10-Q filed with the SEC for the second and third quarters of 2016 contained signed SOX certifications by Clarke, stating that the information contained therein fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act. FleetCor's aforementioned filings were false and misleading because, *inter alia*, FleetCor lacked effective internal financial controls over financial reporting and intentionally misrepresented the basis of the Company's growth and its financial prospects and practices.

210.   Additionally, each of the Director Defendants (*i.e.*, eight out of nine members of the current Board) signed the Company's 2015 10-K and 2016 10-K, which were false and misleading or omitted necessary information to make the statements contained therein not false and misleading for the reasons stated herein. *See also* Securities Class Action, ECF No. 40 at 11, 16-19.

211.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf, and none of

them took any steps in a good faith effort to prevent or remedy that situation. █

█ ████████████████████████████████████████████████████

████████████████████████

212.   The Director Defendants (or at the very least, a majority of them) cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made—and should be excused from making—a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

213.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to occur, and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or, recklessly and/or with gross negligence, disregarded the wrongs complained of herein, and are therefore not disinterested parties.

214.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged

herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

215. Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members), owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

216. Because of their participation in the gross dereliction of fiduciary duties and breaches of the duties of due care, good faith, and loyalty, the Director Defendants face a substantial likelihood of liability, making demand upon them futile.

217. The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such

statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of FleetCor to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand would be futile.

### F.     Demand Would Be Futile as to the Audit Committee Defendants[10]

218.   The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing FleetCor's internal controls over financial reporting, and discharging their other duties described herein. ███████████

█████████████████████████████████████████

█████████████████████████████████████████

---

[10] Defendants Buckman, Johnson, and Macchia are sometimes referred to collectively herein as the "Audit Committee Defendants."

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████   Indeed, the Audit Committee was required to meet

no less frequently than once every quarter for fiscal years 2016 and 2017—and did

so on five occasions in 2016, and one occasion so far in 2017—during which time

the Audit Committee reviewed annual and interim consolidated financial statements

and internal controls over financial reporting.   Despite these duties, the Audit

Committee Defendants knowingly or recklessly reviewed and approved, or failed to

exercise due diligence and reasonable care in reviewing and preventing the

dissemination of false and/or materially misleading earnings press releases and

earnings guidance, and failed in their specific duties to ensure that the Company's

internal controls over financial reporting were sufficient, and that statements made

by the Company regarding its business and financial prospects and practices were

accurate.   Accordingly, the Audit Committee Defendants face a sufficiently

substantial likelihood of liability for breach of their fiduciary duties of loyalty and

good faith.  Any demand upon the Audit Committee Defendants therefore would be

futile.

### G. Demand Would Be Futile as to All Director Defendants for Additional Reasons

219. Each of the Director Defendants receives a lavish annual retainer, in recent years of nearly $250,000, purely for being a Board member, which each Director Defendant has received since becoming a Board member: Clarke in August 2000, Farrelly in April 2014, Hagerty in November 2014, Johnson in March 2003, and Macchia in July 2010.

220. This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on FleetCor. Demand on each of the Director Defendants would be futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of FleetCor's Board.

221. If FleetCor's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by

FleetCor against the Director Defendants, known as the "insured versus insured exclusion."

222.  As a result, if the Director Defendants were to sue themselves or certain of the officers of FleetCor, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

223.  Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting FleetCor by prosecuting this action.  Therefore, demand on FleetCor and its Board would be futile and is excused.

224.  FleetCor has been, and will continue to be, exposed to significant losses due to the Director Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  To make matters worse, the Director Defendants went so far as to cause the Company to issue the December 20, 2019 Press Release—on the same

day the FTC initiated the FTC Action—disavowing the FTC Action as being "without merit." As discussed above, the FTC Action alleges many of the same or substantially similar allegations that Plaintiff alleges here; thus, in disputing the merits of the FTC Action, the Director Defendants have prejudged the derivative claims asserted herein against Clarke, and by implication, themselves. Accordingly, the Director Defendants cannot be said to be disinterested or independent or otherwise capable of objectively reviewing a demand and are breaching their fiduciary duties to the Company (and face a sufficiently substantial likelihood of liability for their breaches). Thus, any demand upon the Board would be futile.

