IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| JERRELL WHITTEN *derivatively on behalf of* FLEETCOR TECHNOLOGIES, INC., | : : : : : | |
| Plaintiff, | : : : | CIVIL ACTION NO. 1:17-CV-2585-LMM |
| v. | : : : | |
| RONALD F. CLARKE, MICHAEL BUCKMAN, JOSEPH W. FARRELLY, THOMAS M. HAGERTY, MARK A. JOHNSON, RICHARD MACCHIA, JEFFREY S. SLOAN, STEVEN T. STULL, and ERIC R. DEY, | : : : : : : : : | |
| Defendants, | : : | |
| –and– | : : | |
| FLEETCOR TECHNOLOGIES, INC., | : : | |
| Nominal Defendant. | : | |

## **ORDER**

This case comes before the Court on Defendants' Motion to Dismiss [42].

After due consideration, and with the benefit of a hearing, the Court enters the

following Order:

## I.   BACKGROUND[1]

In this shareholder derivative suit, Plaintiff Jerrell Whitten has sued on behalf of FleetCor Technologies, Inc. ("FleetCor"), alleging that Defendants breached their fiduciary duties to FleetCor and were unjustly enriched at FleetCor's expense. Defendants are the members of FleetCor's Board of Directors as it was composed when this suit was filed (collectively "Board"), plus FleetCor's CFO, Eric R. Dey.[2] In addition to being a member of the Board, Defendant Ronald F. Clarke was FleetCor's CEO at all times relevant to this suit. Plaintiff's claims are based on the Board's alleged acts and omissions in the face of FleetCor's underlying malfeasance.

FleetCor is a global provider of workforce payment products, whose revenue is primarily derived through the sale and maintenance of "fuel card" programs to business owners with vehicle fleets. Fuel cards are generally distributed by those business owners to allow their employees to purchase fuel at gas stations.

Plaintiff alleges that FleetCor artificially inflated its stock price between February 2016 and May 2017. FleetCor marketed its fuel cards as "fee-free," but Plaintiff alleges that FleetCor drew a substantial part of its revenue from

---

[1] Unless otherwise indicated, all facts are taken from the Verified Amended Shareholder Derivative Complaint [30] and are construed in the light most favorable to Plaintiff as the nonmovant.

[2] One Board member, Hala Moddelmog, is not a party to this lawsuit.

deceptive fees and unfair billing practices. At the same time, FleetCor and Defendant Clarke publicly attributed the company's revenue growth to strong business fundamentals like hard work, customer service, and business acumen. It was this alleged misrepresentation that Plaintiff argues artificially inflated FleetCor's stock price.

Beginning in March 2017, two publications specializing in financial journalism for consumers, Capitol Forum and Citron Research, published reports on FleetCor's alleged deceptive billing practices. Following the first Capitol Forum report on March 1, 2017, FleetCor's stock price fell roughly 23%. FleetCor shareholders filed a federal securities class action in this Court based on the same fraudulent practices as those alleged in this case. See City of Sunrise General Employees' Retirement Plan v. FleetCor Techs., Inc. et al., No. 1:17-cv-2207-LMM (N.D. Ga. May 15, 2018). The parties in that case settled after the Court denied in part FleetCor's motion to dismiss. Id. at ECF No. [40].

The Federal Trade Commission ("FTC") filed an action against FleetCor based on its billing practices on December 20, 2019. See FTC v. FleetCor Techs. Inc. et al., No. 1:19-cv-5727-AT (N.D. Ga. Dec. 20, 2019), ECF No. [1]. The same day, FleetCor released a press statement in response to the FTC's allegations. In this statement, entitled "FLEETCOR Reinforces Commitment to Customer Transparency: Strongly Disagrees with FTC Lawsuit," the company denied the FTC's allegations, labeled them "without merit" and "based upon fundamental

3

misconceptions," and affirmed that FleetCor had followed all applicable laws. See Dkt. No. [30-1] ¶ 17 (citing https://investor.fleetcor.com/node/13376/pdf).

Plaintiff alleges that the Board Member Defendants knew about FleetCor's alleged malfeasance, failed to prevent it, and in some cases benefitted from it. Plaintiff alleges that the Board must have known about the malfeasance because fraudulent fees made up 76% of FleetCor's revenues, and so the Board must also have known that FleetCor's statements about revenue growth were fraudulent. Plaintiff adds that a number of other "red flags" put FleetCor and its Board on notice of the deceptive billing practices. The Court discusses these in greater detail below.

Plaintiff also alleges that Defendants, knowing that FleetCor's stock was artificially inflated, sold stock in FleetCor. This includes Defendant Board Members Clarke, Johnson, Macchia, Farrelly, and Hagerty (collectively "Selling Board Members") and Defendant Dey. These sales took place during a stock repurchase by FleetCor.

Plaintiff's shareholder derivative action includes four counts: Count I – Breach of Fiduciary Duties for Disseminating False and Misleading Information to Shareholders (All Defendants); Count II – Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Insider Selling Defendants); Count III – Unjust Enrichment (All Defendants); and Count IV – Contribution (Defendants Clarke and Dey). Dkt. No. [30-1] ¶¶ 226–250. Defendants have moved to dismiss all claims because Plaintiff cannot show

demand futility. Dkt. No. [43-1]. They contend that Plaintiff was required to demand that the Board pursue Plaintiff's claims on behalf of FleetCor, that Plaintiff failed to make any demand, and that there was no excuse for that failure. Plaintiff responds arguing that demand is excused for various reasons. Dkt. No. [52-1].