225. Plaintiff has not made any demand on shareholders of FleetCor to institute this action since such demand would be a futile and useless act for the following reasons:

(a)  FleetCor is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)  making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of FleetCor shareholders; and

(c)    making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

**COUNT I**
**Breach of Fiduciary Duties for Disseminating False and Misleading**
**Information to Shareholders (All Defendants)**

226.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

227.   Defendants owed, and owe, FleetCor fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed, and owe, FleetCor the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

228.   Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

229.   Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions were not, and could not have been, a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

230.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, FleetCor has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

231.   Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Insider Selling Defendants)

232.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

233.   At the time the Insider Selling Defendants sold their FleetCor stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

234.   The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, revenue growth, and the sufficiency of its Company's internal controls—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms.   Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

235.   At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects,

specifically related to, among other things, the Company's fraudulent billing practices, dissemination of misleading marketing materials, predatory sales tactics, and lack of internal controls over financial reporting.

236. The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

237. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

238. As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

239. Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## COUNT III
## Unjust Enrichment (All Defendants)

240. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

241. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of, and to the detriment of, FleetCor.

242.   Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to FleetCor.

243.   Further, the Insider Selling Defendants sold (or caused to be sold for their benefit) FleetCor common stock while in possession of material, adverse, non-public information concerning the Company, the concealment of which artificially inflated the price of the Company's stock at the time of their sales.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their misappropriation and exploitation of material, adverse, non-public information that belonged to the Company.

244.   Plaintiff, as a shareholder and representative of FleetCor, seeks restitution from Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, fiduciary breaches, and/or insider sales.

245.   Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## COUNT IV
## Contribution (Defendants Clarke and Dey)

246.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247.   The conduct of Defendants Clarke and Dey described above has exposed FleetCor to significant liability under various federal and state laws by their

disloyal acts.  FleetCor is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

248.   Defendants Clarke and Dey have caused FleetCor to suffer substantial harm through their disloyal acts.

249.  FleetCor is entitled to contribution and indemnification from Defendants Clarke and Dey in connection with all such claims that have been, are, or may be asserted against FleetCor by virtue of Defendants Clarke and/or Dey's wrongdoing.

250.   Plaintiff, on behalf of FleetCor, has no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, and unjust enrichment;

B.    Against the Defendants, on behalf of FleetCor, to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws, and to protect FleetCor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to

the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a proposal to ensure the accuracy of the qualifications of FleetCor's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a proposal to permit the shareholders of FleetCor to nominate at least five (5) candidates for election to the Board to replace all current directors who sold stock during the Relevant Period at artificially-inflated prices;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

124

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.    Awarding to FleetCor restitution from Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including all proceeds from the Insider Selling Defendants' illicit stock sales detailed herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## XIII.  JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 24, 2020

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
Georgia Bar No.: 262062
William W. Stone
williams@johnsonfistel.com
Georgia Bar No.: 273907

Mary Ellen Conner
maryellenc@johnsonfistel.com
Georgia Bar No.: 195077
Adam J. Sunstrom
adams@johnsonfistel.com
Georgia Bar No.: 556579
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

**JOHNSON FISTEL, LLP**
Frank J. Johnson
frankj@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*

DocuSign Envelope ID: 06BE121C-7136-464C-BDEE-7EE5FAB73CD2

# **VERIFICATION**

I, Jerrell Whitten, verify that I have reviewed the foregoing Verified Amended Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  February 22, 2020

DocuSigned by:

*Jerrell Whitten*

45FA11B153F1445...

(Signature of Jerrell Whitten)