## II.   STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id. (citing Twombly, 550 U.S. at 556).

At the motion to dismiss stage, "'all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1296

(11th Cir. 2011) (quoting <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1261 (11th Cir. 2006)). However, this principle does not apply to legal conclusions set forth in the complaint. <u>Iqbal</u>, 556 U.S. at 678.

This action is also governed by Federal Rule of Civil Procedure 23.1, which "applies a heightened pleading standard for derivative actions." <u>McDowell v. Bracken</u>, 794 F. App'x 910, 913 (11th Cir. 2019). Rule 23.1 requires a plaintiff to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).

### III.   DISCUSSION

Defendants argue that this case should be dismissed because Plaintiff cannot show "demand futility." Under Delaware law, a plaintiff must normally demand that a corporation's board of directors pursue a claim on behalf of the corporation. This is because the board of directors wields "the power to manage the business and affairs of corporations." 8 Del. C. § 141; <u>Braddock v. Zimmerman</u>, 906 A.2d 776, 784 (Del. 2006) (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984)). That said, Delaware law excuses plaintiffs from the demand requirement if they can show "that demand would be futile." <u>Id.</u> "[D]emand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that '[] the directors are disinterested and

independent . . . .'" Id. (quoting Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993)).

Defendants argue that Plaintiff was required to make a demand on FleetCor's Board, that he failed to do so, and that his failure was not excused. Dkt. No. [43-1]. Plaintiff concedes that he never demanded that the Board pursue his claims. Dkt. No. [30-1] ¶ 212. Nevertheless, he alleges that demand on the Board would have been futile because (1) Defendants pre-judged the merits of his claims and because (2) the Board lacked the ability to make a disinterested judgment on whether to sue. Dkt. No. [52-1].[3] The Court addresses each of these contentions to determine whether Plaintiff can carry his burden to show demand futility.

### A.    Pre-judgment of Plaintiff's Claims

Plaintiff argues that demand on the Board would have been futile because the Board publicly and prematurely disavowed the merits of his claim. Dkt. No. [52-1] at 20–25. Delaware courts have sometimes questioned whether a board could be disinterested when it has taken some action demonstrating prejudgment of a plaintiff's claims. See, e.g., Conrad v. Blank, 940 A.2d 28, 37 (Del. Ch. 2007) (finding that an audit committee's review and approval of allegedly wrongful

---

[3] Plaintiff has emphasized in his briefing that he is not bringing a Caremark claim based on failure to implement systems to monitor operations. Dkt. No. [52-1] at 27–28 (citing In re Caremark Int'l, Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996)). The Court therefore only addresses Plaintiff's "good faith and loyalty" claims.

actions "undermine[d] the court's confidence in the ability of the board to properly consider a demand").

For evidence of prejudgment, Plaintiff points to FleetCor's December 20, 2019, press release in which the company denied the FTC's allegations about its malfeasance. Dkt. No. [52-1] at 20. The press release described the FTC's claims as meritless, based on fundamental misconceptions about FleetCor, and completely inappropriate. Id.; Dkt. No. [30-1] ¶ 17 (citing https://investor.fleetcor.com/node/13376/pdf). Plaintiff contends that the press release reflects the views of the Board and proves that the Board was incapable of responding to Plaintiff's demand in a way that was "disinterested, independent, or objective." Id. ¶ 18. Defendants argue that the press release does not show prejudgment because it was issued years after this lawsuit was filed and because it does not reflect the views of the Board. Dkt. No. [42-1] at 30 n.11.

The Court agrees with Defendants on the impact of the press release. Delaware courts gauge a director's impartiality based upon the circumstances existing at the time a shareholder derivative suit was filed. Rales, 634 A.2d at 934; Aronson, 473 A.2d at 810. And Delaware courts have routinely held that a board's actions taken after the filing date do not show director interest as of the time the lawsuit was filed. See In re Lending Club Corp. Deriv. Litig., C.A. No. 12984-VCM, 2019 WL 5678578, at *15 (Del. Ch. Oct. 31, 2019) (declining to consider impact of a federal securities suit filed six months after the shareholder derivative complaint because "Delaware law instructs this Court to ignore events

subsequent to the filing of a derivative action for the purposes of a demand futility analysis"); Hartsel v. Vanguard Grp., Inc., C.A. No. 5394-VCP, 2011 WL 2421003, at *27 (Del. Ch. June 15, 2011) ("'Futility is gauged by the circumstances existing at the commencement of a derivative suit' and not afterwards with the benefit of hindsight." (quoting Aronson, 473 A.2d at 809–10)); Aronson, 473 A.2d at 810 (rejecting the argument that a board's motion to dismiss a shareholder derivative action showed demand futility because "futility is gauged by the circumstances existing at the commencement of a derivative suit").

Here, the Complaint was filed on July 10, 2017. Dkt. No. [1]. The press release was not published until December 20, 2019. Dkt. No. [30-1] ¶ 17. Even if the press release is attributable to the Board, and not merely the company, it was issued more than two years after this lawsuit was filed. Accordingly, it does not raise a reasonable doubt that the Board would have dismissed Plaintiff's claims more than two years before.[4]

Further, Plaintiff has not pled facts suggesting that the press release is attributable to the Board itself. Nothing on the face of the press release suggests that the Board drafted, reviewed, or even approved it. Delaware courts have

---

[4] Plaintiff argues that Delaware courts have exercised equitable authority to consider post-filing events to gauge director disinterest. Dkt. No. [52-1] at 18. However, each of the cases Plaintiff cites is inapplicable. In those cases, the courts looked to post-filing changes in *board composition* to determine which members should be considered in the demand-futility calculus. That is not an issue here.

rejected plaintiffs' attempts to attribute publications to boards when there was no evidence that the boards were responsible for the content of the publications. See Kops v. Hassell, C.A. No. 11982-VCG, 2016 WL 7011569, at *3 (Del Ch. Nov. 30, 2016) ("Absent from the Complaint are well-pled facts showing that the Board or the Special committee were involved in drafting, preparing, or authorizing the advertisement."); In re Citigroup Inc. S'holder Deriv. Litig., 964 A.2d 106, 133 n.88 (Del. Ch. 2009) ("It is unclear [] how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile."). In fact, the press release here was filed the same day as the FTC's allegations. Such a rapid turnaround suggests that FleetCor did not wait for the Board to approve the statement.

Delaware courts have rejected similar arguments concerning directors who much more directly condemned a plaintiff's claims. For example, in Tilden v. Cunningham, the Delaware Chancery Court found no prejudgment when a board declared a plaintiff's claims to be "without merit" in a pre-suit quarterly 10-Q filed with the SEC. No. 2017-837-JRS, 2018 WL 5307706, at *10 (Del. Ch. Oct. 26, 2018). Similarly, in Highland Legacy Ltd. v. Singer, the court found no prejudgment when a company filed an 8-K with the SEC stating that claims in related litigation "ha[d] no merit." C.A. No. 1566-N, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006). The Highland Legacy court reasoned as follows:

It would be unreasonable for this court to conclude that a board made up of a majority of independent directors could not be asked to pursue this litigation simply because the company expressed a belief in a public filing that the claims in a series of related litigations were unfounded.

Id.; see also Kops, 2016 WL 7011569, at *2–3 (finding no prejudgment when a company declared its "innocence" in a New York Times advertisement).

This Court agrees and follows these Delaware cases. The Court finds that the 2019 press release—issued two years after the filing of this suit and without any indication that the Board even reviewed it—does not imply prejudgment or undermine director independence.

## B.    Board of Director Interest

Plaintiff also argues that the Board could not have exercised disinterested judgment in deciding whether to bring his claims because the claims exposed a majority of the Board to a substantial likelihood of personal liability. Dkt. No. [52-1] at 25–30.[5] "The requisite doubt necessary to find a director interested [] may be raised by well pleaded facts demonstrating that the director will be exposed to liability as a result of the derivative claim." Conrad, 940 A.2d at 37.

---

[5] Plaintiff's Amended Complaint includes some allegations regarding director *independence*, a separate rationale for demand futility from director disinterest. Dkt. No. [30-1] ¶¶ 204–207. However, in his Response Brief, Plaintiff only contests director independence by arguing that the Board prejudged his claims in the 2019 press release. Accordingly, the Court finds that Plaintiff has waived any additional argument as to director independence and focuses instead on disinterest. See Borges v. Bank of N.Y. Mellon, No. 1:13-cv-2623-LMM, 2015 WL 11233231, at *4 (N.D. Ga. Dec. 15, 2015) (failure to oppose arguments in response to motion to dismiss results in waiver).

But "[t]his potential threat of liability must rise to a substantial likelihood . . . ." Id.

Plaintiff argues that a majority of the Board faced a substantial likelihood of liability based upon two claims. First, Plaintiff claims that all Board Member Defendants "knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the company." Dkt. No. [30-1] ¶ 229; Dkt. No. [52-1] at 20 (arguing in favor of the "reasonable inference" that the Board "knew of the fraudulent fee scheme"). And second, Plaintiff claims that the Selling Board Members face a substantial likelihood of liability for insider trading. Dkt. No. [30-1] ¶¶ 232–239; Dkt. No. [52-1] at 27–30.

The Court addresses each of these claims to determine whether Plaintiff has alleged facts demonstrating a substantial likelihood that a majority of directors would be exposed to liability. In doing so, the Court must consider the likelihood of liability as to each claim separately. In re Lending Club, 2019 WL 5678578, at *15 ("This Court evaluates whether a substantial likelihood of liability impugns the impartiality of a demand board on a claim-by-claim basis." (citing Beam v. Stewart, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."))).

Before addressing each of the claims, the Court discusses an issue central to both: whether Plaintiff has shown that the Board knew about the fraudulent practices at FleetCor. This fact is critical to the false/misleading statements claim

12

because Plaintiff must show that the Board *knew* that statements were false or misleading. In re Citigroup, 964 A.2d at 135 (dismissing a shareholder's lawsuit when "the Complaint fail[ed] to plead with particularity facts that would lead to the reasonable inference that the director defendants made or allowed to be made any false statements or material omissions with knowledge or in bad faith"). Likewise, to plead his insider trading claim, Plaintiff must allege particularized facts indicating that Defendants "*knew* material, non-public information about the company's financial condition." Guttman, 823 A.2d at 502 (emphasis added). The knowledge issue is especially relevant because the Court held in the FleetCor securities litigation that the plaintiff there successfully alleged "scienter" against Defendants Clarke and Dey. City of Sunrise, No. 1:17-cv-2207-LMM, ECF No. [40] at 23–28.

### 1.   *The Board's Awareness of Fraudulent Activity*

Plaintiff alleges that Defendants "knew the truth about the Company's financial condition and future business prospects, specifically related to . . . the Company's fraudulent billing practices, dissemination of misleading marketing materials, predatory sales tactics, and lack of internal controls over financial reporting." Dkt. No. [30-1] ¶ 235. To support its argument that Defendants knew this information, Plaintiff argues that (1) fraudulent billing practices accounted for a substantial portion of FleetCor's core business and (2) there were "red flags" that put Defendants on notice of improprieties. Dkt. No. [52-1] at 20–27.

Plaintiff has alleged facts which, taken together and viewed in the light most favorable to him, suggest that the Board should have known about the fraudulent activity at FleetCor. Plaintiff argues that the Board knew of the fraudulent billing scheme because fraudulent fees accounted for more than 76% of FleetCor's revenues. Id. at 20.[6] Plaintiff cites several cases in which courts found that a board knew or should have known about fraud because the fraud was central to a company's "core operations." Id. at 20–21 (citing In re Flowers Foods, Inc. Sec. Litig., 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) ("Plaintiff must allege specific facts establishing scienter as to each Defendant, and consistent with that, where the alleged fraudulent activity is the basis of 84% of the defendants' business, such a fact is relevant for the issue of scienter."); Pfeiffer v. Toll, 989 A.2d 683, 693 (Del. Ch. 2010) (applying under Rule 12(b)(6) the inference that independent directors know core information about a business), rev'd on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P., 23 A.3d 831 (Del. 2011)).[7]

---

[6] The Court does not hold at this stage that the 76% figure is accurate. Indeed, Defendants hotly contest the figure and offer sound arguments to dispute it. Dkt. No. [61-1] at 16 n.5. But the Court is required at this stage to view the well pleaded facts in the light most favorable to Plaintiff, and so the Court views the 76%-of-revenues figure in that light.

[7] The Court discusses Plaintiff's alleged "red flags" further below. For various reasons that the Court will address, these red flags either occurred too late to be relevant to the claims in this suit or did not likely come to the outside directors' attention.

This allegation suggests that FleetCor's Board of Directors should have known that the company was drawing a substantial portion of its business from fees. If Plaintiff's allegations are true, as the Court must assume they are, the fraud at FleetCor was so widespread, and there were enough discrete signs of foul play, that the Board would have been willfully ignorant *not* to be aware of the fraud.

However, that does not end the discussion. Plaintiff must plead particularized facts suggesting that a majority of the individual board members face a substantial likelihood of liability on each of his claims. Conrad, 940 A.2d at 37. While Plaintiff has provided some basis to infer that the Board should have been aware of FleetCor's underhanded fees, Plaintiff has failed to plead particularized facts indicating that each of the individual Board Members knew about the fraud such that they faced personal liability for sanctioning it. Particularized allegations of knowledge are required under Delaware law and Rule 23.1:

> Instead of providing factual allegations regarding the knowledge or bad faith of the individual director defendants, the Complaint makes broad group allegations about the director defendants or the members of the ARM Committee. A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants, and plaintiffs have not made specific factual allegations that would allow for such an inquiry.

In re Citigroup, 964 A.2d at 134; compare with In re AIG, Inc., 965 A.2d 763, 797 (Del. Ch. 2009) ("[T]he Complaint is not laden with such accusations against the

D&O Defendants as a group; these group accusations are used sparingly. Even more important, the Complaint pleads details about the fraudulent schemes that . . . support the inference that [the individual directors] knew of and approved much of the wrongdoing.").

The absence of facts showing individualized awareness of fraud sets this case apart from the FleetCor securities litigation, where the plaintiff alleged facts directly linking Defendants Clarke and Dey to FleetCor's alleged fraud. City of Sunrise, No. 1:17-cv-2207-LMM, ECF No. [40] at at 25 ("[T]he Court finds Plaintiff has plausibly pled that the individual Defendants had direct knowledge of the fraudulent fee practices."). For example, the securities plaintiff alleged that Defendant Clark masterminded the fee scheme. Id. Among other things, he ordered that language dealing with fees in customer contracts be greyed out and shrunken so that it was more difficult to read. Id. Similarly, Defendant Dey indicated by his statements that he was aware FleetCor's telemarketing included a "fee free" pitch. Id. Circumstantial evidence supported the managers' knowledge as well. The Court noted that FleetCor's managers must have been aware that the company was generating $200 million in fees when it advertised that it charged no fees whatsoever. Id. at 26. Thus, the securities plaintiff provided individualized allegations of direct and circumstantial knowledge.

The securities plaintiff's claims were further bolstered by Defendants Clarke and Dey's status as managers, as opposed to directors (although Defendant Clarke was also a director). Their positions as CEO and CFO tied them

much more directly to the fraud alleged. <u>See, e.g.</u>, <u>In re Friedman's, Inc. Sec. Litig.</u>, 385 F. Supp. 2d 1345, 1364 (N.D. Ga. 2005) ("[O]ne who functions as the chief operating officer of a national company and serves as one of the core members of the senior management group necessarily is provided significant information, formally and informally, about the financial performance, or failure of performance, over which he has overall operational responsibility."). Indeed, defendants' managerial roles influenced the "core operations" cases that Plaintiff relies on to show Board knowledge—most of which are securities cases. <u>See</u> <u>In re Flowers Foods</u>, 2018 WL 1558558, at *15–16 (noting that each of the individual defendants was a high-level manager with a job title like COO, CFO, CEO, CAO, President, Executive VP, and Tax Director); <u>In re Wells Fargo & Co. S'holder Deriv. Litig.</u>, 282 F. Supp. 3d 1074, 1099 (N.D. Cal. 2017) (holding that "senior executives" would have been aware of fraud in the company's core business so as to subject them to liability under Section 10(b) and Rule 10b-5).[8]

The reasoning in these cases is sound: when fraudulent activity is a core aspect of a company's business, it stands to reason that managers involved in the company's daily operations would know about that fraud (especially when there are allegations that they masterminded the fraud, as in the FleetCor securities

---

[8] A notable exception is <u>Pfeiffer v. Toll</u>, where Vice Chancellor Laster held that outside directors were responsible for knowledge of the core operations of the company. 989 A.2d at 693. However, the Vice Chancellor emphasized that he was deciding that case under Rule 12(b)(6), and he explicitly distinguished similar cases where Delaware courts had dismissed plaintiffs' claims under Rule 23.1— the standard that applies in this case. <u>Id.</u>

litigation). Conversely, courts have found that the direct knowledge of a manager does not imply the knowledge of board members who are further removed from alleged misconduct. See Ellis v. Gonzalez, C.A. No. 2017-0342-SG, 2018 WL 3360816, at *4, 11 (Del. Ch. Jul. 10, 2018) (dismissing a shareholder derivative case against directors premised on the same misstatement claim the court had previously sustained in a securities case against managers); In re World Acceptance Corp. Deriv. Litig., No. 6:15-cv-2796-MGL, 2017 WL 770539, at *11–12 (D.S.C. Feb. 28, 2017) ("In [the securities] case, this Court held executives who were employees of the Company possessed material non-public information; in the instant case, the majority of the Board consists of Outside Directors who are not, and have never been, employed by the Company.").

To be sure, the Amended Complaint includes discrete allegations about what FleetCor's managers covered at Board meetings. See Dkt. No. [30-1] ¶¶ 149, 218. Even when viewed in the light most favorable to Plaintiff, these allegations do not include particularized facts that the outside Board Members knew of FleetCor's alleged schemes. Rather, the allegations show that the Board was apprised of routine business information like "lowlights," "business relationships," and "forward financial performance." Id. ¶ 149. These allegations do not support Plaintiff's claim that a majority of the Board knew about FleetCor's fraudulent activities.

Accordingly, the Amended Complaint here lacks the individualized allegations of knowledge that were decisive in the securities litigation. While the

Court finds that these allegations provide some basis to infer that the Board collectively *should* have known about the fraud, the allegations fall short of showing that the individual board members each knew of the fraud so that they faced a substantial likelihood of personal liability. See In re Citigroup, 964 A.2d at 134 ("A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants, and plaintiffs have not made specific factual allegations that would allow for such an inquiry."). But even if Plaintiff had pled knowledge in a particularized, individualized, and concrete way, his claims would fail for additional reasons to which the Court now turns.

### 2.    *Approval of False/Misleading Statements*

Plaintiff contends that a majority of the Board faced a substantial risk of liability because the Board knew about FleetCor's alleged fraudulent fee scheme but nevertheless approved the company's misleading statements. See Dkt. No. [30-1] ¶ 229 ("Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.").

Defendants have moved to dismiss this claim as inadequately pled. Dkt. No. [43-1] at 18. Defendants argue that Plaintiff has failed to plead that any Defendant besides Defendants Clarke and Macchia "had anything more than passive involvement in the preparation or communication of the alleged misstatements . . . ." Id. at 19. Defendants acknowledge that Plaintiff alleges

Defendant Clarke made statements to the shareholders, the public, and the SEC, and that Defendant Macchia "provided revisions to an earning call script." Id. (citing Dkt. No. [30-1] ¶¶ 60–61, 64–68, 70–71, 73–74).[9] But Defendants point out that Plaintiff has not alleged the remainder of the Board participated in any misstatements, apart from signing FleetCor's 10-Ks from 2015 and 2016. See Dkt. No. [30-1] ¶ 210 ("[E]ach of the Director Defendants . . . signed the Company's 2015 10-K and 2016 10-K, which were false and misleading or omitted necessary information to make the statements contained therein not false and misleading for the reasons stated herein."). Defendants argue that the Board's signing of the annual 10-Ks is legally deficient to sustain Plaintiff's misstatement claim. Dkt. No. [43-1] at 19.

The Court agrees with Defendants on this issue. Plaintiff's allegations regarding the Board's approval of alleged misstatements are deficient as a matter of law for two reasons. First, Delaware courts have rejected plaintiffs' contentions that board members' routine approval of financial statements would subject the individual members to a substantial likelihood of personal liability:

> [T]he Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow me to reasonably conclude that the director defendants face a substantial likelihood of personal liability. Plaintiffs do not allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions. The Complaint

_____

[9] Defendants argue that Plaintiff has not shown that Mr. Macchia prepared misleading statements, but the Court need not address this argument here.

> merely alleges that Citigroup's financial statements contained false statements and material omissions and that the director defendants reviewed the financial statements pursuant to their responsibilities under the ARM Committee charter. Thus, I am unable to reasonably conclude that the director defendants face a substantial likelihood of liability.

In re Citigroup, 964 A.2d at 134; Wood v. Baum, 953 A.2d 136, 142 (Del. 2008) ("The Board's execution of [a company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality.").

Plaintiff does not respond to Defendants' argument that the Board's signing of the 10-Ks is insufficient for a misstatement claim. Rather, Plaintiff's Response Brief focuses on whether Defendants knew of FleetCor's alleged fraudulent fee scheme. Dkt. No. [52-1] at 25–27. But Plaintiff offers nothing to "suggest sufficient board involvement in the preparation of the disclosures" to conclude that Defendants "face a substantial likelihood of personal liability" based on those disclosures. In re Citigroup, 964 A.2d at 134; see also In re Synchronoss Techs., Inc. Sec. Litig., C.A. No. 17-7173, 2020 WL 3118749, at *6 (D.N.J. June 12, 2020) (applying Delaware law) ("Plaintiff has not pointed to anything in the record which indicates that the Directors . . . were responsible for reviewing that particular SEC filing and thus attribute that misleading disclosure to them."); Steinberg v. Bearden, C.A. No. 2017-0286-AGB, 2018 WL 2434558, at *10 (Del. Ch. May 30, 2018) ("[M]erely pleading that the Audit Committee

'caused' or 'caused or allowed' the Company to issue [quarterly 10-Qs] is not sufficient particularized pleading to excuse demand under Rule 23.1.").

Second, Plaintiff does not allege in his Amended Complaint how the 10-Ks were false or misleading. Plaintiff does not, for example, allege that the 10-Ks misstated the percentage of FleetCor's revenue drawn from fees.[10] Plaintiff merely alleges in conclusory terms that they were "false and misleading or omitted necessary information to make the statements contained therein not false and misleading for the reasons stated herein." Dkt. No. [30-1] ¶ 210. This boilerplate allegation does not sustain Plaintiff's burden of identifying "with sufficient specificity the actual misstatements or omissions that constituted a violation of the board's duty of disclosure." In re Citigroup, 964 A.2d at 132–33; see also In re The Home Depot, Inc. S'holder Deriv. Litig., 223 F. Supp. 3d 1317, 1330–31 (N.D. Ga. 2016) ("By not showing specific statements in the proxy that were rendered misleading or false, the Plaintiffs have failed to demonstrate a duty on the part of the Board to disclose the information . . . ."); Freedman v. Mulva, C.A. No. 11-686-LPS-SRF, 2014 WL 975308, at *4 (D. Del. Mar. 12, 2014) (holding that demand was not excused under the Aronson test when the plaintiff "fail[ed] to allege with particularity a misstatement or omission in the Proxy Statement constituting a disclosure violation"). Notably, Plaintiff's boilerplate

---

[10] In fact, Plaintiff alleges that, "*according to its SEC filings*, FleetCor generates 76% of its net revenue from fees." DKt. No. [30-1] ¶ 58 (emphasis added). If the SEC filings properly attributed FleetCor's revenues to fees, it is unclear what about them was, in Plaintiff's estimation, false or misleading.

allegation at ¶ 210 is the only discussion of the 2015 and 2016 10-Ks appearing anywhere in the Amended Complaint.

Accordingly, the Court finds that Plaintiff has not carried his burden of pleading particularized facts showing that a majority of the Board faced a substantial likelihood of liability for approving the issuance of false statements. Plaintiff has failed to plead that the Board was responsible for any misstatement or what that misstatement might have been. Plaintiff was therefore required to make a demand upon the Board as to the misstatement claim and failed to do so. Thus, Plaintiff's misstatement claim (Count I) is **DISMISSED**.

### 3. *Insider Trading*

Plaintiff also argues that a majority of the Defendant Board Members faced a substantial risk of personal liability due to insider trading. Dkt. No. [30-1] ¶¶ 198–207. This includes Defendants Clarke, Johnson, Macchia, Farrelly, and Hagerty ("Selling Board Members"). Id. ¶ 198. To show demand futility, Plaintiff must plead "particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from the particularized pled facts that) they knew material, non-public information about the company's financial condition." Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003). As previously discussed, Plaintiff alleges that Defendants "knew the truth about the Company's financial condition and future business prospects, specifically related to . . . the Company's fraudulent billing practices, dissemination of misleading marketing materials,

23

predatory sales tactics, and lack of internal controls over financial reporting."
Dkt. No. [30-1] ¶ 235.

Defendants argue that this claim should be dismissed because Plaintiff has
failed to show (1) that the Selling Board Members possessed material, adverse,
non-public information or (2) that they traded on such information. Dkt. No. [43-
1] at 24. The Court addresses only the first issue—whether the Selling Board
Members "knew material, non-public information about the company's financial
condition." Guttman, 823 A.2d at 502; id. at 505 ("[I]nsider trading claims
depend importantly on proof that the selling defendants acted with scienter.").

The Court agrees with Defendants that, even viewed in the light most
favorable, Plaintiff's allegations do not raise a substantial likelihood that the
Selling Board Members (apart from Defendant Clarke) knew adverse, material,
non-public information. Simply put, any information that Plaintiff alleges came
to the attention of the outside directors was public. Plaintiff has not alleged
particularized facts indicating that the non-manager Selling Board Members were
aware of non-public information which they then traded on. Plaintiff raises
several arguments to the contrary, and the Court addresses each.

First, Plaintiff emphasizes that fees composed 76% of FleetCor's revenues
despite the company's advertisements that its fuel cards were "fee free." Dkt. No.
[52-1] at 25. Plaintiff argues that the Selling Board Members knew about this
inconsistency and traded upon it. Id.; see also id. at 28–29 ("Plaintiff's collective
allegations plausibly show the Board knew of the fraudulent fee scheme—

24

particularly the insider trading allegations against five the nine Board members, which subject them to a substantial likelihood of liability.").

Assuming for the sake of argument that this information was adverse and material, Plaintiff has failed to allege that the activity was non-public, an essential element of insider trading. See United States v. Riley, 90 F. Supp. 176, 198 (S.D.N.Y. 2015) ("'Information is nonpublic if it is not available to the public through such sources as [] Securities and Exchange Commission filings . . . ." (quoting United States v. Cusimano, 123 F.3d 83, 89 n.6 (2d Cir. 1997))). Rather, Plaintiff alleges that FleetCor reported in "its SEC filings" that it generated 76% of its net revenue from fees. Dkt. No. [30-1] ¶ 58; id. ¶ 80. If this is true, the public had the same information as the putative "insiders"—FleetCor's Board— concerning the percentage of FleetCor's revenue attributable to fees. So that figure could not serve as a predicate for insider trading.

The public also had access to Defendant Clarke's alleged misrepresentations, so these would not have been non-public either. Plaintiff draws its 76% figure from the portion of the securities litigation order where the Court addressed misrepresentations made to the *public*: Defendant Clarke attributed FleetCor's revenue growth to business fundamentals when it was actually due to fees. See City of Sunrise, No. 1:17-cv-2207-LMM, ECF No. [40] at 16–17 ("[T]he question is whether Defendants publicly told investors one thing about their revenue sources . . . when in fact that statement was a material misrepresentation."). A central fact of the case against Defendant Clarke was that

he publicly misattributed FleetCor's revenue growth to business fundamentals. Given this, and given that Plaintiff alleges that FleetCor publicly reported the 76%-of-revenues figure, it is unclear how this could serve as material, non-public information, a necessary predicate for insider trading.

While it is theoretically possible that outside Board Members acquired adverse, material, non-public information regarding FleetCor's "dissemination of misleading marketing materials, predatory sales tactics, and lack of internal controls over financial reporting," Dkt. No. [30-1] ¶ 235, Plaintiff has failed to plead particularized facts indicating that they did so. Plaintiff argues that the Board knew about FleetCor's fraudulent activities based on seven "red flags":

1. FleetCor's illicit revenues and fees were "closely tracked" by the Board and by employees;

2. Employees were directed to test fees on vulnerable customers;

3. Customers complained about the illicit fees to FleetCor and the Better Business Bureau and sued FleetCor over them;

4. Capitol Forum and Citron published publicly available investigative reports detailing the fee scheme;

5. FleetCor's largest customer, Chevron, sued FleetCor on May 1, 2017 for "harvesting customer accounts for fees";

6. Shareholders filed the securities case against FleetCor; and

7. Federal regulators were actively investigating Fleetcor.

Dkt. No. [52-1] at 26–27.

Each of these points viewed in the light most favorable to Plaintiff fails to show that the non-manager Selling Board Members knew of any material, non-

public information upon which they might have traded. Each of the lawsuits—including the Chevron suit, the securities action, and the FTC action—were filed after the last alleged insider trade, which took place on March 10, 2017. Dkt. No. [30-1] ¶ 179. Plaintiff alleges that the Capitol Forum report was published on March 1, 2017, nine days before the last trade, but the report was public, not insider information. Id. ¶ 13. The Citron report was published beginning on April 4, 2017 after the last trade had already occurred. Id. ¶ 13 n.2. The single customer suit cited by Plaintiff—which was for a $1,000 fee that would not likely have come to the attention of the Board—was filed in West Virginia State Court and so was also public. Id. ¶ 97. Likewise, the Better Business Bureau published the customer complaints that Plaintiff alleges put Defendants on notice of the improprieties, and Plaintiff cites only five such complaints. Id. ¶ 98.

While Plaintiff argues in his Response Brief that that Board "tracked" illicit revenues and fees, that allegation does not appear in the Amended Complaint. Instead, Plaintiff alleges that "FleetCor also carefully tracked its customer retention rate, including accounts lost and the reason for the customer attrition." Id. ¶ 144. Plaintiff does not allege that the retention rates came to the attention of the Board as he must to plead insider knowledge. And finally, Plaintiff fails to allege that the Board had any knowledge of FleetCor's "testing fees on vulnerable customers." For these reasons, the Court finds that Plaintiff's "red flags" would not have put the Board on notice of adverse, material, non-public information upon which the members might trade.

Last, Plaintiff argues that the Selling Board Members' sales mirrored Defendants Clarke and Dey's in a way that implies scienter. Plaintiff notes that the Court previously found in the securities class action that Defendant Clarke and Defendant Dey's stock sales supported the claim that they intended to defraud investors. Dkt. No. [52-1] at 29 (citing City of Sunrise, No. 1:17-cv-2207-LMM, ECF No. [40] at 23–28). Plaintiff emphasizes that the sales of the other Selling Board Members closely tracked the sales of Defendants Clarke and Dey— sometimes even occurring on the same day. Dkt. No. [30-1] ¶ 200; Dkt. No. [52-1] at 24. Thus, Plaintiff argues, the Selling Board Members were all selling on the basis of material non-public information, id. at 24–25:

- Defendant Johnson sold 20,000 shares, or 16.69% of his holdings, for $3,036,064.00 on May 10, 2016. This was on the same day that Defendant Clarke sold 290,000 shares for $43,621,800.00.

- Defendant Macchia sold 1,200 shares, or 9.60% of his holdings, for $181,430.64 on May 12, 2016, two days after Defendants Clarke and Johnson's sale. Defendant Macchia later sold 1,200 shares, or 9.25% of his holdings, for $192,621.00 on March 9, 2017. This second sale took place on the same day that Defendant Clarke sold 87,884 shares, or 22.33% of his holdings, for $14,121,403.25.

- Defendant Farrelly sold 1,200 shares, or 27.12% of his holdings, for $202,476.12 on September 7, 2016. This was on the same day that Defendant Clarke sold 63,617 shares, or 18.21% of his holdings, for $10,697,281.25.

- Defendant Hagerty sold 3,224 shares, or 65.92% of his holdings, for $518,869.59 on March 10, 2017. This sale was on

the day after Defendant Clarke sold 87,884 shares, or 22.33%
of his holdings, for $14,121,403.25.

Dkt. No. [30-1] ¶ 179.

Plaintiff also notes that the Selling Board Members sold a disproportionate number of shares after FleetCor initiated a repurchase program on February 4, 2016. Dkt. No. [30-1] ¶ 179. During the 13 months before that date, Plaintiff alleges, the Board sold a cumulative $5,601,318.18 in stock with only three board members selling. Id. During the 13 months following the beginning of the repurchase program, the Selling Board Members (plus Defendant Dey) sold a cumulative $108,787,014.34 in stock. Of these proceeds, $4,169,154.92 were Defendant Dey's, and $100,486,398.07 were Defendant Clarke's. Id.

Plaintiff is correct that the Court found the timing and size of Defendants Clarke and Dey's sales probative of scienter in the securities litigation. But Defendants Clarke and Dey, as managers, were much more directly linked to the alleged fraud. In fact, the Court found that the securities plaintiff had alleged "direct knowledge of the fraudulent free practices." City of Sunrise, No. 1:17-cv-2207, ECF No. [40] at 25. And while the stock sales qualified as "circumstantial evidence" that the managers knew the stock price was overvalued, the Court emphasized that the securities defendants' stock sales were "not independently dispositive" on the issue of scienter. Id. at 26. Rather, the stock sales "only bolster[ed] [the securities plaintiff's] scienter claims" alongside other circumstantial and direct evidence. Id.

As previously discussed, Plaintiff has failed to plead particularized facts suggesting the non-manager Selling Board Members had individualized knowledge of insider information. The trades of Defendants Clarke and Dey were "not independently dispositive" of securities fraud. If Defendants Clarke and Dey's trades were not sufficient on their own, then it stands to reason that the other Selling Board Members' trades would not subject them to a substantial risk of liability just because they mirrored the managers' sales. This is especially so where, as here, the only "insider information" alleged to have come to the Board's attention was available to the public.

Accordingly, the Court finds that, even viewed in the light most favorable, Plaintiff has failed to plead particularized facts showing that a majority of the Board faced a substantial risk of personal liability for insider trading. Plaintiff has failed to show that a majority of the Board Members were in possession of material, non-public information that they might have traded on. Plaintiff was required to demand that the Board pursue this claim and failed to do so. Thus, Plaintiff's insider trading claim (Count II) is **DISMISSED**.[11]

## IV.   CONCLUSION

Based upon the foregoing, Defendants' Motion to Dismiss [42] is **GRANTED**. The Clerk is **DIRECTED** to **CLOSE** this case.

---

[11] Counts III and IV are also **DISMISSED**. Plaintiff's unjust enrichment claim (Count III) depends upon the success of Plaintiff's other claims, and Plaintiff has not shown that demand would be excused for his contribution claim (Count IV) against Defendants Clarke and Dey only.

**IT IS SO ORDERED** this <u>21st</u> day of October, 2020.

**Leigh Martin May**
**United States District Judge**